## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| ACT NOW TO STOP WAR AND END RACISM <br> COALITION <br> 1247 E Street SE <br> Washington, D.C. 20003 <br><br> and <br><br> MUSLIM AMERICAN SOCIETY FREEDOM <br> FOUNDATION <br> 1325 G Street NW, Suite 500 <br> Washington, D.C. 20005 <br><br>        Plaintiffs, <br> v. <br><br> DISTRICT OF COLUMBIA <br> 441 Fourth Street, NW <br> Washington, D.C. 20001 <br><br>        Defendant | Civil Action No.: 07-cv-01495 (HKK) |

---

## FIRST AMENDED
## COMPLAINT FOR INJUNCTIVE RELIEF
### (declaring D.C. postering regulations to be unconstitutional
### in violation of the First Amendment and Due Process Clauses)

Political postering is a form of political communication deeply rooted in the American tradition of free speech. Like the leaflet and pamphleteering, postering is a time honored means used to compel and encourage political action.

Political candidates in the District of Columbia know that, which is why they cover the District with political posters relating to their campaign messages. Anyone who has resided in the District for any period of time is well familiar with the postering phenomena around elections in which virtually every lamp post or traffic signal in the District is covered with election campaign

signs creating a visual cacophony of political messages imploring readers to support a particular candidate or vote in support of a particular issue that arises within the campaign electoral structure. Campaign posters are allowed to remain posted for many months at a time, the entire period of their relevancy, and even well beyond that period since candidates who drop out of a race are allowed to keep their signs posted until thirty days after the general election (even if they drop out prior to or because of the primary election results).

Even broader rights are afforded to persons who wish to affix posters when the content or message is designed to prevent crime.

However different rules apply to grassroots activists, including anti-war and civil rights activists, who seek to educate the public and compel political action outside of an electoral campaign. Their speech - - core political speech at the heart of the First Amendment - - is burdened with limitations and restrictions on posting not imposed upon those engaged in favored speech.

Unmistakably, the challenged regulations directly regulate protected expression. Under existing precedent, for example, the District could enact a complete ban on posting on utility poles. See Members of Taxpayers for Vincent v. City of Los Angeles, 466 U.S. 789 (1984). However, once the District of Columbia opens a forum and elects to permit some postering, the District is required to regulate with precision and is not excused from operating within the constitutional strictures of the First Amendment and due process principles. N.A.A.C.P. v. Button, 371 U.S. 415, 432 (1963). The District has failed to heed this bedrock principle.

The District has created a hierarchy of speech within its regulation of postering. The District of Columbia postering restrictions are a classic, unconstitutional regulatory system in

which favored content or subject matter receives favored treatment and privileges and where disfavored content, including anti-war posters calling for mass assembly, is burdened with crippling and potentially bankrupting fines.

Those who poster as candidates within election politics, the well financed party based political system, have highly valued speech and are allowed exemptions from the ordinary restrictions on the duration that posters may be affixed. Anti-crime posters may remain posted forever and without limitation. Anti-war posters are required to be removed after sixty days even though the war rages on.

An anti-war or grassroots organization need not even post a single poster itself in order to be shut down and be bankrupted by the government.

The D.C. regulatory system is a "strict liability" system. This means that a group or person whose name or address is identified in a poster is liable for any misuse of that poster, even if the group or person did not actually produce the poster.

Any grassroots group that produces political literature, or graphic political posters, is strictly liable for its literature and posters being posted in violation of the regulations - - even if the group did not post the literature. Were there such an analogous strict liability system for newspapers, this would mean that *The Washington Post* would be subject to $2,000 fines every time a person "litters" by leaving a copy of the day's paper on a bench, or every time a page was found blowing in the wind. Not even this preeminent and well-established institution could withstand enforcement of such a punitive system. However, it need not worry since the government does not appear intent on sanctioning the *Post* for such "misuse" of its product.

Where the system's strict liability provisions are enforced, and the District has announced

a campaign of targeted enforcement, it also creates an extraordinary chilling effect even on the mere dissemination of political materials, flyers and posters, even though (obviously) there are many places, such as on dormitory bulletin boards, cafes, or in a person's home windows or on her walls, where such items may lawfully be placed regardless of the regulations.

The penalties for violations are extreme. A hundred cited posters is a two hundred thousand dollar fine or, alternatively, a period of public servitude that exceeds one full year (if one counts all the hours in a year and allow none for break, food, or sleep).

Furthermore, the regulations impose registration requirements - - that a person who posts political signage must register with the Mayor their name, address, telephone number and the content of their speech. This violates the protected right to engage in anonymous speech. This requirement is waived for persons who post speech in support of a candidate for office.

Yet, there are few other forms of speech more critical or core than that which opposes war. Thousands of American lives have been lost and tens of thousands have life altering injuries. Walter Reed is overflowing. Hundreds of thousands of Iraqis have died, according to the medical journal the *Lancet*.

The plaintiffs, grassroots political organizations which seek to produce and post political posters in opposition to the war, request this Court issue a prohibitory injunction that prohibits enforcement of the postering regulations in the absence of constitutionally allowable and non-discriminatory system of regulations.

## JURISDICTION AND VENUE

1.  This Court has jurisdiction to hear this complaint pursuant to 28 U.S.C. § 1331 (federal question) and 28 U.S.C. § 1343(a)(3) and (4) (civil rights jurisdiction).

4

2.     Venue is appropriately vested in this Court pursuant to 28 U.S.C. § 1391 because a

substantial part of the acts or omissions giving rise to the claims herein occurred in the

District of Columbia.

## PARTIES

3.     Plaintiff ACT NOW TO STOP WAR AND END RACISM COALITION ("ANSWER")

is a grassroots organization that engages in community and national political organizing

and activism including carrying out meetings, protests, mass demonstrations and other

educational activities and First Amendment assemblies in opposition to war and racism.

ANSWER's national headquarters are in Washington, D.C.

4.     Plaintiff MUSLIM AMERICAN SOCIETY FREEDOM FOUNDATION ("MAS

FREEDOM") is the civic and human rights advocacy entity of the Muslim American

Society (MAS), the largest Muslim grassroots, charitable, religious, social, cultural, civil

and educational organization in America - with 55 chapters in 35 states. MAS Freedom

focuses on empowering the Muslim-American community through civic education,

participation, community outreach, and coalition building including First Amendment

assemblies in opposition to war and in support of civil rights. It works to uphold the

human rights and civil liberties of all Americans, including Muslim-Americans and to

promote understanding between Muslims and non-Muslims.

5.     Defendant DISTRICT OF COLUMBIA is a municipal corporation and constitutes the

local government of Washington, D.C.

## FACTS

6.     The District of Columbia, pursuant to anti-litter laws, maintains regulations that restrict

5

the use of posters on public space to communicate ideas and messages. These regulations

are located within the District of Columbia Municipal Regulations, 24 D.C.M.R. §108.

7.    The challenged postering regulations contain content based distinctions.

8.    The challenged regulations contain distinctions based on whether the content of speech is

a) commercial ("related to the sale of goods and services"), b) non-commercial (not

"related to the sale of goods and services," c) political campaign literature (signs of

"individuals seeking office," or d) aiding crime prevention ("designed to aid in

neighborhood protection from crime"). <u>See</u> 24 D.C.M.R. §§108.4, 108.5.

9.    Commercial signs are prohibited from posting on lampposts and appurtenances. 24

D.C.M.R. §§108.1, 108.4.

10.    Noncommercial signs ("Any sign, advertisement, or poster that does not relate to the sale

of goods or services") may be affixed to any lamppost, or appurtenance to a lamppost.

11.    A lamppost is defined as any public post erected for the purpose of supporting electrical

wires.

12.    Public street lights and traffic lights are considered to be "lampposts." Traffic or utility

boxes are considered lampposts or appurtenances to lampposts.

13.    Among the three categories of regulated postering that encompass political speech or

advocacy, the greatest burdens and restrictions are placed upon grassroots political speech

generally.

14.    Posters carrying a grassroots political message[1] are subject to restrictions, including that

---

[1] By referencing posters with a "grassroots political message," plaintiffs mean non-commercial political posters which do not fall into either the category of campaign posters or aiding crime prevention.

such signs may not be affixed for more than sixty days. 24 D.C.M.R. § 108.5.

15. Favored political speech, that which is political campaign literature or designed to aid crime prevention are exempt from the sixty day limitation and may be posted for as long as the political matter retains relevance. 24 D.C.M.R. §108.5.

16. Signs of those individuals seeking election to political office may remain posted for an indefinite period of time concluding thirty days following the general election, with no fixed limit on the number of days such signs may remain posted. 24 D.C.M.R. §108.6.

17. Signs of those individuals seeking election to political office may remain posted even well beyond the period of relevancy, even for months after such individual has withdrawn from a campaign. See 24 D.C.M.R. §108.6. Campaign literature may stay up from the date that a candidate complies with certain registration requirements until thirty days after the *general* election even if the candidate lost in the primary or withdrew well before the general election.

18. Signs, the content of which are "designed to aid neighborhood protection from crime," which is presumably always relevant, may be posted forever. 24 D.C.M.R. 108.5(b).

19. As such, anti-crime posters may stay up forever, but anti-war posters must be torn down even where the death toll from war is rising daily.

20. The period of relevancy for anti-war posters and messaging exceeds sixty days. Officials within the U.S. Government assert that the so-called "war on terror," of which the war in Iraq is one component, will last a lifetime.

21. The penalty for violating the postering regulations are substantial and quasi-criminal.

22. The fourth, and each subsequent, poster that is found within a sixty-day period to be in

violation of the postering regulations subjects the responsible party to a $2,000 fine or, alternately, a period of 100 hours of servitude. One hundred such cited posters are punishable by a $200,000 fine or, alternately, 10,000 hours of labor. There are only 8,760 hours in a year.

23.     This creates a staggering chill upon postering as an exercise of constitutionally protected free speech. Any person engaged in political postering, understandably, may or will post multiple posters simultaneously in order to establish visibility.

24.     Any technical violation of the regulations (knowing or unknowing), multiplied by however many posters an individual may post, subjects the responsible party to crippling and bankrupting penalties or long-term servitude.

25.     The District imposes strict liability for violation of these regulations upon persons or groups whose name or address is identified in a poster even if the person/group did not produce the poster.

26.     If a third party produces posters that identify a grassroots political group or even advertise a First Amendment protected event sponsored by that group, strict liability may be imposed upon the grassroots political group for posting of such materials in violation of these regulations.

27.     The District also imposes strict liability upon the originator of posters that are posted in violation of the regulations, regardless of whether the originator posted the sign.

28.     If an anti-war or civil rights organization distributes posters and any of those posters are found to be unlawfully posted - - even in the absence of proof that the organization itself posted the materials - - the grassroots political organization is financially liable to the

crippling fines.

29. Constitutional law strongly disfavors, and constitutionally prohibits or restricts, the imposition of strict liability for constitutionally protected activities.

30. The District's strict liability scheme means that any organization that distributes political posters must assume the massive financial risk that any person, well intended or maliciously intended, will post their political signs in violation of the regulations.

31. The District's strict liability scheme means that any third party landlord or organization that rents or shares office space with a grassroots political organization may be subjected to citation if the shared address or telephone appears on a poster allegedly in violation of the regulations.

32. This creates an unconstitutional and severe chilling effect on free speech upon the reasonable person who wishes to communicate a political message through images and posters.

33. Reasonable persons who wish to communicate via posters or signs or art will be chilled in the distribution of their work where the risk is that some third-party can actually cause their bankruptcy and financial ruin through a pattern of unlawful posting.

34. Reasonable third parties who wish to lease office space or engage in political association with grassroots groups which engage in postering will be chilled where such association can subject the third party to financial penalty for alleged wrongful free free speech postering.

35. Yet, the originator of political posters is simply engaging in what is deeply within the American political tradition.

36.   The District's postering regulatory system is precisely the sort of severe and

discriminatory system that is intended to be precluded by operation of the First

Amendment. The Supreme Court has repeatedly warned against regulatory systems which

use restrictions and exemptions to favor certain speech based on content.

> "[A]n exemption from an otherwise permissible regulation of speech may represent
> a governmental 'attempt to give one side of a debatable public question an advantage
> in expressing its views to the people." First Nat. Bank of Boston v. Bellotti, 435 U.S.
> 765, 785-786 (1978). Alternately, through the combined operation of a general
> speech restriction and its exemptions, the government might seek to select the
> 'permissible subjects for public debate,' and thereby to 'control . . . the search for
> political truth.' Consolidated Edison Co. of N.Y. v. Public Serv. Comm'n of N.Y.,
> 447 U.S. 530, 538 (1980)." City of Ladue v. Gilleo, 512 U.S. 43, 51 (1994).

37.   In the instant regulatory system, the result is that messages favored by the government,

including specifically those expressed through party politics and the candidate election

process, may remain posted for the full period of relevancy, but messages expressed outside

of this particular system by the grassroots to the people on issues of great public concern, are

subject to time restrictions and potential financial sanction. Likewise, anti-crime messages

are also more protected as important speech.

38.   Yet, anti-war posters merit no less protection than these other forms of political speech.

Courts have acknowledged that expression that protests a decision to go to war is "absolutely

pivotal speech." City of Ladue, 512 U.S. 43, 54 (1994). This is painfully clear to the families

of those service members who have had sons and daughters kill and be killed in this war, as

well as to those families whose members have suffered or been killed in the Middle East.

39.   Furthermore, the regulations impose registration requirements - - that a person who posts

political signage - - actually register with the Mayor their name, address, telephone number

and the content of their speech. 24 D.C.M.R. §108.11. This violates the protected right to engage in anonymous speech. This requirement is waived for persons who post speech in support of a candidate for office.

40.    The regulations impose penalties for such non-harmful conduct such as the failure to affix the date on which it was posted, 24 D.C.M.R. §108.7, which serves no legitimate interest apart from the unconstitutional duration limitations.

41.    There is no compelling government interest that weighs in favor of maintaining the above-referenced content-based distinctions.

42.    The regulations are unconstitutionally vague. They fail to provide objective criteria to preclude unconstitutional discretion by administrator and fail to place reasonable individuals on notice as to what type of postering is acceptable under the regulations. See, e.g.., 24 D.C.M.R. §§108.8 - 108.9 (regarding use of adhesives), 108.10 (imposing per limitations on number of "versions" of signs on one side of a street per each block, without providing any definition as to what constitutes a block or how posters on lampposts at the corner of a block are to be counted with respect to each adjacent side of the block or what constitutes a "version" of a poster); 24 D.C.M.R. §§108, et seq. (Fail to set forth guidelines for imposing strict liability or any rebuttable presumption of liability).

43.    The regulations are so imprecise as to allow arbitrary application.

44.    The regulations burden substantially more speech than necessary to advance any legitimate government interest.

45.    The regulations do not constitute reasonable time, place and manner restrictions.

46.    The existing regulatory system pertaining to postering on public space and public lamps,

11

and appurtenances, is utterly and plainly unconstitutional and cannot be remedied through judicial limitation or interpretation. It is unconstitutionally void.

## COUNT ONE
### (Violation of the First Amendment and Due Process Clauses)

47.   Plaintiffs reallege and incorporate by reference the allegations set forth in paragraphs 1 through 46, as if set forth herein.

48.   The District of Columbia violates the free speech and petition rights of plaintiffs arising pursuant to the First Amendment to the U.S. Constitution, the Due Process clause, and 42 U.S.C. § 1983 by maintaining an unconstitutional regulatory scheme to restrict the use of political posters upon public space.

49.   Plaintiffs seek to engage in or associate with postering on issues of public import, including advocacy challenging the U.S. Government's war policies and in support of civil rights and constitutional liberties, and are harmed and/or threatened by severe financial penalty through enforcement of the postering regulations.

## PRAYER FOR RELIEF

WHEREFORE, the plaintiffs request that this Honorable Court:

A.   Declare the postering regulations at 24 D.C.M.R. §108 to be unconstitutional;

B.   Issue an injunction to enjoin enforcement of the existing postering regulatory provisions as applied to political speech until such time as a lawful and constitutionally sound permitting system may be enacted;

C.   Award reasonable attorneys' fees and costs; and

D.   Any other relief the court deems just and appropriate.

12

December 18, 2007

Respectfully submitted,

Carl Messineo (#450033)
PARTNERSHIP FOR CIVIL JUSTICE

Mara Verheyden-Hilliard (#450031)
PARTNERSHIP FOR CIVIL JUSTICE
2401 Pennsylvania Ave., NW, Ste 320
Washington, D.C. 20037
T. 202.955.5559  F. 202.955.5589

13