## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| ACT NOW TO STOP WAR AND END | ) | |
| RACISM COALITION, *et al*., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| v. | ) | Civil Action No.: 07-cv-01495 (HHK) |
| | ) | |
| DISTRICT OF COLUMBIA, | ) | |
| | ) | |
| Defendant. | ) | |
| ——————————————————— | ) | |

## PLAINTIFFS' OPPOSITION TO
## DEFENDANT'S MOTION TO DISMISS

Political postering, which is analogous to leafleting, is an historic and protected means for conveying political thoughts, ideas and energizing movements at the grassroots level. The constitutional rights of free speech accrue to the benefit not only of those with means to purchase advertisements, or those whose views are in line with the government, or that reflect established interests or political parties, but to all - - including those who engage directly in democratic action or criticism of government policies through the time honored traditions of political postering.

> "The liberty of the press is not confined to newspapers and periodicals. It necessarily embraces pamphlets and leaflets. These indeed have been historic weapons in the defense of liberty, as the pamphlets of Thomas Paine and others in our own history abundantly attest. The press in its historic connotation comprehends every sort of publication which affords a vehicle of information and opinion. What we have had recent occasion to say with respect to the vital importance of protecting this essential liberty from every sort of infringement need not be repeated."

Lovell v. Griffin, 303 U.S. 444, 452 (1938) (declaring as facially void, a municipal ordinance which required registration and license in order to distribute leaflets)

The case before this Court does not arise in the context of an absolute ban on postering on public lampposts and appurtenances. It presents a case in which the municipal government of

the District of Columbia has opened that forum to postering, but then unconstitutionally burdened those who post disfavored content with strict restrictions on duration, with other conditions, as well as the risk of severe financial sanction for violations. Those who post signs with government favored content, that which challenges local crime or which carries the message of candidates speaking within the establishment electoral process, are not subject to these same restrictions and do not risk such sanctions. This arrangement is even more pernicious than an ordinance which would ban political postering outright on public lampposts, for a ban on this form of communication so deeply rooted in the District's political process might engender a political reaction. Here, the District has crafted a system of postering authorities and penalties such that those whose messages are favored by the government can post freely and with relatively little risk. Those, like plaintiffs, who wish to engage in grassroots activism including advocacy that condemns the U.S. war and occupation in Iraq have their free speech rights abridged and risk crippling and severe financial penalties should they seek to post in the same manner as is allowed persons campaigning for elected office or speaking against neighborhood crime.

The District of Columbia has established a patently unconstitutional system that grants privileges and imposes restrictions on postering activity based on the content of the message expressed. It is a content-based system that is void on its face, for there is no conceivable basis and certainly no compelling state interest (and, notably, none offered by the defendant in its motion) justifying this content based regulation of protected expressive conduct.[1]

---

[1] The applicable constitutional framework was described by one U.S. District Court as follows:
"[The Supreme] Court has held time and time again: 'Regulations which permit the government to discriminate on the basis of the content of the message cannot be tolerated under the First Amendment.' Forsyth County, 505 U.S. at 135, quoting, Regan v. Time, Inc., 468 U.S. 641, 648-49 (1984). Content-based regulations, particularly those that discriminate against political speech, are subject to 'the most exacting scrutiny.' Bartnicki v. Vopper, 200 F.3d 109, 121 (3d Cir. 1999), aff'd, 532 U.S. 514 (2001). To meet the exacting standard of strict scrutiny, the government must prove that the content-based regulation is necessary to serve a compelling governmental interest and is

Before the Court are two organizational plaintiffs, each with independent standing to raise on their own behalf and on behalf of others a facial challenge to this unconstitutional, overbroad and discriminatory set of regulations. The District of Columbia asks this Honorable Court to dismiss the challenge to this patently unconstitutional system on prudential considerations of abstention.

For the reasons stated below, the Court should deny the District of Columbia's motion.

I.     **<u>Younger</u> Abstention is Not Applicable Where Plaintiffs Do Not Seek to Enjoin any Administrative Enforcement Action, But Instead Present a Broad and Specific Constitutional Facial Challenge to Postering Regulations that are Overbroad, Content-based and that Objectively Chill First Amendment Protected Activity**

The two organizational plaintiffs, the ANSWER Coalition (Act Now to Stop War & End Racism) and the Muslim American Society Freedom Foundation (MASF) challenge the District of Columbia's postering regulations as being flagrantly and patently unconstitutional as those regulations establish a hierarchy of favored and disfavored speech based on an apparent ranking of the perceived importance of content. <u>See</u> First Amended Complaint at 2 – 4; <u>id.</u> at 6, ¶¶7 – 10; <u>id.</u> at 6 – 7, ¶¶13-20; <u>id.</u> at 10, ¶¶36 - 38 (unconstitutional hierarchy established based on whether content of speech is commercial or "related to the sale of goods or services," non-commercial or advocacy or not "related to the sale of goods or services," political campaign literature or signs of "individuals seeking office," or "designed to aid in neighborhood protection from crime"). The regulatory system uses restrictions and exemptions and selectively imposes strict burdens and limitations based on the messaging content of the poster. <u>See</u> First Amended Complaint at 2-4; <u>id.</u> at 6, ¶¶7 – 20; <u>id.</u> at 10 – 11, ¶¶36 – 41.

---

narrowly drawn to achieve that end. <u>Id.</u>" <u>Bell Vista United v. City of Philadelphia</u>, Civil Action No. 04-1014 (E.D.Pa. 2004) at 16.

Anti-crime posters may be posted forever. Political campaign literature may be posted for an indefinite amount of time and even long after a candidate has withdrawn from a race. Yet sixty day limits are imposed on grassroots political advocacy speech, including anti-war speech, despite the fact that the war and occupation rage on. See First Amended Complaint at 2- 4; id. at 6 – 7, ¶¶14 – 20.

The two organizational plaintiffs also challenge the postering regulations as being flagrantly and patently unconstitutional as they require registration with the government to engage in political postering, thereby prohibiting anonymous postering,[2] although that requirement is waived if the content of the speech is political campaign literature. See First Amended Complaint at 4; id. at 10 – 11, ¶39.

The two organizational plaintiffs also challenge the strict liability and vicarious liability scheme of enforcement,[3] whereby the government claims the authority to issue citations and financial penalties to persons/groups who merely associate with those who engage in postering, including to landlords or persons who rent or share office space in the same building, and

---

[2] "There can be no doubt that such an identification requirement would tend to restrict freedom to distribute information and thereby freedom of expression. . . . Anonymous pamphlets, leaflets, brochures and even books have played an important role in the progress of mankind. Persecuted groups and sects from time to time throughout history have been able to criticize oppressive practices and laws either anonymously or not at all. The obnoxious press licensing law of England, which was also enforced on the Colonies was due in part to the knowledge that exposure of the names of printers, writers and distributors would lessen the circulation of literature critical of the government. " Talley v. California, 362 U.S. 60, 64 (1960) (declaring unconstitutional an ordinance requiring that handbills have printed on them the names of persons who distributed or sponsored them); See also Watchtower Bible and Tract Society, Inc. v. Village of Stratton, 536 U.S. 150 (2002) (registration requirement to canvas violates First Amendment) ; But see 24 D.C.M.R. §108.11 ("Within twenty-four (24) hours of posting each sign, advertisement or poster, two (2) copies of the material shall be filed with an agent of the District of Columbia so designated by the Mayor. The filing shall include the name, address, and telephone number of the originator of the sign, advertisement, or poster.").

[3] "[A]n individual may [not] be held liable for damages merely by reason of his association with others who committed unlawful acts." N.A.A.C.P. v. Claiborne Hardware, 458 U.S. 886, 920 n.56 (1982) (oft cited for the principle that the First Amendment does not tolerate guilt by association). The concept of due process likewise requires that guilt be personal. See, e.g., Scales v. United States, 367 U.S. 203, 225 (1961). Where First Amendment freedoms are at stake, an even greater degree of specificity and clarity of laws is required. N.A.A.C.P. v. Button, 371 U.S. 415, 432-33 (1963) ("Because First Amendment freedoms need breathing room to survive, government may regulate in the area only with narrow specificity.").

regardless of who actually posted any poster at issue. <u>See</u> First Amended Complaint at 8 – 9, ¶¶25 – 34.

The two organizational plaintiffs also challenge the regulations as unconstitutionally vague, in particular with respect to the failure to place persons on notice as to what are allowable or prohibited adhesives and for vagueness in the definition of what constitutes a "block" or a "version" of a poster for the purpose of enforcing a limitation of 3 versions of a poster per block. <u>See</u> First Amended Complaint at 11, ¶42; 24 D.C.M.R. §108.10 ("No more than three (3) versions or copies of each sign, advertisement or poster shall be affixed on one (1) side of a street within one (1) block.")

As reflected above, the two organizational plaintiffs present a broad-scale and specific constitutional challenge to the postering regulations that sweep across the full scope of their breadth.

Independently and collectively these regulations objectively chill postering and expressive activity. If a person or group wishes to poster on anti-war or civil rights issues to the same extent that persons are allowed to poster on anti-crime issues, that person or group must be willing to accept bankrupting financial penalties. <u>See</u>, D.C. Law 15-205 of 2004 (fine for the 1st violation is $150 or 8 service hours, for 2nd violation is $300 or 16 service hours, for 3rd violation is $600 or 32 hours, and for 4th or greater violation is $2000 or 100 service hours), The same draconian sanctions await any person or group that seeks to poster to the same extent as is otherwise allowed by the District to individuals seeking office or posting electoral campaign literature.

In response to this broad and specific constitutional challenge, the District of Columbia urges abstention by pointing to notices of infraction citing the ANSWER Coalition for allegedly

violating one provision of the regulations, the adhesive clause, which prohibits the posting of posters "affixed by adhesives that prevent their complete removal from the fixture or that do damage to the fixture." See Def's Memo. at 3; 24 D.C.M.R. §108.9.

Understanding the related enforcement proceedings to be properly confined to that which is reflected on the face of the notices of infraction, specifically whether there has been a violation in certain instances of the adhesive clause, there is no reason to anticipate (as the District argues in its legal argument) that the ANSWER Coalition "may raise any and all of its asserted constitutional issues there." Def's Opp at 3.

First, the administrative hearing will not allow or entertain constitutional challenges to the underlying regulations. This position has been reiterated by the Administrative Judge in the current citation hearings. See 1 D.C.M.R. 512.9 (prohibiting hearing examiner from refusing to enforce provision where provision is repugnant to the U.S. Constitution).

Second, accepting the issue in administrative proceedings as the District frames it, even where constitutional defenses were asserted[4] there would be little reason to reach and adjudicate constitutional issues. Either the ANSWER Coalition used adhesive that damaged public property when posters were removed or it didn't. This is a factual issue, not a constitutional issue. No party stands before this Court to argue, as the District suggests, the existence of a First Amendment right to permanently damage public property. See, Def's Memo at 3 ("The District has a valid esthetic interest in ensuring that public property is not permanently marred or damaged by improperly attached posters. . ."). That is not what the case before this Court is

---

[4] The administrative proceedings are not adequate for the airing of constitutional defenses, particularly those that are fact based such as defenses based on bad faith, retaliatory intent, unconstitutional targeting and selective enforcement. No discovery is allowed the respondent as a matter of right in the administrative proceeding. 1 D.C.M.R §2823. The administrative judges lack the legal competency to entertain constitutional challenges. See 1 D.C.M.R. §512.9 ("In deciding appeals, a hearing committee shall not have the authority to refuse to enforce any statute, rule or regulation of the United States or of the District of Columbia on the ground that it is repugnant to the Constitution of the United States.").

about. The District of Columbia mischaracterizes the thrust of the present case in order to make its misplaced argument for dismissal.

This case presents a challenge far broader in scope than fine regulatory details about allowable adhesives.

Right now, those who wish to poster against the war and occupation of Iraq risk substantial penalties for leaving posters up indefinitely or at least for the duration of the occupation or even for the several month period in advance of a mass action necessary to build a demonstration. Yet, at the very same time, those who speak out against neighborhood crime may leave their posters up forever. Signs with content challenging neighborhood crime are favored, signs with content challenging war crimes are disfavored.

Likewise, signs with content supporting a candidate for election are favored while signs with content challenging political decisions are disfavored. Those who seek elected office may leave their signs up for as many months as they remain relevant to an election and even long after a candidate has withdrawn from a race. Any anti-war group that posts similarly will be crushed and extinguished by fines and draconian penalties. One hundred cited posters leads to a two hundred thousand dollar fine or, alternatively, a period of servitude that exceeds one full year (if one counts all of the hours in a year, and leaves none for food, sleep or breaks). See D.C. Law 15-205 of 2004, "Fiscal Year 2005 Budget Support Act of 2004," (4th and subsequent violations penalized each with $2,000 fine or 100 hours of public service).

Bizarrely, and without any factual basis whatsoever, the District of Columbia contends this has no chilling effect on constitutionally protected speech. See Def's Memo. at 3 ("neither plaintiff has shown the realistic potential for a 'chilling effect' on the exercise of any constitutional right.").

No reasonable person or organization can fully exercise their rights under this threat. See, New York Times Co. v. Sullivan, 376 U.S. 254, 277 (1964) ("[T]he fear of damage awards . . . may be markedly more inhibiting than the fear of prosecution under a criminal statute.").

The anti-war ANSWER Coalition has expended substantial organizational resources to voluntarily remove posters to avoid such penalties based on duration of posting - - even though anti-war posters maintain their relevancy as the war and occupation of Iraq continues. See Exhibit 1, Affidavit of Brian Becker at ¶¶4 – 6.

The constituency of plaintiff Muslim American Society Freedom Foundation is one that has been targeted by the government and has great concerns about the risk of bringing the force of the state upon it by the full exercise of their rights through postering on issues of public import and debate. See Exhibit 2, Affidavit of Imam Mahdi Bray at ¶4. They, too, must refrain from using posters the same way as is allowed those whose speech pertains to neighborhood crime or whose speech supports a candidacy for elected office. Id. at ¶¶5 – 6.

The injury to these plaintiffs is not only imminent, it is *current and ongoing*.

Historically, social change - - including popular action to force the cessation of unjust war or policies - - has come from the popular expression of speech and democratic action. Hence, the primacy of the protection of free speech as the First Amendment to the U.S. Constitution. Few restrictions manifest a more flagrant violation of the First Amendment than those which regulate and restrict based on the content of speech, much less establish a formalized hierarchy as do the District regulations.

The District's apparent interests lie in the protection of election related speech and in the preservation of posters the substance of which is designed to prevent neighborhood crime. Grassroots political speech outside of the limited electoral process is not the interest of the

District of Columbia government. Anti-war activists, including the plaintiffs, cannot afford access to television or radio ads or even billboards as can the major political parties. Grassroots activism, which may be the most direct form of democratic action, relies on posters, on leaflets, on person-to-person and low cost person-to-public means of communication. Yet, speech consisting of grassroots activism is discriminated against on the basis of content with the District's regulation of postering activity.

In its motion to dismiss, the District of Columbia presents no compelling state interest to justify this content-based discrimination. No relevant case law suggests, and all relevant case law rejects, that personal preference or aesthetics justifies content based discrimination. The District of Columbia offers no argument that its discriminatory and hierarchical content-based ranking and restriction of speech survives strict scrutiny. That is because there is no such argument. This is a plainly unconstitutional abridgment of speech and expressive activity.

The District of Columbia returns in its argument repeatedly to the contention that government has an interest in aesthetics and may regulate conduct in furtherance of that interest. Yet the District's regulations are content-based and not a neutral aesthetically driven constraint. Plaintiffs do not dispute that avoidance of visual clutter or aesthetics may, under existing case law, form a legitimate state interest that may be advanced in a non-discriminatory and constitutional manner by the District of Columbia. However, the District of Columbia does not have an objection to postering generally based on aesthetics. Having opened the forum of public lampposts and appurtenances to postering, the District of Columbia may not restrict access or use of that forum on the basis of content of speech, particularly political content that is at the core of the First Amendment's protections.

## II.     Abstention Is Not Appropriate in the Face of the Flagrant and Constitutional Violations Manifest in the Challenged Regulations

The District concurs that the <u>Younger</u> abstention doctrine does not apply where the federal plaintiff presents a flagrant and patent constitutional violation. Def's Memo. at 6; <u>See also</u> <u>JMM Corp.</u>, 378 F.3d at 1122, <u>citing</u> <u>Younger v. Harris</u> 401 U.S. 37, 53 – 54 (1971) (abstention doctrine not applicable where flagrant and patent constitutional violation present); <u>Dumbrowski v. Pfister</u>, 380 U.S. 479, 489-90 (1965) ("We hold the abstention doctrine is inappropriate for cases such as the present one where. . . statutes are justifiably attacked on their face as abridging free expression, or as applied for the purpose of discouraging protected activities.")

Accordingly, abstention is neither appropriate nor mandated in this case.

The District of Columbia's regulations of postering are nothing less than a shocking and flagrant violation of the First Amendment. There are few offenses more anathema to, and more clearly proscribed by, the First Amendment than government action that restricts speech or, as in this case, creates a hierarchy of speech restrictions based on content.

This is a far cry from the circumstance in <u>JMM Corp. v. District of Columbia</u>, 378 F.3d 1117 (D.C. Cir. 2004), where the Court of Appeals explicitly observed that the zoning situation in that case was not "flagrantly and patently" in violation of the Constitution, particularly given the multiple U.S. Supreme Court cases upholding such zoning regulation of porn shops in the face of First Amendment challenges. <u>JMM Corp. v. District of Columbia</u>, 378 F.3d 1117, 1127 (D.C. Cir. 2004).

The District of Columbia intentionally misrepresents plaintiffs' claims when the District claims that "plaintiffs have not alleged" the postering regulations to be flagrantly and patently unconstitutional. Defs' Memo. at 6. This is demonstrably false.

Plaintiffs, in the First Amended Complaint, assert that

"The District's postering regulatory system is precisely the sort of severe and discriminatory system that is intended to be precluded by operation of the First Amendment. The Supreme Court has repeatedly warned against regulatory systems which use restrictions and exemptions to favor certain speech based on content.

'[A]n exemption from an otherwise permissible regulation of speech may represent a governmental 'attempt to give one side of a debatable public question an advantage in expressing its views to the people.' First Nat. Bank of Boston v. Bellotti, 435 U.S. 765, 785-786 (1978). Alternately, through the combined operation of a general speech restriction and its exemptions, the government might seek to select the 'permissible subjects for public debate' and thereby to 'control . . . the search for political truth.' Consolidated Edison Co. of N.Y. v. Public Serv. Comm'n of N.Y., 447 U.S. 530, 538 (1980).' City of Ladue v. Gilleo, 512 U.S. 43, 52 (1994)."
First Amended Complaint at 10, ¶36.

Plaintiffs also assert that

"The District has created a hierarchy of speech within its regulation of postering. The District of Columbia postering restrictions are a classic, unconstitutional regulatory system in which favored content or subject matter receives favored treatment and privileges and where disfavored content, including anti-war posters calling for mass assembly, is burdened with crippling and potentially bankrupting fines."
Id. at 2 – 3.

Plaintiffs also observe the flagrancy of the violation, asserting that

"[A]nti-war posters merit no less protection than these other forms of political speech. Courts have acknowledged that expression that protests a decision to go to war is 'absolutely pivotal speech.' City of Ladue, 512 U.S. 43, 54 (1994)."
Id. at 10, ¶38.

Plainly, the gravamen of the plaintiffs' complaint is that the postering regulations are patently and flagrantly unconstitutional.

## III.    MASF and the ANSWER Coalition Independently Have Standing

Under traditional and ordinary rules of standing, a group which has present objective harm or threat of a specific future harm has standing. See Def's Memo. at 16 citing Laird v.

Tatum, 408 U.S. 1, 14 (1972); See also Lujan v. Defenders of Wildlife, 504 U.S. 555, 560 – 61

(1992) (standing exists where there is injury in fact, the injury is fairly traceable to the

challenged conduct, and is likely to be redressed by a favorable decision).

Both plaintiffs in this case, the ANSWER Coalition and MASF, have standing. *These*

*organizations' constitutionally protected freedoms are currently injured.* See, Elrod v. Burns,

427 U.S. 347, 373-374 (1976) ("The loss of First Amendment freedoms, for even minimal

periods of time, unquestionably constitutes irreparable injury"); See also Branch v. F.C.C., 824

F.2d 37 (D.C. Cir. 1987), quoting Elrod v. Burns, 427 U.S. 347, 373 – 374 (1976).

Both MASF and the ANSWER Coalition are currently refraining from posting materials

on public lampposts and appurtenance to the extent as is allowed those engaging in favored

speech because of the existence of the postering regulations and the severe penalties imposed for

violations. See Exhibit 1, Affidavit of Brian Becker at ¶¶3,7; Exhibit 2, Affidavit of Imam Mahdi

Bray at ¶5 Most fundamentally, this harms and discriminatorily limits these organizations'

abilities to reach out and communicate to the public at large through posters. See Exhibit 1,

Affidavit of Brian Becker at ¶5; Exhibit 2, Affidavit of Imam Mahdi Bray at ¶6.

The ANSWER Coalition has been forced to expend its limited organizational and

volunteer resources in order to physically remove posters to avoid penalties for posting them for

the same duration as is allowed for campaign posters or anti-crime posters. See Exhibit 1,

Affidavit of Brian Becker at ¶¶4 – 6. This diversion of resources detracts from their primary

organizational purposes, including engaging in anti-war and anti-racism advocacy. Id. at 5; See

Havens Realty Corp. v. Coleman, 455 U.S. 363, 379 (1982) (standing conferred by frustration of

purpose and related diversion of resources). The Coalition must also divert organizational and

human resources to counsel new volunteers, many of whom are concerned about, and

discouraged from, engaging in postering because of the risk of enormous personal fines. <u>See</u> Exhibit 1, Affidavit of Brian Becker at ¶7.

These circumstances all present cognizable and direct injury-in-fact that meet the traditional requirements for standing.

In addition to direct standing, the plaintiffs also assert third-party standing on behalf of the First Amendment interests of others not directly before the Court. <u>See</u> Exhibit 1, Affidavit of Brian Becker at ¶8 (brings suit on behalf of self and others); Exhibit 2, Affidavit of Imam Mahdi Bray at ¶3 (same).

The impermissible risk of chilling free speech is of such constitutional magnitude and concern that the U.S. Supreme Court has created an exception from the general standing rules to allow parties to present facial challenges to statutes or regulations that have the potential to chill expressive activity. <u>See</u>, <u>Forsyth County v. Nationalist Movement</u>, 505 U.S. 123, 129 (1992); <u>Thornhill v. Alabama</u>, 310 U.S. 88, 97 (1940); <u>Freedman v. Maryland</u>, 380 U.S. 51, 56 (1965); <u>See</u> <u>also</u> <u>Virginia v. American Booksellers Ass'n</u>, 484 U.S. 383, 392-93 (1988) (plaintiff may also bring claims on behalf of those who would be chilled from constitutionally protected speech or expression through challenged action); <u>Secretary of State of MD v. J.H. Muson Co.</u>, 467 U.S. 947, 956-57 (1984); <u>Broadbrick v. Oklahoma</u>, 413 U.S. 601, 612 (1973).

"This exception from general standing rules is based on an appreciation that the very existence of some broadly written laws has the potential the chill the expressive activity of others not before the Court." <u>Forsyth</u>, 505 U.S. at 129 – 130. This exception expressly encompasses "cases where the ordinance sweeps too broadly, penalizing a substantial amount of speech that is constitutionally protected." <u>Id.</u> at 130.

"It has long been recognized that the First Amendment needs breathing space and that statutes attempting to restrict or burden the exercise of First Amendment

13

rights must be narrowly drawn and represent a considered legislative judgment that a particular mode of expression has to give way to other compelling needs of society. As a corollary, the Court has altered its traditional rules of standing to permit — in the First Amendment area — 'attacks on overly broad statutes with no requirement that the person making the attack demonstrate that his own conduct could not be regulated by a statute drawn with the requisite narrow specificity.' _Dombrowski_ v. _Pfister_,  380 U.S., at 486. Litigants, therefore, are permitted to challenge a statute not because their own right of free expression are violated, but because of a judicial prediction or assumption that the statute's very existence may cause others not before the court to refrain from constitutionally protected speech or expression."

Broadrick v. Oklahoma, 413 U.S. 601, 611 - 12 (1973)

In other words, even absent an enforcement action alleging violation of the particular provisions of the regulations at issue, a plaintiff may bring a facial challenge where a rule risks chilling protected expression. See, id. at 129.

Plaintiffs have standing under this broader recognition of standing in the context of the First Amendment.[5] No one, except someone with extraordinary financial means, can afford to post anti-war posters and leave them up as if they were anti-crime or campaign posters.

Plaintiffs' challenge to the postering regulation system is a classic facial overbreadth challenge. While the District could exercise a cognizable interest in regulating postering, the manner in which it has chosen to regulate is discriminatory, sweeps far too broadly and encompasses an enormous amount of protected activity within its proscriptions. Of course, there is no need to exhaust administrative remedies where a facial challenge lies. See, Lakewood v. Plain Dealer Publishing Co., 486 U.S. 750, 755 - 762 (1988).

The District of Columbia is simply wrong that broader First Amendment standing applies only in criminal contexts. See, e.g., Forsyth County v. Nationalist Movement, 505 U.S. 123, 129 (1992) (in civil challenge, holding unconstitutional an ordinance authorizing county

---

[5]    Remarkably, the District of Columbia cites the case of ANSWER Coalition v. Kempthorne, 493 F.Supp.2d 34 (D.D.C. 2007) to suggest that the Court in that case ruled against the ANSWER Coalition on this particular application of standing. See Def's Memo. at 16. In fact the Court found that ANSWER did have standing.  Id.

administrator to impose a fee on issuance of demonstration permits). There is nothing in the District's referenced case, <u>Parker v. District of Columbia</u>, 478 F.3d 370, 375 (D.C. Cir. 2007) that so holds.

The District's citations to <u>Navegar, Inc. v. Unites States</u>, 103 F.3d 994, 998 (D.C. Cir. 1997) and the considerably more recent post-<u>Navegar</u> case of <u>Seegars v. Gonzalez</u>, 396 F.3d 1248 (D.C. Cir. 2005) are equally misplaced.

The D.C. Circuit was clear in its treatment of <u>Seegars</u>, which was a pre-enforcement challenge to a criminal statute restricting gun ownership, that it distinguished this particular context from that of pre-enforcement standing to challenge statutes that regulate or restrict expression in the First Amendment context. <u>See</u> <u>Seegars</u>, 396 F.3d at 1254 (distinguishing the gun control challenge from cases upholding pre-enforcement review in the First Amendment context).

The <u>Seegars</u> Court was equally clear when it distinguished the lack of standing for plaintiffs to challenge non-First Amendment statutes from a challenge to regulations, as are the postering regulations. <u>Seegar</u>, 396 F.3d at 1253 ("We cannot help noting that <u>Navegar</u>'s analysis is in sharp tension with standard rules governing preenforcement challenges to agency regulations, where an affected party may generally secure review before enforcement . . .").

The <u>Seegar</u> and <u>Navegar</u> cases are limited to the non-First Amendment contexts in which they arise, as is reflected by the <u>Seegar</u> ruling:

> "Despite these apparent tensions [with the First Amendment cases and with pre-enforcement regulation review], we faithfully apply the analysis articulated by <u>Navegar</u>. We do so *not* because it represents our 'law of firearms.' <u>See</u> <u>generally</u> Frank H. Easterbrook, *Cyberspace and the Law of the Horse*, 1996 U. Chi. Legal F. 207, 207-08 (1996). We do so because it represents the only circuit case dealing **with a non-First Amendment** preenforcement challenge to a criminal statute that has not reached the court through agency proceedings. <u>See</u> <u>LaShawn v. Barry</u>, 87 F.3d 1389, 1395 (D.C. Cir. 1996) (en banc)."

Seegars v. Gonales, 396 F.3d 1249, 1254 (D.C. Cir. 2005) (boldface added).

The District's citation to Laird v. Tatum, 408 U.S. 1 (1972) is irrelevant to the current case. Plaintiffs' injury in this case is not a "mere subjective chill." It is in marked contrast to the instant case which presents current and direct injury-in-fact as well as an objective chill of protected rights. In Laird, the plaintiffs claimed a mere subjective chill arising from a program that lawfully collected information about public activities with principal sources of information being the public news media and publications in general circulation as well as public meetings. Laird, 408 U.S. at 6. Aside from the mere subjective personal disturbance at the existence of the program, the Laird plaintiffs "failed to allege any action on the part of the Army that was unlawful in itself and further failed to allege any injury or any realistic threats to their rights growing out of the Army's actions." Id. at 8. Counsel in Laird explained that plaintiffs' alleged injury-in-fact was that "in some future civil disorder of some kind, the Army is going to come in with a list of troublemakers . . . and go rounding up people and putting them in military prisons somewhere." Laird at 8-9 n.5. At another opportunity, Laird counsel represented "We're not quite sure exactly what they have in mind and that is precisely what causes the chill, the chilling effect." Id.

Laird is simply inapplicable to the case now before the Court.

IV.    **The ANSWER Coalition is Not Barred By _Res Judicata_ From Challenging the Constitutionality of this Patently Unconstitutional System**

The argument regarding _res judicata_, of course, has no bearing at all on the standing or claims of MASF which is not in any way in privity with the ANSWER Coalition.

The District of Columbia begins its _res judicata_ argument by making the distinction between issue preclusion and claim preclusion, the two distinct applications of the principles of

preclusion. For reasons stated below, there is no basis for preclusion within either of these frameworks.

The ANSWER Coalition does not dispute that the sole prior occasion on which it was ever issued a ticket for allegedly improper postings on D.C. public space was the issuance of three citations dated March 18, 2002[6] which became the subject of administrative proceedings.

The District of Columbia does not argue that there is any *issue preclusion* from the three prior tickets. Citing case law, the District accurately recites that in order for there to be issue preclusion there must be an "issue [that] was actually and necessarily determined by a court of competent jurisdiction" in a prior proceeding. Defs' Memo. at 12, citing, Beverly Health & Rehabilitation Svcs, Inc. v. NLRB, 317 F.3d 316, 322 (D.C. Cir. 2003).

There were three stages to those proceedings. There was, first, an administrative hearing regarding the citations. Although the ANSWER Coalition sought to present constitutional legal and factual defenses, the hearings examiner refused to entertain them on the basis that hearings examiners lacked legal competency to do so. See 1 D.C.M.R. § 512.9 ("In deciding appeals, a hearing committee shall not have the authority to refuse to enforce any statute, rule or regulation of the United State or of the District of Columbia on the ground that it is repugnant to the Constitution of the United States.").

The second stage was an appeal to the Board of Appeals and Review. The District of Columbia concedes that the BAR declined to determine any constitutional issues. See Def's Memo. at 11 ("The BAR also noted that while it was 'authorized to consider issues of constitutionality, and both parties had extensively briefed the issue, it concluded that 'this issue in this case should be left for consideration by the District of Columbia Court of Appeals if appellant so choose [sic] to file an appeal there.").

---

[6] Infraction notices Nos. 328966-1, 328965-0, 328967-2 (March 18, 2002).

In the third stage, the D.C. Court of Appeals declined to review the matter further, citing a lack of jurisdiction, based on the fact that no appeal had been filed within the requisite fifteen day appeal period for appeal of an administrative decision. There is no suggestion by the District of Columbia that any constitutional issue was determined or adjudicated by this action.

The District of Columbia does, however, argue *claim preclusion*, that the ANSWER Coalition could have raised constitutional defenses to the three citations from the year 2002 and, having failed to do so successfully, is barred from ever asserting such defenses against postering citations or, more precisely, from bringing any constitutional challenge to the postering restrictions. This would effectively immunize the District and allow it to unconstitutionally sanction an anti-war organization engaged in communicating with the public on matters of public import at the core of the First Amendment even where no court has ever determined that a speech/postering regulation system that distinguishes on the basis of content of posters is sustainable or constitutional.

This is a curious argument especially when juxtaposed against the District's argument that MASF lacks standing because it has never been cited under the postering regulations. By application of this argument, MASF or any entity may not challenge the constitutionality of the postering regulations unless a citation has been issued and once a citation has been issued must advance their constitutional arguments through the administrative process and appeal. By the District's standards, there is no way to bring a constitutional challenge in U.S. District Court.

The District of Columbia, however, is decidedly non-specific as to what constitutional defenses could have been raised in connection with the three 2002 notices of infraction. It is an inaccurate oversimplification to suggest that all constitutional challenges to a regulatory scheme

may be raised in any context in which any ticket is issued, even where only a narrow violation of one provision is alleged.

In the context of those infractions, there was no evidence that the ANSWER Coalition had even posted the three items. The inspector testified that "I don't have any idea who put them up." The hearing examiner made a finding that there was a violation, specifically that copies of the posters had not been registered with the Mayor (although no evidence or testimony was presented that a search of records had been done and no registration found) and that the ANSWER Coalition would be vicariously liable for this failure because it created the posters and made them available to the public.

There were no charges that the posters had been posted for a duration that exceeded the limitations imposed on non-commercial postings. There was no way for the ANSWER Coalition in this proceeding to mount a wholesale constitutional challenge against provisions that were not at issue in the facts as presented.

Even were the ANSWER Coalition able to have asserted a wholesale challenge to the postering regulations, it is undisputed no constitutional challenge was ever adjudicated. Under these circumstances, where the issue is of such public import and is of a constitutional magnitude, *res judicata* does not apply to bar consideration of the constitutional issues by this Court.

The doctrine of claim preclusion or *res judicata* does not apply to constitutional issues or issues of public import. The D.C. Circuit is clear that the doctrine of *res judicata* is simply a formulation of policy, which may be outweighed by other matters of policy including specifically in cases involving important questions of constitutional law. See Apotex, Inc. v. Food & Drug Admin., 393 F.3d 210 (D.C. Cir. 2004), citing, Hardison v. Alexander, 655 F.2d

1281, 1288-89 (D.C. Cir. 1981) ("there are exceptions [to *res judicata*] for reasons of compelling

public policy, such as cases involving important questions of constitutional law."); Hardison v.

Alexander, 655 F.2d 1281, 1288 – 1289 (D.C. Cir. 1981) ("paramount questions of constitutional

law" have been recognized to "overcome the normal application of *res judicata*"); Spilker v.

Hankin, 188 F.2d 35, 38 – 39 (D.C. Cir. 1951).

      One District Court has articulated this principle as follows,

> "[W]here as here private litigation has extensive implications of public import, the
> rule of *res judicata* or estoppel is not allowed to stultify reassessment of the prior
> decision. The public interest supersedes the private interest. See Commissioner of
> Internal Revenue v. Sunnen, 333 U.S. 591, 599, 68 S.Ct. 715, 92 L.Ed. 898
> (1948); Mercoid Corp. v. Mid-Continent Investment Co., 320 U.S. 661, 669-670,
> 64 S.Ct. 268, 88 L.Ed. 376 (1944); Spilker v. Hankin, 88 U.S. App.D.C. 206, 188
> F.2d 35, 38 – 39 (1951). See also 1B Moore, Federal Practice ¶0.405[11] (2d ed.
> 1965)."

Griffin v. State Board of Education, 296 F. Supp. 1178, 1181 (E.D. VA 1969).

      This is consistent with the rulings of other Circuit courts. See Knox By and Through

Hagberg v. Lederle Lab., 4 F.3d 875, 881 n.4 (10th Cir. 1993) ("flexible exceptions to the law of

preclusion are occasionally necessary."); International Harvester v. OSHA, 628 F.2d 982, 986

(7th Cir. 1980), quoting, Bowen v. U.S., 570 F.2d 1311, 1321 (7th Cir. 1978) ("This court does

not adhere to a rigid view of the doctrine in the administrative context: The sound view is

therefore to use the doctrine of *res judicata* when the reasons for it are present in full force, to

modify it when modification is needed, and to reject it when the reasons against it outweigh

those in its favor."); Moch v. East Baton Rouge Parish School Bd., 548 F.2d 594, 597 (5th Cir.

1977)("[C]ourts have occasionally rejected strict application of bar and estoppel principles when

their use would violate an overriding public policy or result in manifest injustice."); Pearlstein v.

Scudder & German, 429 F.2d 1136, 1143 (2nd Cir. 1970) ("The doctrine of *res judicata* has in the

past been held subordinate to principles of public policy").

Public policy weighs heavily in favor of an adjudication on the constitutional issues involved. There has not been duplicative litigation from the 2002 infraction notices. The D.C. Court of Appeals did not consider the constitutional issues. It upheld each of the three $35 tickets based on the lack of an appeal within the requisite period and the consequential lack of jurisdiction of that Court to hear the case. No Court has ever addressed these issues. Yet, their impact is severe for the ANSWER Coalition itself, and goes far beyond the ANSWER Coalition, as the inclusion of the MASF as a plaintiff indicates.

**Conclusion**

For the foregoing reasons, the plaintiffs respectfully request this Honorable Court deny the District's motion to dismiss.

March 14, 2008                                      Respectfully Submitted,

                                                   /s/ Carl Messineo /s/
                                                   Carl Messineo (#450033)
                                                   Mara Verheyden-Hilliard (#450031)
                                                   Partnership for Civil Justice
                                                   617 Florida Avenue, NW
                                                   Washington, DC 20001
                                                   (202) 232-1180
                                                   (202) 350-9557 fax

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

ACT NOW TO STOP WAR AND END )
RACISM COALITION, *et al.*, )
 )
   Plaintiffs, )
v. ) Civil Action No.: 07-cv-01495 (HHK)
 )
DISTRICT OF COLUMBIA, )
 )
   Defendant. )
 )

## AFFIDAVIT OF BRIAN BECKER

1. I am the National Coordinator of the ANSWER (Act Now to Stop War and End Racism) Coalition, am over the age of eighteen and competent to attest as follows based on personal knowledge.

2. The ANSWER Coalition is a grassroots civil rights organization which seeks to engage the public in communications opposing war and racism, among other issues. The Coalition is not funded like the Democratic or Republican Parties are, and whose candidates are given preferential treatment under the existing postering regulations to carry their message to the public. We can't afford television campaigns, radio spots or even billboards. We conduct our advocacy through the time honored traditions of person-to-person communications, leaflets, articles as well as posters.

3. The ANSWER Coalition is currently refraining from posting materials on public lampposts and appurtenances to the full extent as is allowed those whose posters have an anti-crime content or electoral campaign content.

4.  We have expended organizational resources in order to remove posters from public space to avoid the severe penalties threatened under the regulations.

5.  Having to remove these posters to avoid the sixty day duration limit means that our core purpose, engaging the public with anti-war and anti-racism advocacy, is frustrated. We use postering to reach the public and deliver our core political messages and we need for our message to remain visible.

6.  Having to remove these posters means we must divert and consume organizational resources for the removal process.

7.  We also are forced to expend organizational and human resources to counsel volunteers and activists who share our beliefs and who, concerned about the possibility of severe financial penalty, are discouraged from engagong in postering activities, although otherwise desiring to.

8.  We bring this constitutional rights lawsuit in federal court seeking relief for ourselves and others not currently before the Court from the unconstitutional and overbroad postering system. We all deserve to be treated on an equal basis by the District of Columbia Government when it comes to regulation of expression.

I hereby certify under penalty of perjury that the foregoing is true and correct.  Executed this 14th day of March, 2008.

Brian Becker

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

ACT NOW TO STOP WAR AND END           )
RACISM COALITION, *et al.*,            )
                                       )
            Plaintiffs,                )
        v.                             )          Civil Action No.: 07-cv-01495 (HHK)
                                       )
DISTRICT OF COLUMBIA,                  )
                                       )
            Defendant.                 )
_____)

## AFFIDAVIT OF IMAM MAHDI BRAY

1. I am the Executive Director of the Muslim American Society Freedom Foundation

   (MASF), and am over eighteen years of age and competent to testify to the following

   based on personal knowledge.


2. The MASF is the civil and human rights advocacy entity of the Muslim American

   Society (MAS), the largest Muslim grassroots, charitable, religious, social, cultural, civil

   and educational organization in America – with 55 chapters in 35 states. MASF focuses

   on empowering the Muslim-American community through civic education, participation,

   community outreach, and coalition building including First Amendment assemblies in

   opposition to war and in support of civil rights. It works to uphold the human rights and

   civil liberties of all Americans, including Muslim-Americans and to promote

   understanding between Muslims and non-Muslims.


3. The MASF seeks to engage in postering, and seeks that all others engaged in civil rights

   advocacy, be able to engage in postering to the same extent as is afforded others,

including those favored within the existing District of Columbia municipal regulation system.

4. Our constituency has been targeted by government actions and has great concern about the risk of bringing the force of the state upon it by the full and equal exercise of our rights through postering on issues of public import and debate.

5. Our organization must currently refrain from posting materials on public lampposts and appurtenances in the District of Columbia in the same manner and with the same freedom as is allowed those whose speech pertains to neighborhood crime or whose speech supports a candidacy for elected office.

6. As an organization that is committed to civil rights and human rights advocacy, as well as promoting understanding and communication between Muslim and non-Muslim communities, we are adversely impacted by not being allowed, and by being chilled from the exercise, of the full scope of freedoms and privileges to poster that is allowed to others whose messages are favored within the regulatory system. This limits our ability to post materials in order to reach out and communicate our message to the public at large.

I hereby certify under penalty of perjury that the foregoing is true and correct. Executed this 13th day of March, 2008.

Mahdi Bray