**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| ACT NOW TO STOP WAR AND END RACISM COALITION, *et al.*, )<br>)<br>) | |
| Plaintiffs, ) | |
| v. ) | 07-cv-1495 (RCL) |
| DISTRICT OF COLUMBIA, ) | |
| Defendant. ) | |

---

## MEMORANDUM OPINION

## I.    INTRODUCTION

This case concerns the constitutional right to hang political posters on lampposts in the nation's capital.  The District of Columbia permits anyone to post a sign expressing a general political message for sixty days.  Signs related to a specific event must be removed within thirty days of its occurrence, but they may hang for an indefinite period before the event.

The Act Now to Stop War and End Racism Coalition ("ANSWER") and Muslim American Society Freedom Foundation ("MASF") allege that these regulations violate the First Amendment.  They further claim that the District's enforcement mechanism contravenes the Due Process Clause, and ANSWER alleges that the District subjected it to retaliatory enforcement for exercising its First Amendment rights, thus violating 42 U.S.C. § 1983.  In 2008, the District moved to dismiss, and this Court granted its motion on standing and abstention grounds.[1]  The Court of Appeals reversed and remanded the case for further consideration.  In the opinion below, this Court will clarify the posture of the case and address plaintiffs' claims.

---

[1] The case was assigned to Judge Kennedy from its filing in 2007 until May 4, 2011, when it was transferred by consent to Chief Judge Lamberth.  Reassignment of Civil Case, May 4, 2011, ECF No. 36.

## II. BACKGROUND

From 1980 until after the filing of this lawsuit in 2007, the rules for posting on the District's lampposts were outlined by Title 24: Public Space and Safety, Chapter 1: Occupation and Use of Public Space, Section 108: Signs, Posters, and Placards of the District of Columbia Municipal Regulations.  24 D.C.M.R. § 108.  The relevant provisions provided as follows:

108.5:  A sign, advertisement, or poster shall not be affixed for more than sixty (60) days, except the following:

(a) Signs, advertisements, and posters of individuals seeking political office in the District who have met the requirements of § 210 of the D.C. Campaign Finance Reform and Conflict of Interest Act (D.C. Code § 1-1420 (1981)); and

(b) Signs designed to aid in neighborhood protection from crime shall be exempt from the sixty (60) day time period.

108.6:  Political campaign literature shall be removed no less than thirty (30) days following the general election.

108.7:  Each sign, advertisement, or poster shall contain the date upon which it was initially affixed to a lamppost.

108.8:  Each sign, advertisement, or poster shall be affixed securely to avoid being torn or disengaged by normal weather conditions.

108.9:  Signs, advertisements, and posters shall not be affixed by adhesives that prevent their complete removal from the fixture, or that do damage to the fixture.

108.10: No more than three (3) versions or copies of each sign, advertisement, or poster shall be affixed on one (1) side of a street within one (1) block.

108.11: Within twenty-four (24) hours of posting each sign, advertisement, or poster, two (2) copies of the material shall be filed with an agent of the District of Columbia so designated by the Mayor.  The filing shall include the name, address, and telephone number of the originator of the sign, advertisement, or poster.

*Id.*

In the summer of 2007, ANSWER—a "grassroots civil rights organization which seeks to engage the public in communications opposing war and racism, among other issues," Affidavit of Brian Becker 1–2, Mar. 14, 2008, ECF No 11-1 ["ANSWER Affidavit"]—posted signs advertising its September 15th "March to Stop the War" on public lampposts and electrical boxes throughout the city. The District cited ANSWER for numerous violations of § 108.9, the provision regarding the use of adhesives. *See* Def.'s Mot. Dismiss, Ex. 1, Feb. 6, 2008, ECF No. 8-1 (reproducing four Notices of Violation, all referencing § 108.9) ["Def.'s First Mot. Dismiss"]. ANSWER contested the tickets before the District's Office of Administrative Hearings ("OAH"). That adjudicatory process continues. *See* Notice Regarding Activity Before The Office of Administrative Hearings, Oct. 25, 2010, ECF No. 34 ["OAH Notice"].

In addition to its claims before the OAH, ANSWER challenged the District's postering regulations as unconstitutional in this Court. Compl., Aug. 21, 2007, ECF No. 1. Unlike in the administrative proceeding, ANSWER sued in federal court with a co-plaintiff, MASF, which "focuses on empowering the Muslim-American community through civic education, participation, community outreach, and coalition building including First Amendment assemblies in opposition to war and in support of civil rights." Affidavit of Imam Mahdi Bray, Mar. 14, 2008, ECF No 11-2 ["MASF Affidavit"].

In a complaint that the Court of Appeals later characterized as having "rather a blunderbuss quality," *ANSWER Coal. v. Dist. of Columbia (ANSWER II)*, 589 F.3d 433, 437 (D.C. Cir. 2009), plaintiffs alleged that the postering regulations were facially unconstitutional because they contained improper content-based distinctions in violation of the First Amendment, First Am. Compl. ¶¶ 7–8, Dec. 18, 2007, ECF No. 3.; were unconstitutionally vague, *id.* ¶¶ 42–44; violated plaintiffs' right to anonymous speech, *id.* ¶ 39; and imposed a strict liability regime that

violated plaintiffs' due process rights, *id.* ¶¶ 25–34. Plaintiffs focused most of their attention on the content-based discrimination claim, charging that the divergent regulations governing general, electoral, and anti-crime messages "created a hierarchy of speech" that represented a "classic, unconstitutional regulatory scheme." *Id.* at 2. Both plaintiffs submitted affidavits explaining that they had refrained from posting signs on public lampposts in the manner they would prefer because of the regulations, and that they were suing on behalf of themselves and "all others engaged in civil rights advocacy" whose speech had been similarly "chilled." MASF Affidavit, at 1–2; ANSWER Affidavit, at 1–2.

The District moved to dismiss the complaint. Def.'s First Mot. Dismiss. The District argued, among other theories, that MASF lacked standing because it had suffered no injury from the regulations, *id.* at 14–20, and that the Court should abstain from adjudicating ANSWER's claims under the doctrine of *Younger v. Harris*, 401 U.S. 37 (1971), because ANSWER would have an opportunity to present its constitutional claims through the administrative proceedings at the OAH. Def.'s First Mot. Dismiss 4–8. This Court agreed with both arguments and granted the District's motion to dismiss. *ANSWER Coal. v. Dist. of Columbia (ANSWER I)*, 570 F. Supp. 2d 72 (D.D.C. 2008). Plaintiffs appealed.

On November 2, 2009—shortly before the Court of Appeals heard oral arguments—the District's Department of Transportation issued a Notice of Emergency and Proposed Rulemaking revising the poster rules. 56 D.C. Reg. 8759–60 (Nov. 6, 2009). The new rules allowed:

> all signs that are not lewd, indecent, or vulgar, or do not pictorially represent the commission of or the attempt to commit any crime to be posted on a structure in public space for sixty (60) days, and a sign, advertisement, or poster related to a specific event may be affixed any time prior to an event but shall be removed no later than thirty (30) days following the event for which it is advertising or publicizing.

*Id.* at 8759.  The Department explained that the emergency rulemaking was "necessitated by the immediate need to address the continuing threat to the public welfare posed by an unequal treatment of non-commercial advertising in the public space."  *Id.*  The Department characterized the new regulations as "a technical amendment" that "removes a time limit distinction that exists between political and non-political advertising that has raised First Amendment concerns."  *Id.*  The new provisions, which became final on January 8, 2010, 57 D.C. Reg. 528 (Jan. 8, 2010), read as follows:

> 108.5:  A sign, advertisement, or poster not related to a specific event shall be affixed for no more than sixty (60) days.

> 108.6:  A sign, advertisement, or poster related to a specific event may be affixed any time prior to the event but shall be removed no later than thirty (30) days following the event to which it is related.

24 D.C.M.R. §§ 108.5–108.6 (2011).

The Court of Appeals decided the case on grounds that did not require consideration of these new rules.  The Court first reversed on the issue of MASF's standing.  Judge Williams explained that the Foundation's affidavit "plainly indicat[ed] an intent to engage in conduct violating the 60-day limit" and that this qualified as the "credible statement by the plaintiff of intent to commit a violative act" that the D.C. Circuit had previously held to constitute standing in a First Amendment facial challenge.  *ANSWER II*, 589 F.3d at 435 (quoting *Seegars v. Gonzales*, 386 F.3d 1248, 1253 (D.C. Cir. 2005)).

The Court of Appeals also remanded on some of the claims by ANSWER that this Court had initially declined to consider under the *Younger* abstention doctrine.  Judge Williams explained that "the district court appropriately abstained" on the claims related to § 108.9, the adhesive provision, which ANSWER had directly challenged in the OAH.  *Id.*  But on the other claims, the Court of Appeals held that "consistent with *Younger*, ANSWER may raise

constitutional challenges in federal district court that are completely independent of and severable from the violations it is facing in the District's administrative proceedings." *Id.*

With the case back before this Court, plaintiffs updated their complaint to account for the revised regulations. Supplemental Pleading, May 5, 2010, ECF No. 22-1 ["Suppl. Pldg."]. They maintained all the claims that they had asserted previously, including their principal allegation that the regulations draw an unconstitutional, content-based distinction between signs carrying a general political message and signs related to political campaigns. *Id.* ¶ 4. While the new regulations replaced the explicit exception for signs posted in support of "individuals seeking political office" with a more general category for signs "related to a specific event," plaintiffs argued that the District had "simply substituted a new set of unconstitutional content-based distinctions for the prior set of unconstitutional content-based distinctions." *Id.* Their basis for this argument is their allegation "on information and belief" that the District would interpret political campaigns as "events," thus allowing them to continue to be treated differently from general political messages. *Id.* ¶¶ 9–10. Several months later, plaintiffs removed the "on information and belief" designation after the D.C. Board of Elections and Ethics noted on its website that "the new rules allow campaign posters to remain up 30 days after the general election . . . ." Notice to the Court That Complaint Allegations Are No Longer "On Information and Belief," Sept. 16, 2010, ECF No. 32 (quoting www.dcboee.org/candidate_info/ general_info/campaign_posters.asp) ["Pl.'s Notice"].

Plaintiffs added two new counts in their supplemental pleading. First, in addition to facially challenging §§ 108.5–108.6 of the new regulations, they added an "as applied" challenge alleging that the provisions are improperly content-based and undefined. Suppl. Pldg. ¶¶ 102– 04. Second, ANSWER added a claim that the District had violated 42 U.S.C. § 1983 by issuing

"baseless" citations "in retaliation for the ANSWER Coalition's exercise of its lawful rights to free speech through lawful postering activities." *Id.* ¶¶ 105–06. ANSWER based this claim on ninety-nine citations it received from the District in March and April 2010, which it alleges were issued "*notwithstanding the fact that the Coalition had fully complied with the* [amended] *regulations.*" *Id.* ¶ 44 (emphasis in original).

The District again moved to dismiss all of plaintiffs' claims. Def.'s Mot. Dismiss, June 2, 2010, ECF No. 26 ["Def.'s Mot."]. After plaintiffs had filed their opposition and the District had replied, the OAH issued an order announcing that proceedings would be scheduled in ANSWER's challenge to the tickets it received in 2007. OAH Notice. ANSWER then voluntarily dismissed its claims for prospective relief related to its constitutional challenges to the regulations in this Court. Stipulation of Dismissal, Oct. 25, 2010, ECF No. 35. Plaintiffs and the District stipulated that the dismissal would "eliminate the legal issues pertaining to abstention" while preserving MASF's challenges to the regulations and ANSWER's § 1983 claim. *Id.* at 1. Those are the claims the District now seeks to dismiss.

## III. LEGAL STANDARD

While this case is more than four years old, it remains at the motion to dismiss stage of the proceedings. A motion to dismiss under Rule 12(b)(6) tests the legal sufficiency of a complaint. *Browning v. Clinton*, 292 F.3d 235, 242 (D.C. Cir. 2002). To satisfy this test, a complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief, in order to give the defendant fair notice of what the . . . claim is and the grounds upon which it rests." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). "[W]hen ruling on a defendant's motion to dismiss, a judge must accept as true all of the factual allegations contained in the complaint," *Atherton v. Dist. of Columbia*, 567 F.3d 672, 681 (D.C.

Cir. 2009), and grant a plaintiff "the benefit of all inferences that can be derived from the facts alleged." *Kowal v. MCI Commc'ns Corp.*, 16 F.3d 1271, 1276 (D.C. Cir. 1994).

A court, however, may not "accept inferences drawn by plaintiffs if such inferences are unsupported by the facts set out in the complaint." *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009). In other words, "only a complaint that states a plausible claim for relief survives a motion to dismiss." *Id.*; *see also Atherton*, 567 F.3d at 681 (holding that a complaint must plead "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged").

## IV.    ANALYSIS

### A.    Standing

The core of this case is plaintiffs' First Amendment challenge, but before turning there the Court must clarify a lingering issue related to standing. When the Court of Appeals held that MASF had standing to pursue its claims, the only constitutional challenge asserted was a facial challenge to the District's postering regulations. In fact, the Court of Appeals explicitly analyzed the elements necessary "to confer standing on a litigant bringing *a pre-enforcement facial challenge.*" *ANSWER II*, 589 F.3d at 435 (emphasis added). The Court explained that MASF's affidavit outlining its desire to engage in postering activities that would violate the regulations, combined with the District's record of enforcing the rules, "plainly qualifies, at the stage of a motion to dismiss" as sufficient to convey standing. *Id.* at 436. MASF has since supplemented its initial affidavit with additional details about its "intent to engage in expressive activities which would violate the 60-day limit," Suppl. Pldg. ¶ 17, including specific postering campaigns opposing racial profiling. *Id.* ¶¶ 18–27. There is thus no doubt that MASF has standing to bring a pre-enforcement facial challenge.

It is almost equally certain, however, that MASF lacks standing to bring the "as applied" challenge that plaintiffs added as Count Two of their Supplemental Pleading. *Id.* ¶¶ 102–04. While ANSWER may have had standing to litigate this issue, it voluntarily dismissed its claim for relief to help remove the abstention issue. Stipulation of Dismissal, at 2. MASF, by contrast, has refrained from posting signs in violation of the regulations, so the District has not enforced the law against the organization. Logically, then, MASF cannot bring an as applied challenge. *Cf. Hill v. Colorado*, 530 U.S. 703, 710 (2000) ("Because the statute had not actually been enforced against petitioners, . . . they only raised a facial challenge."); *Seegars*, 386 F.3d at 1251 ("No plaintiff in this case has been arrested and prosecuted for violating the disputed provisions of the Code, so plaintiffs' case constitutes a 'preenforcement' challenge."). The Court will thus consider MASF's facial challenge only.

**B.      First Amendment Framework**

The First Amendment provides that "Congress shall make no law . . . abridging the freedom of speech." U.S. Const., amend. I. The Supreme Court has long held that this restriction applies not only to Congress, but also to municipal governments. *Lovell v. Griffin*, 303 U.S. 444, 450 (1938). While the First Amendment "reflects 'a profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open,'" *Snyder v. Phelps*, 131 S.Ct. 1207, 1215 (2011) (quoting *New York Times Co. v. Sullivan*, 376 U.S. 254, 270 (1964)), a city government "may sometimes curtail speech when necessary to advance a significant and legitimate state interest." *Members of the City Council of City of L.A. v. Taxpayers for Vincent*, 466 U.S. 789, 804 (1984) (citing *Schenck v. United States*, 249 U.S. 47, 52 (1919)).

Courts in this Circuit generally follow three steps in assessing a First Amendment challenge: "first, determining whether the First Amendment protects the speech at issue, then identifying the nature of the forum, and finally assessing whether the . . . justifications for restricting . . . speech 'satisfy the requisite standard.'" *Mahoney v. Doe*, 642 F.3d 1112, 1116 (D.C. Cir. 2011) (quoting *Cornelius v. NAACP Legal Def. & Educ. Fund, Inc.*, 473 U.S. 788, 797 (1985)).

The first step here is undisputed. "[S]igns are a form of expression protected by the Free Speech Clause . . . ." *City of Ladue v. Gilleo*, 512 U.S. 43, 48 (1994). That is particularly true given the subject of the signs plaintiffs seek to post—political opinions on public issues such as war and racial profiling. *Snyder*, 131 S.Ct. at 1211 ("[S]peech on public issues occupies the 'highest rung of the hierarchy of First Amendment values' and is entitled to special protection." (quoting *Connick v. Myers*, 461 U.S. 138, 145 (1983)); *City of Ladue*, 512 U.S. at 54 (characterizing antiwar speech as "absolutely pivotal"). Plaintiffs' desire to post signs bearing political messages therefore easily qualifies as protected by the First Amendment.

The second step is to determine the nature of the forum in which the protected speech occurs. This is slightly more complicated than the first step, but it still raises no serious doubt. The "lamppost[s] and appurtenances" referenced by the regulations, 24 D.C.M.R. § 108.1, are government property. Public forum doctrine "divides government property into three categories for purposes of First Amendment analysis." *Oberwetter v. Hilliard*, 639 F.3d 545, 551 (D.C. Cir. 2011). One category is the traditional public forum, which encompasses public areas that have "by long tradition or by government fiat . . . been devoted to assembly and debate." *Perry Educ. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37, 45 (1983). A second category is the limited public forum or designated public forum, which comprises "public property which the

10

State has opened for use by the public as a place for expressive activity." *Id.* The final category is the nonpublic forum, which consists of government property that is "not by tradition or designation a forum for public communication." *Id.* at 46. In determining which analysis to apply to a given means of expression, the "dispositive question is not what the forum is *called*, but what *purpose* it serves." *Boardley v. U.S. Dep't of the Interior*, 615 F.3d 508, 515 (D.C. Cir. 2010).

The District's lampposts do not rise to the level of a traditional public forum. Their purpose is not to serve as a means of expression. Unlike streets and parks, the quintessential public fora, they have not "immemorially been held in trust for the use of the public and, time out of mind, . . . been used for purposes of assembly, communicating thoughts between citizens, and discussing public questions." *Hague v. C.I.O.*, 307 U.S. 496, 515 (1939). On the other hand, the District's lampposts cannot be considered a nonpublic forum. While the Supreme Court found Los Angeles's utility poles to be a nonpublic forum in *Taxpayers for Vincent*, 466 U.S. at 815, there is an important distinction between that case and this one. The Los Angeles ordinance banned all signs on utility poles. *Id.* Here, the District explicitly permits a wide array of posting on public lampposts. The District could hardly argue—and indeed, it does not—that it considers lampposts a nonpublic forum given that regulations at issue in this case designate them as a lawful place for posting under many circumstances. 24 D.C.M.R. § 108. Instead, the District's lampposts are a textbook example of a limited or designated public forum, in which public property has been "opened for use by the public as a place for expressive activity." *Perry Educ. Ass'n*, 460 U.S. at 45.

The third step in the First Amendment analysis is to assess whether the regulations meet the legal standard for a designated public forum. The test for a designated public forum is the

same as that for a traditional public forum. *Id.* at 46. To comply with the First Amendment, a government regulation in a public forum must meet three criteria. It must be content-neutral; it must be narrowly tailored to serve a significant government interest; and it must leave open ample alternatives for communication. *Burson v. Freeman*, 504 U.S. 191, 197 (1992) (citing *United States v. Grace*, 461 U.S. 171, 177 (1983)). Plaintiffs' principal argument is that the regulatory provisions distinguishing between event-based speech and non-event-based speech, §§ 108.5–108.6, fail to meet these criteria. The District contends that the provisions satisfy all three criteria and thus constitute valid "time, place, and manner" speech restrictions aimed at promoting the government's interest in preventing litter. *Id.*; *Ward v. Rock Against Racism*, 491 U.S. 781, 799 (1989).[2] The Court will consider this issue first and then turn to plaintiffs' other claims.

### C.   The Event / Non-Event Distinction in §§ 108.5–108.6

#### 1.   *Content Neutrality*

One of the bedrock principles of First Amendment law is that the "government has no power to restrict expression because of its message, its ideas, its subject matter, or its content." *Ashcroft v. ACLU*, 535 U.S. 564, 573 (2002) (internal quotation marks omitted). Laws that discriminate on the basis of content "pose the inherent risk that the government seeks not to advance a legitimate regulatory goal, but to suppress unpopular ideas or information." *Turner Broad. Sys. v. Fed. Commc'ns Comm'n*, 512 U.S. 622, 641 (1994). Content-based laws are thus "'presumptively invalid,' and the government bears the burden to rebut that presumption."

---

[2] If the regulations are found to be content-based, they can still be constitutional if they survive strict scrutiny. *Burson*, 504 U.S. at 198. Under this demanding standard, the District would have to show that "the regulation is necessary to serve a compelling state interest and that it is narrowly drawn to achieve that end." *Id.* While not impossible to meet, *see id.*, this is a very difficult hurdle to clear and the District does not suggest it can.

*United States v. Playboy Entm't Grp., Inc.*, 529 U.S. 803, 817 (2000) (quoting *R.A.V. v. City of St. Paul*, 505 U.S. 377, 382 (1992)).

This principle is conceptually clear, but applying it is "not always a simple task." *Turner Broad.,* 512 U.S. at 642. In some cases, a content-based law plainly singles out a particular viewpoint for restriction. *See, e.g.*, *Boos v. Barry*, 485 U.S. 312 (1988) (banning signs near embassies that criticized the foreign government, but not signs that supported the foreign government). In other cases, a law stifles expression of a particular topic and is deemed content-based for that reason. *See, e.g., Republican Party of Minn. v. White*, 536 U.S. 765 (2002) (banning judicial candidates from commenting on controversial legal or political issues). In still other cases, a law impacts only the time, place, or manner of expression and will be upheld as content-neutral. *See, e.g.*, *Kovacs v. Cooper*, 336 U.S. 77 (1949) (upholding a ban on "loud and raucous" sound trucks on city streets regardless of the messages they broadcast); *Clark v. Cmty. for Creative Non-Violence,* 468 U.S. 288 (1984) (upholding regulations on sleeping in Lafayette Park regardless of the sleepers' purpose).

The District asserts several times that its regulations are content-neutral, Def.'s Mot. 13, 14, 19–21, because it has not "'adopted a regulation of speech because of a disagreement with the message it conveys.'" *Id.* at 19–20 (quoting *Hill*, 530 U.S. at 719–20). But the District seems to conflate content neutrality with viewpoint neutrality. It is true that the regulations apply equally to posters of all viewpoints. Antiwar and pro-war advocates are treated the same. But this is not true with regard to content. The guidelines provide substantially different treatment to two posters that are identical in every respect except that one contains content related to an event while the other does not. For example, a sign reading, "Bring our troops home" could hang for sixty days. But an identical sign with an additional line reading, "Bring

our troops home: Vote the Peace Party candidate in 2016" could presumably hang for the next five years. The Supreme Court has made clear that a speech restriction must be both viewpoint-neutral and content-neutral to pass constitutional muster. "Regulation of the subject matter of messages, though not as obnoxious as viewpoint-based regulation, is also an objectionable form of content-based regulation." *Hill*, 530 U.S. at 722 (citing *Consol. Edison Co. of N.Y. v. Public Serv. Comm'n of N.Y.*, 447 U.S. 530, 538 (1980)).

The District also contends that the regulations are content-neutral because they do not "'totally prohibit a type of expression or a specific message'" but rather "'merely regulate the manner in which the message may be conveyed.'" Def.'s Mot. 20 (quoting *ISKCON of Potomac, Inc. v. Kennedy*, 61 F.3d 949, 955 (D.C. Cir. 1995)). The District is correct that a complete ban on a category of speech arouses heightened suspicion under the First Amendment. *City of Ladue*, 512 U.S. at 55. But this does not mean that speech restrictions that impose a "differential burden" on varying categories of speech can escape careful review for content neutrality. *Turner Broad.*, 512 U.S. at 642 ("Our precedents . . . apply the most exacting scrutiny to regulations that suppress, disadvantage, or impose differential burdens upon speech because of its content."). In *Whitton v. City of Gladstone*, 54 F.3d 1400 (8th Cir. 1995), the Eighth Circuit considered a constitutional challenge to an ordinance that subjected political signs to durational limits—but not a total ban—while allowing commercial signs to be displayed indefinitely. *Id.* at 1403. The city argued that the regulation was a content-neutral time, place, and manner regulation. The court disagreed, finding that the durational requirement was content-based because it did not limit "the durational period of signs generally" but rather "limited the duration of *political* signs . . . in particular." *Id.* at 1406.

Finally, the District argues that the regulations should be judged content-neutral "even if those regulations have some incidental effect on speech" because they promote a content-neutral purpose—reducing litter and blight. Def.'s Mot. 21. The Supreme Court considered a law with similar characteristics in *City of Renton v. Playtime Theatres, Inc.*, 475 U.S. 41 (1986). Renton had enacted a zoning ordinance that prohibited adult motion picture theaters from locating within 1,000 feet of residential zones and properties such as churches and schools. *Id.* at 43. The Court explained that the regulation "does not appear to fit neatly into either the 'content-based' or the 'content-neutral' category." *Id.* at 47. While the ordinance "treats theaters that specialize in adult films differently from other kinds of theaters," it was "aimed not at the *content* of the films . . . but rather at the *secondary effects* of such theaters on the surrounding community," such as the impact on the safety and appearance of residential neighborhoods. *Id.* Because the Renton City Council's "*predominate* concerns" when passing the ordinance were with these content-neutral secondary effects, the Supreme Court held that the law should be considered content-neutral. *Id.* at 48 (emphasis in original).

The District defends §§ 108.5–108.6 on this rationale. Because the regulation is "'justified without reference to the [content] of the regulated speech,'" the District insists that it is content-neutral. *Id.* at 19 (quoting *Ward*, 491 U.S. at 798). The District's argument is correct as far as it goes. But it does not go far enough. While a content-neutral purpose is necessary to save a regulation like this one, it is not sufficient. When a city seeks to justify a distinction based partly on content, that distinction *must actually advance the content-neutral purpose the city asserts*. "[T]he mere assertion of a content-neutral purpose [will not] be enough to save a law which, on its face, discriminates based on content." *Turner Broad.*, 512 U.S. at 642–43 (quoting *Arkansas Writers' Project v. Ragland*, 481 U.S. 221, 231–32 (1987)). As the Eighth Circuit

explained in *Whitton*, courts are not "required to accept legislative explanations from a governmental entity regarding the purpose(s) for a restriction on speech without further inquiry." *Whitton*, 54 F.3d at 1403. In other words, even if the Court agrees that a regulation is *justified* by a content-neutral purpose, courts "must still ask whether the regulation *accomplishes* the stated purpose in a content-neutral manner." *Id.*

The Supreme Court illustrated this principle in *City of Cincinnati v. Discovery Network, Inc.*, 507 U.S. 410 (1993). There the Court considered an ordinance that banned "the use of newsracks that distribute 'commercial handbills' but not 'newspapers.'" *Id.* at 430. The city defended the regulation as a means to promote its content-neutral interests in safety and esthetics. *Id.* Because the "*justification* for the regulation is content neutral," the city argued, the regulation itself was content-neutral as well. *Id.* The Supreme Court disagreed. While arguing that Cincinnati's asserted purpose must be content-neutral, the Court found that regulations distinguishing between commercial and non-commercial newspapers did not advance that purpose. The newsracks carrying commercial papers were "no greater an eyesore than the newsracks permitted to remain on Cincinnati's sidewalks." *Id.* at 425. Because the regulation was "predicated on the content of the publications" and "the interests that Cincinnati has asserted are unrelated to any distinction between 'commercial handbills' and 'newspapers,'" the Court held that the regulation was content-based. *Id.* at 430.

The District similarly defends §§ 108.5–108.6 as a way to promote its esthetic interest "in ensuring that public property is not permanently marred or damaged by improperly attached posters," Def.'s First Mot. Dismiss 5, and its interest in combating litter. Def.'s Mot. 3. These interests are undoubtedly valid. *Taxpayers for Vincent*, 466 U.S. at 805 ("It is well settled that the state may legitimately exercise its police powers to advance esthetic values."). But the

question remains whether the distinctions drawn by §§ 108.5–108.6 actually advance those interests.

Viewed on its own, §108.5, which limits posters "not related to a specific event" to a hanging time of sixty days, is unproblematic. An across-the-board durational restriction would limit litter by requiring posters of all types to be taken down after a certain number of days. Likewise, the provision of § 108.6 requiring posters related to events to be "removed no later than thirty (30) days following the event" is straightforward. A poster for an event that has already occurred is more likely to constitute litter and blight than a poster for a future event or a general political message. This Court's concern arises from the other half of § 108.6, which allows posters related to a specific event to be "affixed any time prior to the event." It is not clear how allowing posters to hang for an indefinite period of time before an event advances the District's interest in reducing litter. Indeed, it seems likely to have the opposite effect. Posters advertising events in the distant future—the "Bring our troops home: Vote the Peace Party candidate in 2016" sign discussed above, for example—are virtually certain to fall off, blow away, or get torn down. Because the organizations that post them will not be responsible for removing them until thirty days after the events occur, the cost of cleaning them up will fall on the District and its taxpayers.

In the absence of an explanation for how this distinction between event and non-event signs advances the District's objective of litter prevention, the differential burdens imposed by §§ 108.5–108.6 present serious First Amendment concerns. *City of Ladue*, 512 U.S. at 52 ("Exemptions from an otherwise legitimate regulation of a medium of speech may . . . diminish the credibility of the government's rationale for restricting speech in the first place."). In particular, given that the District has announced that elections qualify as "events" under the new

regulations, Pl.'s Notice, this distinction could be seen as a way of resurrecting the old rules that prioritized election-related speech—including the political communications of the government officials who make and enforce the rules—over general issue advocacy and political expression. Such a distinction will be unlikely to survive First Amendment scrutiny. *City of Cincinnati*, 507 U.S. at 430. By contrast, an across-the-board durational restriction that applies without exceptions based on the content of the signs would address this constitutional concern while preserving the District's interest in preventing litter.

2.     *Narrow Tailoring*

Having assessed the primary issue of the content-neutrality as some length, the Court can address the remaining aspects of the plaintiffs' claim relatively briefly. In this case, the requirement that a time, place, and manner restriction be "narrowly tailored to serve a significant government interest," *Burson*, 504 U.S. at 197, largely overlaps with the content-neutrality inquiry outlined above. We have explained that the District's objectives of litter removal and esthetic cleanliness constitute significant interests. *Taxpayers for Vincent*, 466 U.S. at 805. The question, then, is whether §§ 108.5–108.6 are narrowly tailored to advance those objectives. In this context, "narrow tailoring" is construed more generously than in some other constitutional settings. The regulation merely needs to "serve those interests" stated, even if a more carefully drawn regulation would accomplish the task better. *Hill*, 530 U.S. at 726 ("As we have emphasized on more than one occasion, when a content-neutral regulation does not entirely foreclose any means of communication, it may satisfy the tailoring requirement even though it is not the least restrictive or least intrusive means of serving the statutory goal.").

This is simply another way of asking the question we posed above: Can the District show that the event/non-event distinction drawn by §§ 108.5–108.6 actually advances its anti-littering

and esthetic interests?  If so, the regulation will be both content-neutral and narrowly tailored.  If not, it will be neither.  While this is not the situation in every First Amendment challenge, to answer one inquiry is to answer both in this case.  As Justice Kennedy observed in a similar setting, "In some cases, a censorial justification will not be apparent from the face of a regulation which draws distinctions based on content, and the government will tender a plausible justification unrelated to the suppression of speech or ideas.  There the compelling-interest test may be one analytical device to detect, in an objective way, whether the asserted justification is in fact an accurate description of the purpose and effect of the law."  *Burson*, 504 U.S. at 213 (Kennedy, J., concurring).

### 3.  *Alternative Channels for Communication*

The third requirement of a time, place, and manner restriction is that it must leave open ample alternative channels for communication.  *Id.* at 191.  This is not in serious doubt here.  The regulations do not close any channel of communication.  Lampposts remain open to plaintiffs for sixty days.  Moreover, while posting signs on lampposts is an important means of communications for groups like plaintiffs, "the First Amendment does not guarantee the right to employ every conceivable means of communication at all times and places," *Taxpayers for Vincent*, 466 U.S. at 812, and plaintiffs remain "free to engage in a rich variety of [other] expressive activities: they may picket, march, hand out leaflets, carry signs, sing, shout, chant, perform dramatic presentations, solicit signatures for petitions, and appeal to passersby."  *White House Vigil for ERA Comm. v. Clark*, 746 F.2d 1519, 1528 (D.C. Cir. 1984).  Thus, if the District can establish content-neutrality and narrow tailoring, its argument that §§ 108.5–108.6 are valid time, place, and manner regulations will prevail.

### 4.  *Facial Challenge*

There is one final issue to address with respect to plaintiffs' claim that §§ 108.5–108.6 violates the First Amendment. MASF challenges the constitutionality of the regulations on their face. In a general facial challenge, a plaintiff must "establish that no set of circumstances exists under which [the provision challenged] would be valid, or that the statute lacks any plainly legitimate sweep." *United States v. Stevens*, 130 S. Ct. 1577, 1587 (2010) (quoting *United States v. Salerno*, 481 U.S. 739 (1987)). But there is an exception to this rule for First Amendment challenges. A law will be held facially invalid if it "sweeps too broadly, penalizing a substantial amount of speech that is constitutionally protected." *Forsyth Cnty. v. Nationalist Movement*, 505 U.S. 123, 130 (1992).

As explained above, posting signs is constitutionally protected speech. If the event/non-event distinction is content-based and thus "presumptively invalid," *Playboy*, 529 U.S. at 817, this constitutionally protected speech would be infringed for anyone wishing to post a general political message for more than sixty days. MASF explains that it "intends to launch a community-based and issue oriented anti-racial profiling campaign using signs and posters on public space," Suppl. Pldg. ¶ 20, but "cannot risk the massive enforcement action that the municipality has brought down upon the ANSWER Coalition were it to simply advance the campaign and post in violation of the existing 60-day limit." *Id.* ¶ 27. MASF also explains that it brings its constitutional challenge on behalf of "all others engaged in civil rights advocacy" whose speech has similarly been "chilled." MASF Affidavit, at 1–2. This encompasses, presumably, a substantial amount of speech, and the possibility of chilling such constitutionally protected expression makes a facial challenge appropriate. Thus, given MASF's affidavit and the District's record of enforcing the poster regulations—two factors credited by the Court of

Appeals, *ANSWER II*, 589 F.3d at 435—plaintiffs have alleged enough to raise a facial challenge to §§ 108.5–108.6. The District's motion to dismiss Count One is therefore denied.

### D. Plaintiffs' Other Constitutional Claims

#### 1. Vagueness

In addition to attacking §§ 108.5–108.6 as improperly content-based, plaintiffs also challenge those provisions as "unconstitutionally vague." First. Am. Compl. ¶ 42. A law can be invalidated for vagueness if it "fail[s] to provide the kind of notice that will enable ordinary people to understand what conduct it prohibits" or if it "may authorize or even encourage arbitrary and discriminatory enforcement." *City of Chicago v. Morales*, 427 U.S. 41, 56 (1999).

Plaintiffs object that § 108.6's provision excepting posters "related to a specific event" from the sixty-day limit "does not define what content qualifies a sign to be considered as 'related to a specific event'" and thus "delegates overly-broad and unconstrained discretion to the enforcement" officer. Pl.'s Opp'n 20. As a result, they claim, the "person affixing the sign has no way of knowing in advance what his or her obligations for removal actually are." *Id.* at 21.

The District counters that "[d]etermining whether there is an 'event' is not remotely a 'subjective' exercise; either there *is* an event referenced on the poster, or there is not." Def.'s Reply 6, Aug. 23, 2010, ECF No. 30. The District has clarified that elections do constitute events. Pl's Notice. As far as the Court is aware, this is the only limiting construction the District has provided publicly. In its Reply, the District suggests that the dictionary definition of "event"—"'something that happens: occurrence'"—provides sufficient guidance for people considering posting on public lampposts. Def.'s Reply at 6 n.6 (quoting *Webster's New Collegiate Dictionary* 396 (7th ed. 1973)). While the District deserves recognition for

embracing the recent legal trend in dictionary citation, *see* Adam Liptak, *Justices Turning More Frequently to Dictionary, and Not Just for Big Words*, *N.Y. Times*, June 13, 2011, this particular definition offers little in the way of clarity. Plaintiffs present a series of hypotheticals demonstrating potential vagueness about the meaning of "event" in the context of §§ 108.5–108.6. For example, could a sign reading "Enact Civil Rights Bill No. XXX!" be posted for sixty days only, or indefinitely until the "event" of the bill's passage? Pl.'s Opp'n 22. Certainly the passage of the bill is "something that happens," thus meeting the dictionary definition supplied by the District. Plaintiffs also raise questions about a sign bearing only the name of a political candidate, such as "Graham." *Id.* at 20–21. Is this a general political message or an event-related sign that can remain up indefinitely until thirty days after the election? Does it matter if the election is years into the future? If candidate Graham loses a primary election, must the sign come down in thirty days? Or is the "something that happens" the general election?

Some of plaintiffs' other scenarios strike the Court as a bit far-fetched, and courts "must be careful not to go beyond the statute's facial requirements and speculate about 'hypothetical' or 'imaginary' cases." *Wash. State Grange v. Wash. State Republican Party*, 552 U.S. 442, 450 (2008). Yet practical uncertainties like those above raise the possibility that the law "fail[s] to provide the kind of notice that will enable ordinary people to understand what conduct it prohibits." *Morales*, 427 U.S. at 56. At this stage in the proceedings, that is enough to state a vagueness claim. The District will have an opportunity during discovery to provide greater clarity about the definition of "event" and to demonstrate that it has established the "minimal guidelines to govern law enforcement" that the Constitution requires. *Kolender v. Lawson*, 461 U.S. 352, 358 (1983).

2.     *Anonymous Speech*

Plaintiffs allege that the registration requirement, § 108.11, represents an unconstitutional restraint on their right to anonymous speech. This argument lacks merit and can be disregarded.

While safeguarding the "respected tradition of anonymity in the advocacy of political causes," *McIntrye v. Ohio Elections Comm'n*, 514 U.S. 334, 343 (1995), the First Amendment allows for restrictions of anonymous speech when there is a substantial relation between the restriction and a sufficiently important government interest. *Doe v. Reed*, 130 S.Ct. 2811, 2818 (2010). Here, the government's interest is in "reaching law violators," *Buckley v. Am. Constitutional Law Found.*, 525 U.S. 182, 196 (1999), and ensuring that the District's restrictions can be meaningfully enforced. Without some record of which organizations have posted signs on lampposts, there would be no way to hold anyone accountable for violating the regulations. Groups could post anonymously, leave their signs up in violation of the rules, and shift the cleanup costs to the taxpayer. In short, there would be little incentive to follow the law. The government's "enforcement interest" has therefore been recognized as a legitimate justification for restricting anonymous speech. *Id.*; *McIntyre*, 514 U.S. at 353. The question is whether § 108.11 relates substantially to that objective without impermissibly burden protected speech.

The Supreme Court outlined a framework for this inquiry in *Buckley*. In that case, the Court considered a Colorado law that required petition organizers seeking signatures to, among other restrictions, wear name badges and file affidavits disclosing their addresses. *Buckley*, 525 U.S. at 196. The Court held that a speaker's interest in anonymity reaches its zenith at the moment he or she engages the intended audience, but recedes as interaction with the public grows more distant. Because the name badge requirement "compels personal name identification at the precise moment when the circulator's interest in anonymity is greatest," the

Court struck it down as a violation of the First Amendment.  *Id.* at 199.  At the same time, the Court found the affidavit requirement, which was "separated from the moment the circulator speaks," *id.* at 198, to constitute a valid restriction that furthered the state's law enforcement interest without exposing the speaker to "the risk of 'heat of the moment' harassment" or violating his anonymous speech rights.  *Id.* at 199.

The provision challenged here, § 108.11, closely resembles the affidavit requirement upheld by the *Buckley* Court.  Like the affidavit requirement, and unlike the name badge requirement, it imposes no burden at the moment plaintiffs seek to engage their intended audience—the time of posting.  In fact, it requires no pre-posting disclosure at all.  It merely directs the organization posting the sign to file copies and basic identifying information with the District within twenty-four hours of posting.  § 108.11.  This advances the District's valid law enforcement interest without exposing the organization to potential harassment or revealing its identity to the public in any way.  Plaintiffs therefore cannot state an anonymous speech claim. *Buckley*, 525 U.S. at 199.

As a general matter, plaintiffs can "prevail under the First Amendment if they can show 'a reasonable probability that the compelled disclosure . . . will subject them to threats, harassments, or reprisals from either Government officials or private parties.'"  *Reed*, 130 S.Ct. at 2820 (quoting *Buckley v. Valeo*, 424 U.S. 1, 74 (1976)).  While the parties now before the Court have not made any such allegations, future plaintiffs who could demonstrate that the registration requirements subject them to these burdens could bring a challenge.  "Upholding the law against a broad-based challenge does not foreclose a litigant's success in a narrower one." *Id.* at 2821.

3.      *Strict Liability Enforcement*

Plaintiffs' final constitutional claim is that the District imposed a system of "strict liability" enforcement in violation of the Due Process Clause. First Am. Compl. ¶¶ 25–34. This argument is also unpersuasive.

Plaintiffs base their claim largely on *Schneider v. New Jersey*, 308 U.S. 147 (1939), in which the Supreme Court invalidated city ordinances that banned leafleting in public streets and held the distributors of the literature responsible for encouraging litter. *See also Talley v. California*, 362 U.S. 60 (1960). The Court held that "the purpose to keep the streets clean and of good appearance is insufficient to justify an ordinance which prohibits a person rightfully on a public street from handing literature to one willing to receive it." *Schneider*, 308 U.S. at 162. Instead of punishing those who distributed the leaflets, the Court explained, the city could better prevent litter by citing "those who actually throw papers on the streets." *Id.*

The *Schneider* Court based its decision on the First Amendment, not a Due Process Clause strict liability theory. But in any event, the regulation at issue here can be distinguished from the one invalidated in *Schneider*. Unlike the leafleters in *Schneider*, plaintiffs here do not hand their posters to people who willingly accept them and then make a conscious choice to discard them as litter. Here, the potential litter takes the form of a sign on a public lamppost. No one voluntarily accepts it and decides to turn it into litter. If it remains posted beyond the durational limits and then blows away, there is no one to hold responsible but the organization that produced the poster and, presumably, benefited from its public placement. The only alternative would be to leave the cleanup cost with the District's taxpayers.

The Sixth Circuit reached a similar conclusion in *Jobe v. City of Cattlettsburg*, 409 F.3d 261 (6th Cir. 2005), in which it upheld a prohibition on placing leaflets on vehicles parked in public streets. The court explained that "the recipient of an advertisement or other pamphlet on a

car windshield has no choice in receiving the literature" and held that it did not constitute a due process violation to hold the originator responsible for creating the litter. *Id.* at 271. Here the situation is even clearer, because no one receives the literature at all. If the originator is not held responsible, the law cannot be enforced. The Due Process Clause does not require this. As *Schneider* itself explained, constitutional protections "do[] not deprive a city of all power to prevent street littering." *Schneider*, 308 U.S. at 162.

The Supreme Court has made clear that "[i]mposing liability without independent fault" can be constitutional when it "rationally advances the State's goal." *Pac. Mut. Life v. Haslip*, 499 U.S. 1, 14 (1991). Here the District passes that test, because the strict liability system provides a way—possibly the only way—to enforce anti-littering regulations with respect to signs posted on public poles. Furthermore, while "[s]trict liability is generally disfavored in criminal law, particularly with respect to cases that implicate the First Amendment," *United States v. Sheehan*, 512 F.3d 621, 629 (D.C. Cir. 2008), the District correctly notes that the regulations here are civil in nature. Def.'s Mot. 26. Strict liability for civil regulations has a long history of constitutionality. *See Morissette v. United States*, 342 U.S. 246, 256–61 (1952) (recounting the history of strict liability civil offenses, which the Court traces back to laws holding tavernkeepers responsible for selling liquor to habitual drunkards). "[I]n a broad range of civil and criminal contexts," strict liability is "not fundamentally unfair and does not in itself violate the Due Process Clause." *Haslip*, 499 U.S. at 15. This context falls into that category.

### E.    ANSWER's § 1983 Claim

ANSWER's remaining claim is that the District harassed it with a series of "bogus and false notices of violation" under 24 D.C.M.R. § 108 in March and April 2010. Suppl. Pldg. ¶ 42. Because ANSWER alleges that it "fully complied with the letter of the new and amended

postering regulations," *id.* ¶ 40, the organization claims that the District lacked "the slightest colorable factual basis," *id.* ¶ 63, for issuing the tickets and therefore must have targeted ANSWER in retaliation for its First Amendment-protected "postering free speech activities." Pl.'s Opp'n 36. This, ANSWER argues, constitutes a § 1983 violation by the District. *Id.*

To prove a § 1983 violation by the District, a plaintiff must allege both "a violation of his rights under the Constitution or federal law" and "also that the municipality's custom or policy caused the violations." *Warren v. Dist. of Columbia*, 353 F.3d 36, 38 (D.C. Cir. 2004). Taking plaintiff's allegations as true, as we must at this stage of the proceedings, *Atherton*, 567 F.3d at 681, ANSWER clearly satisfies the first half of the test by stating a constitutional violation. Penalizing an organization for posting political signs *within* the stated regulations (presuming, for now, the constitutionality of those regulations) plainly abridges free speech in violation of the First Amendment.

ANSWER then "bears the burden of pleading the existence of a municipal custom or practice that abridges [its] federal constitutional or statutory rights." *Bonaccorsy v. Dist. of Columbia,* 685 F. Supp. 2d 18, 27 (D.D.C. 2010). Plaintiff cannot meet that burden. While ANSWER describes the ninety-nine tickets it was issued with specificity, Suppl. Pldg. ¶ 68, it never coherently alleges the existence of a broader municipal custom or practice that explains the issuance of those tickets. It does not claim, for example, that the District established a custom of retaliating against organizations that adopted a particular message or spoke out against it in some way. It does not suggest that other groups were "similarly retaliated against for exercising their First Amendment rights." *Bonaccorsy,* 685 F. Supp. 2d at 27. And it never suggests a "deliberate choice" that the District made to retaliate against organizations practicing free speech. *See City of Canton v. Harris*, 489 U.S. 378, 389 (1989) ("[M]unicipal liability under §

1983 attaches where—and only where—a deliberate choice to follow a course of action is made from among various alternatives.").

Ultimately, the whole of ANSWER's claim is that the District's unconstitutional "custom or practice" was to issue one organization a batch of arguably questionable tickets over a single two-month period. While there is no hard-and-fast way to characterize a "custom or practice" in pleading a § 1983 claim, this narrow allegation does not rise to the level of any previously validated approach. *See Trimble v. Dist. of Columbia*, --- F. Supp. 2d ---, Civ. No. 10-460 (RWR), 2011 WL 1557886 (D.D.C. Apr. 26, 2011). Fatally, ANSWER supplies no information to support the suggestion that the District targeted it because of its First Amendment activities. As the Supreme Court has explained, "[a]llegations of government misconduct are easy to allege and hard to disprove," *Crawford-El v. Britton*, 523 U.S. 574, 585 (1998). And while "plaintiffs alleging municipal liability under section 1983 may not be held to a heightened pleading standard," a § 1983 complaint "alleging municipal liability must include some factual basis for the allegation of a municipal policy or custom." *Atchinson v. Dist. of Columbia*, 73 F.3d 418, 421–22 (D.C. Cir. 1996). This claim lacks that factual basis. ANSWER simply does not present sufficient allegations to establish a "direct causal link between a municipal policy or custom and the alleged constitutional deprivation," *City of Canton*, 489 U.S. at 385. ANSWER thus fails "state a claim to relief that is plausible on its face." *Iqbal*, 129 S.Ct. at 1949 (quoting *Twombly*, 550 U.S. at 570). As this Court has held consistently, "merely speculating that an unidentified policy and uncorroborated practice or custom exists without providing any factual heft to support the allegation is insufficient to state a claim under § 1983." *Trimble*, 2011 WL 1557886 at *4.

This is not to suggest that ANSWER has no way to contest the allegedly "bogus" tickets it received. It can challenge the validity of those citations in the OAH, where plaintiff has

previously and appropriately turned to challenge the propriety of individual Notices of Violation. *See* OAH Notice.  If the tickets were indeed issued wrongfully, ANSWER will receive its remedy in that forum.  But it has not presented the allegations necessary to support a § 1983 claim in this federal Court.  The District's motion to dismiss the § 1983 claim is thus granted.

## V.     CONCLUSION

For the reasons stated above, the District's motion to dismiss is denied with respect to Count One, MASF's facial challenge to the regulations based on the First Amendment.  The motion is granted with respect to Count Two, since MASF cannot raise an as-applied challenge, and Count Three, ANSWER's § 1983 claim.

The case will now proceed to discovery, and the District will have an opportunity to clarify the questions remaining about the meaning of the term "event" and the relation of event/non-event distinction in §§ 108.5–108.6 to the anti-littering interest it asserts.  The Court harbors no preconceived view and will consider the District's arguments with an open mind.  But if the Court finds that the regulations restrict expression based on content without furthering a content-neutral purpose, it will have little choice but to conclude that they favor election-related communications over general political advocacy in violation of the First Amendment.

There is, of course, another alternative available to the District's officials.  They can revise the regulations to include a single, across-the-board durational restriction that applies equally to all viewpoints and subject matters. This would address the problem of litter, remove the suspicion that politicians are carving out exceptions to benefit their own campaigns, and uphold the tradition of vibrant free expression in the nation's capital.

A separate Order consistent with these findings shall issue this date.

Signed by Royce C. Lamberth, Chief Judge, on July 21, 2011.