## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| ACT NOW TO STOP WAR AND END RACISM COALITION, *et al.,* | ) ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | 07-cv-1495 (RCL) |
| THE DISTRICT OF COLUMBIA | ) ) | |
| Defendant. | ) ) | |

## MEMORANDUM OPINION

The Court considers whether the fourth iteration of the District of Columbia's law regulating the posting of signs on lampposts passes First Amendment muster. The law's most recent version treats signs relating to an "event" differently from "non-event" signs when determining how long the signs may remain posted. The District has amended the law twice since this Court's last substantive opinion. While these amendments bring the law closer to constitutionality, the District has not properly explained the event/non-event distinction, and has added a definition of "event" that explicitly delegates broad administrative discretion to enforcement officers. Therefore the plaintiff is entitled to summary judgment.

## I.    BACKGROUND

### A.  Early History of the Case

From 1980 until the filing of this suit in 2007, the rules for posting on the District's lampposts exempted campaign and public safety signs from the generally-applicable durational limits, and required that campaign posters be removed within thirty days after the general election. At the time, the law stated:

108.5:  A sign, advertisement, or poster shall not be affixed for more than sixty (60) days, except the following:

> (a) Signs, advertisements, and posters for individuals seeking political office in the District…; and

> (b) Signs designed to aid in neighborhood protection from crime shall be exempt from the sixty (60) day time period.

108.6:  Political campaign literature shall be removed no less than thirty (30) days following the general election.

108.7:  Each sign, advertisement, or poster shall contain the date upon which it was initially affixed to a lamppost.

108.8:  Each sign, advertisement, or poster shall be affixed securely to avoid being torn down or disengaged by normal weather conditions.

108.9:  Signs, advertisements, and posters shall not be affixed by adhesives that prevent their complete removal from the fixture, or do damage to the fixture.

108.10: No more than three (3) versions or copies of each sign, advertisement, or poster shall be affixed on one (1) side of a street within one (1) block.

108.11: Within twenty-four (24) hours of posting each sign, advertisement, or poster, two (2) copies of the material shall be filed with an agent of the District of Columbia so designated by the Mayor.  The filing shall include the name, address, and telephone number of the originator of the sign, advertisement, or poster.

24 D.C. CODE MUN. REGS. § 108 (1980).

In the summer of 2007, Act Now to Stop War and End Racism Coalition ("ANSWER")—a "grassroots civil rights organization which seeks to engage the public in communications opposing war and racism, among other issues," Affidavit of Brian Becker 1–2, Mar. 14, 2008, ECF No. 11-1 ("ANSWER Affidavit")—posted signs advertising its September 15th "March to Stop the War" on public lampposts and electrical boxes throughout the city.  The District cited ANSWER for numerous violations of § 108.9, the provision regarding the use of adhesives.  *See* Ex. 1 to Def.'s First Mot. Dismiss, Feb. 6, 2008, ECF No. 8-1 (reproducing four Notices of Violation, all referencing § 108.9).  ANSWER contested the tickets before the District's Office of Administrative Hearings ("OAH").

In addition to its claims before the OAH, ANSWER challenged the District's postering regulations in this Court.  Compl., Aug. 21, 2007, ECF No. 1.  Unlike in the administrative proceeding, ANSWER sued in federal court with a co-plaintiff, Muslim American Society Freedom Foundation ("MASF"), which "focuses on empowering the Muslim-American community through civic education, participation, community outreach, and coalition building including First Amendment assemblies in opposition to war and in support of civil rights." Affidavit of Imam Mahdi Bray, Mar. 14, 2008, ECF No 11-2 ("MASF Affidavit").

In their complaint, the plaintiffs alleged that the regulations were facially unconstitutional because they contained improper content-based distinctions in violation of the First Amendment, First Am. Compl. ¶¶ 7–8, Dec. 18, 2007, ECF No. 3; were unconstitutionally vague and overbroad, *id.* ¶¶ 42–44; violated plaintiffs' right to anonymous speech, *id.* ¶ 39; and imposed a strict liability regime that violated plaintiffs' due process rights, *id.* ¶¶ 25–34.  Both plaintiffs submitted affidavits explaining that they had refrained from posting signs on public lampposts in the manner they would prefer because of the regulations, and that they were suing on behalf of themselves and "all others engaged in civil rights advocacy" whose speech had been similarly "chilled."  MASF Affidavit 1–2; ANSWER Affidavit 1–2.

The District moved to dismiss the complaint.  Def.'s First Mot. Dismiss, Feb. 6, 2008, ECF No. 8.  The District argued, among other theories, that MASF lacked standing because it suffered no injury from the regulations, *id.* at 14–20, and that the Court should abstain from adjudicating ANSWER's claims under the doctrine of *Younger v. Harris*, 401 U.S. 37 (1971), because ANSWER could present its constitutional claims through the administrative proceedings at the OAH.  Def.'s First Mot. Dismiss 4–8.  The Court agreed with both arguments and granted

the District's motion to dismiss.  *Act Now to Stop Racism and End War Coal. v. Dist. of Columbia* (*ANSWER I*), 570 F. Supp. 2d 72 (D.D.C. 2008).  Plaintiffs appealed.

On November 2, 2009—shortly before the United States Court of Appeals for the District of Columbia Circuit heard oral arguments—the District's Department of Transportation ("Department") issued a Notice of Emergency and Proposed Rulemaking revising the poster rules.  D.C. MUN. REGS. tit. 56, §§ 8759–60 (Nov. 6, 2009).  The new rules allowed:

> all signs that are not lewd, indecent, or vulgar, or do not pictorially represent the commission of or the attempt to commit any crime to be posted on a structure in public space for sixty (60) days, and a sign, advertisement, or poster related to a specific event may be affixed any time prior to an event but shall be removed no later than thirty (30) days following the event for which it is advertising or publicizing.

*Id.* at 8759.  The Department explained that the emergency rulemaking was "necessitated by the immediate need to address the continuing threat to the public welfare posed by an unequal treatment of non-commercial advertising in the public space."  *Id.*  The Department characterized the new regulations as "a technical amendment" that "removes a time limit distinction that exists between political and non-political advertising that has raised First Amendment concerns."  *Id.* The revised provisions, which became final on January 8, 2010, D.C. MUN. REGS. tit. 57, § 528 (Jan. 8, 2010), read as follows:

> 108.5:  A sign, advertisement, or poster not related to a specific event shall be affixed for no more than sixty days.
>
> 108.6:  A sign, advertisement, or poster related to a specific event may be affixed any time prior to the event but shall be removed no later than thirty (30) days following the event to which it is related.

24 D.C. CODE MUN. REGS. §§ 108.5–108.6 (2011).

The Court of Appeals decided the case on grounds that did not require consideration of these new rules.  The Court first reversed on the issue of MASF's standing.  Judge Williams explained that MASF's affidavit "plainly indicat[ed] an intent to engage in conduct violating the

60-day limit" and that this qualified as the "credible statement by the plaintiff of intent to commit a violative act" that the D.C. Circuit had previously held to constitute standing in a First Amendment facial challenge. *Act Now to Stop Racism and End War Coal. v. Dist. of Columbia* (*ANSWER II*), 589 F.3d 433, 435 (D.C. Cir. 2009) (quoting *Seegars v. Gonzales*, 396 F.3d 1248, 1253 (D.C. Cir. 2005)).

The Court of Appeals also remanded on some of the claims by ANSWER that this Court had initially declined to consider under the *Younger* abstention doctrine. Judge Williams explained that "the district court appropriately abstained" on the claims related to § 108.9, the adhesive provision, which ANSWER had directly challenged in the OAH. *Id.* But on the other claims, the Court of Appeals held that "consistent with *Younger*, ANSWER may raise constitutional challenges in federal district court that are completely independent of and severable from the violations it is facing in the District's administrative proceedings." *Id.*

With the case back before the Court, plaintiffs updated their complaint to account for the revised regulations. Suppl. Pleading, May 5, 2010, ECF No. 22-1. They maintained the claims that they had previously asserted, including their principal allegation that the regulations draw an unconstitutional, content-based distinction between signs carrying a general political message and signs related to political campaigns. *Id.* ¶ 4. While the new regulations replaced the explicit exception for signs posted in support of "individuals seeking political office" with a more general category for signs "related to a specific event," plaintiffs argued that the District had "simply substituted a new set of unconstitutional content-based distinctions for the prior set of unconstitutional content-based distinctions." *Id.*

Plaintiffs added two new counts in their supplemental pleading. First, in addition to facially challenging §§ 108.5–108.6 of the new regulations, they added an "as applied" challenge

alleging that the provisions are improperly content-based and undefined. *Id.* ¶¶ 102–04. Second, ANSWER added a claim that the District had violated 42 U.S.C. § 1983 by issuing "baseless" citations "in retaliation for the ANSWER Coalition's exercise of its lawful rights to free speech through lawful postering activities." *Id.* ¶¶ 105–06. ANSWER based this claim on ninety-nine citations it received from the District in March and April 2010, which it alleges were issued "notwithstanding the fact that the Coalition had fully complied with the [amended] regulations." *Id.* ¶ 44 (emphasis omitted).[1]

### B. The Court's July 2011 Ruling on Defendant's Motion to Dismiss

The District again moved to dismiss all of plaintiffs' claims. Def's Second Mot. Dismiss, June 2, 2010, ECF No. 26. Thereafter, ANSWER voluntarily dismissed its prospective claims under Counts One and Two, leaving MASF to pursue those facial constitutional challenges alone. Stipulation of Dismissal, Oct. 25, 2010, ECF No. 35. On July 21, 2011, this Court granted in part and denied in part the District's motion. *Act Now to Stop Racism and End War Coal. v. Dist. of Columbia* (*ANSWER III*), 798 F. Supp. 2d 134 (D.D.C. 2011). This Court ruled that MASF had standing to bring its facial challenge, but both plaintiffs lacked standing for their new "as applied" claims. *Id.* at 143. The Court then considered the merits of MASF's First Amendment challenges. When determining whether the claims could survive a motion to dismiss, the Court "must accept as true all of the factual allegations contained in the complaint," *Atherton v. Dist. of Columbia*, 567 F.3d 672, 681 (D.C. Cir. 2009), and grant plaintiffs "the benefit of all inferences that can be derived from the facts alleged." *Kowal v. MCI Commc'ns Corp.*, 16 F.3d 1271, 1276 (D.C. Cir. 1994).

---

[1] This case was originally assigned to Judge Henry H. Kennedy, who presided over this case until his retirement in 2011. The case was reassigned by consent to Chief Judge Royce C. Lamberth on May 4, 2011. Reassignment of Civil Case, ECF No. 36. The proceedings discussed in the next section, Part II.B., occurred under Chief Judge Lamberth, who is currently assigned to this case.

The Court found that the signs were "a form of expression protected by the Free Speech Clause." *Id*. at 144 (quoting *City of Ladue v. Gilleo*, 512 U.S. 43, 48 (1994)). Next, the Court found that the lampposts are "a textbook example of a limited or designated public forum, in which public property has been 'opened for use by the public as a place for expressive activity.'" *Id*. at 145 (quoting *Perry Educ. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37, 46 (1983)).

The Court then considered whether the law could meet the standards for a designated public forum, which permits content-neutral regulations which are narrowly tailored to serve a significant public interest, and leave open ample alternatives for communication.[2] *Id*. (citing *Burson v. Freeman*, 504 U.S. 191, 197 (1992)). While the law was viewpoint-neutral—applying equally to anti-war and pro-war posters—it was not necessarily content-neutral. "The guidelines provide substantially different treatment to two posters that are identical in every respect except that one contains content related to an event while the other does not." *Id*. at 146.

The Court also rejected the District's arguments that "the regulations are content-neutral because they do not totally prohibit a type of expression or a specific message but rather merely regulate the manner in which the message may be conveyed" and "that the regulations should be judged content-neutral even if [they] have some incidental effect on speech because they promote a content-neutral purpose—reducing litter and blight." *Id*. at 146–47 (citations omitted). The Court explained that restrictions that impose differential burdens on speech must still reviewed for content neutrality, *id*. at 146 (citing *Turner Broad. Sys. v. F.C.C.*, 512 U.S. 622, 642 (1994)), and that the regulations at issue did not clearly accomplish a content-neutral purpose in a content-neutral manner, *id*. at 147.

---

[2] If the regulations are found to be content-based, they can still be constitutional if they survive strict scrutiny. *Burson,* 504 U.S. at 198. Under this demanding standard, the District would have to show that "the regulation is necessary to serve a compelling state interest and that it is narrowly drawn to achieve that end." *Id.* While not impossible to meet, *see id.,* this is a very difficult hurdle to clear.

The Court summarized its main concerns with the District's regulations as follows:

> Viewed on its own, § 108.5, which limits posters "not related to a specific event" to a hanging time of sixty days, is unproblematic. An across-the-board durational restriction would limit litter by requiring posters of all types to be taken down after a certain number of days. Likewise, the provision of § 108.6 requiring posters related to events to be "removed no later than thirty (30) days following the event" is straightforward. A poster for an event that has already occurred is more likely to constitute litter and blight than a poster for a future event or a general political message. This Court's concern arises from the other half of § 108.6, which allows posters related to a specific event to be "affixed any time prior to the event." It is not clear how allowing posters to hang for an indefinite period of time before an event advances the District's interest in reducing litter….

> In the absence of an explanation for how this distinction between event and non-event signs advances the District's objective of litter prevention, the differential burdens imposed by §§ 108.5–108.6 present serious First Amendment concerns. *City of Ladue*, 512 U.S. at 52 ("Exemptions from an otherwise legitimate regulation of a medium of speech may…diminish the credibility of the government's rationale for restricting speech in the first place."). In particular, given that the District has announced that elections qualify as "events" under the new regulations, Pl.'s Notice, this distinction could be seen as a way of resurrecting the old rules that prioritized election-related speech—including the political communications of the government officials who make and enforce the rules—over general issue advocacy and political expression.

*Id*. at 148. After considering whether the law could be narrowly tailored and leave alternative channels of communication open, the Court denied the District's motion to dismiss Count One of the complaint. *Id*. at 149–50. The Court suggested that "an across-the-board durational restriction that applies without exceptions based on the content of the signs would address the constitutional concern while preserving the District's interest in preventing litter." *Id*. at 149.

The Court also refused to dismiss MASF's claim that that the law is unconstitutionally vague and overbroad. MASF contends that the law does not adequately define which posters "relate to an event," does not give adequate notice to potential speakers, and allows for arbitrary enforcement. *Id*. at 150–51. While "some of plaintiff's…scenarios str[uck] the Court as a bit far-fetched," the Court found "practical uncertainties…raise[d] the possibility that the law 'fail[s]

to provide the kind of notice that will enable ordinary people to understand which conduct it prohibits.'" *Id.* at 151 (quoting *City of Chicago v. Morales*, 527 U.S. 41, 56 (1999)).

The Court dismissed plaintiffs' claims that the registration requirement "represents an unconstitutional restraint on their right to anonymous speech," and "that the District imposed a system of 'strict liability' enforcement in violation of the Due Process Clause." *Id.* at 152–53. The Court found these claims legally meritless. *Id.* The Court also dismissed ANSWER's § 1983 claim that the "District harassed it with a series of bogus and false notices of violation." *Id.* at 153 (citations omitted). While ANSWER alleged a violation of its constitutional rights, it could not meet its "'burden of pleading the existence of a municipal custom or practice that abridges [its] federal constitutional or statutory rights.'" *Id.* at 154 (quoting *Bonaccorsy v. Dist. of Columbia*, 685 F. Supp. 2d 18, 27 (D.D.C. 2010)). The Court dismissed all of ANSWER's active claims, leaving only MASF's facial constitutional challenges. The Court ordered the case to proceed to discovery to give the District "an opportunity to clarify the questions remaining about the meaning of the term 'event' and the relation of [the] event/non-event distinction in §§ 108.5–108.6 to the anti-littering interest it asserts." *Id.* at 155.

### C. Current Regulations

Following *ANSWER III*, the District twice amended its postering regulations. On August 26, 2011, the Department of Transportation amended the disputed regulations to read:

> 108.5:   A sign, advertisement, or poster shall be affixed for no more than one hundred eighty (180) days.
>
> 108.6:   A sign, advertisement, or poster related to a specific event shall be removed no later than thirty (30) days following the event to which it is related.   This subsection is not intended to extend the durational restriction in subsection 108.5.

D.C. MUN. REGS. tit. 58, § 7688 (Aug. 26, 2011).   The following month, the District further amended the regulations.   D.C. MUN. REGS. tit. 58, § 8410 (Sept. 30, 2011).   First, the District

required the person posting the sign, in their filing with the District, to designate the date of the

event for event-related signs:

> 108.11: Within twenty-four hours of posting each sign, advertisement, or poster, two (2) copies of the material shall be filed with an agent of the District of Columbia so designated by the Mayor.  The filing shall include the name, address, and telephone number of the originator of the sign, advertisement, or poster, *and if the sign is for an event, the date of the event*.

*Id*. (new text in italics).  Furthermore, the amendment added a subsection defining "event":

> 108.13: For purposes of this section, the term 'event' refers to an occurrence, happening, activity or series of activities, specific to an identifiable time and place, if referenced on the poster itself or reasonably determined from all circumstances by the inspector.

24 D.C. CODE MUN. REGS. § 108.13 (2012) (providing current 108.13 definition of "event").

These regulations are currently in effect.  D.C. MUN. REGS. tit. 59, § 273 (Jan. 20, 2012).

On June 22, 2012, MASF and the District filed cross-motions for summary judgment.

Pl.'s Mot. Summ. J, ECF No. 60; Def.'s Mot. Summ. J., ECF No. 59.  The Court now considers

these motions and will grant in part MASF's motion, and deny in toto defendant's motion.

## II.    LEGAL STANDARD

### A.  Summary Judgment

"The court shall grant summary judgment if the movant shows that there is no genuine

dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed.

R. Civ. P. 56(a); *see also Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 247 (1986).  The mere

existence of *any* factual dispute will not defeat summary judgment; "the requirement is that there

be no *genuine* issue of *material* fact."  *Anderson*, 477 U.S. at 247–48 (emphasis in original).  A

fact is material if, under the applicable law, it could affect the outcome of the case.  *Id*.  A

dispute is genuine if the "evidence is such that a reasonable jury could return a verdict for the

nonmoving party." *Id*. Because "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge," the "evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Id*. at 255. A nonmoving party, however, must establish more than "the existence of a scintilla of evidence" in support of its position. *Id*. at 252. The inferences drawn from the evidence "must be reasonably probable and based on more than mere speculation." *Rogers Corp. v. E.P.A.*, 275 F.3d 1096, 1103 (D.C. Cir. 2002) (citations omitted). In addition, the nonmoving party may not rely solely on allegations or conclusory statements. *See Greene v. Dalton*, 164 F.3d 671, 675 (D.C. Cir. 1999). The nonmoving party must present specific facts that would enable a reasonable jury to find in its favor. *Id*. If the evidence presented is "merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson*, 477 U.S. at 249–50.

The filing of a cross-motion for summary judgment does not "concede the factual allegations of the opposing motion." *CEI Washington Bureau, Inc. v. Dep't of Justice*, 469 F.3d 126, 129 (D.C. Cir. 2006). Cross-motions for summary judgment are treated separately. *See Sherwood v. Washington Post*, 871 F.2d 1144, 1147 n.4 (D.C. Cir. 1989) ("[I]t does not matter that the District Court was faced with cross-motions for summary judgment. 'The rule governing cross-motions for summary judgment…is that neither party waives the right to a full trial on the merits by filing its own motion; each side concedes that no material facts are at issue only for the purposes of its own motion.'") (quoting *McKenzie v. Sawyer*, 684 F.2d 62, 68 n.3 (D.C. Cir. 1982)). The court may—despite the parties' stipulations that there are no disputed facts—find that material facts are in dispute, deny both motions, and proceed to trial. *Id*. at 1147 n.4.

### B.  Public Forum Doctrine

The First Amendment provides that "Congress shall make no law…abridging the freedom of speech."  U.S. CONST., amend. I.  The Supreme Court has long held that this restriction applies not only to Congress, but also to state and municipal governments.  *Lovell v. Griffin*, 303 U.S. 444, 450 (1938).  While the First Amendment "reflects 'a profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open,'" *Snyder v. Phelps*, 131 S. Ct. 1207, 1215 (2011) (quoting *N.Y. Times Co. v. Sullivan*, 376 U.S. 254, 270 (1964)), a municipal government "may sometimes curtail speech when necessary to advance a significant and legitimate state interest," *Members of the City Council of City of L.A. v. Taxpayers for Vincent*, 466 U.S. 789, 804 (1984).

Courts in this Circuit generally follow three steps in assessing a First Amendment challenge: "first, determining whether the First Amendment protects the speech at issue, then identifying the nature of the forum, and finally assessing whether the…justifications for restricting…speech 'satisfy the requisite standard.'"  *Mahoney v. Doe,* 642 F.3d 1112, 1116 (D.C. Cir. 2011) (quoting *Cornelius v. NAACP Legal Def. & Educ. Fund, Inc.*, 473 U.S. 788, 797 (1985)).  The first step here is undisputed.  "[S]igns are a form of expression protected by the Free Speech Clause[.]"  *City of Ladue*, 512 U.S. at 48.  The Court will focus on the second and third steps: identifying the nature of the forum and determining the requisite standard.

### 1.  Identifying the Nature of the Forum

The second step is to determine the nature of the forum in which the protected speech occurs.  Public forum doctrine "divides government property into three categories for purposes of First Amendment analysis."  *Oberwetter v. Hilliard*, 639 F.3d 545, 551 (D.C. Cir. 2011).  One category is the traditional public forum, which encompasses public areas that have "by long

tradition or by government fiat…been devoted to assembly and debate." *Perry,* 460 U.S. at 45. A second category is the limited public forum or designated public forum, which comprises "public property which the State has opened for use by the public as a place for expressive activity." *Id.* The final category is the nonpublic forum, which consists of government property that is "not by tradition or designation a forum for public communication." *Id.* at 46. In determining which analysis to apply to a given means of expression, the "dispositive question is not what the forum is called, but what purpose it serves." *Boardley v. U.S. Dep't of the Interior,* 615 F.3d 508, 515 (D.C. Cir. 2010).

### 2.  Determining the Requisite Standard

The next step is determining and applying the requisite standard. The test for a designated public forum is the same as that for a traditional public forum. *Perry,* 460 U.S. at 46. The key question is whether the law is a content-based or content-neutral regulation of speech. Content-based regulations are subject to strict scrutiny, and will only be upheld if "the regulation is necessary to serve a compelling state interest and…is narrowly drawn to achieve that end." *Burson,* 504 U.S. at 197–98. Content-neutral regulations are judged under a less rigorous "time, place or manner" test, which permits restrictions when "they are narrowly tailored to serve a significant governmental interest" and "leave open ample alternative channels for communication of the information." *Ward v. Rock Against Racism,* 491 U.S. 781, 791 (1989).

The "government has no power to restrict expression because of its message, its ideas, its subject matter, or its content." *Ashcroft v. American Civil Liberties Union,* 535 U.S. 564, 573 (2002) (citations omitted). "Deciding whether a particular regulation is content based or content neutral is not always a simple task. We have said that the 'principal inquiry in determining content neutrality…is whether the government has adopted a regulation of speech because of

[agreement or] disagreement with the message it conveys.'" *Turner*, 512 U.S. at 642 (quoting *Ward*, 491 U.S. at 791) (alterations in original). Generally, "laws that by their terms distinguish favored speech from disfavored speech on the basis of the ideas or views expressed are content based," while "laws that confer benefits or impose burdens on speech without reference to the ideas or views expressed are in most instances content neutral." *Id.*

Laws that discriminate based on viewpoint are most odious. *R.A.V. v. City of St. Paul*, 505 U.S. 377, 382 (1992); *see also Hastings Christian Fellowship v. Martinez*, 130 S. Ct. 2971, 3006 (2010) ("We have never before taken the view that a little viewpoint discrimination is acceptable.") (Scalia, J., dissenting). However, courts should be careful not to "conflate content neutrality with viewpoint neutrality." *ANSWER III*, 798 F. Supp. 2d at 146. "Regulation of the subject matter of messages, though not as obnoxious as viewpoint-based regulation, is also an objectionable form of content-based regulation." *Hill v. Colorado*, 530 U.S. 703, 722 (2000).

Laws that distinguish "based only upon the manner in which speakers transmit their messages to viewers, and not upon the messages they carry" are content-neutral. *Turner*, 512 U.S. at 645. Furthermore, a "'regulation that serves purposes unrelated to the content of the expression is deemed neutral, even if it has an incidental effect on some speakers or messages but not others.'" *Hastings*, 130 S. Ct. at 2994 (quoting *Ward*, 491 U.S. at 791). The "mere assertion of a content-neutral purpose will not be enough to save a law which, on its face, discriminates based on content," *Turner*, 512 U.S. at 642–43 (citations omitted)—"that distinction must actually advance the content-neutral purpose the city asserts," *ANSWER III*, 798 F. Supp. 2d at 147 (original formatting omitted).

### C. Substantial Overbreadth and Vagueness

MASF also challenges the District's law as unconstitutionally overbroad and vague on its face.  In the First Amendment context, courts are especially concerned about overbroad and vague laws that may have a chilling effect on speech.  *See*, *e.g.*, *Reno v. American Civil Liberties Union*, 521 U.S. 844, 871–72 (1997) ("The vagueness of such a regulation raises special First Amendment concerns because of its obvious chilling effect on speech.") (citing *Dombrowski v. Pfister*, 380 U.S. 479, 494 (1965)).  Courts are suspicious of "[b]road prophylactic rules in the area of free expression[,]" and therefore "[p]recision of regulation must be the touchstone in an area so closely touching our most precious freedoms."  *NAACP v. Button*, 371 U.S. 415, 438 (1963) (citations omitted).

The doctrines of substantial overbreadth and vagueness [3] often overlap, and Courts frequently blend them together.  *See*, *e.g.*, *Forsyth County v. Nationalist Movement*, 505 U.S. 123, 129 (1992) ("[A] party [may] challenge an ordinance under the overbreadth doctrine in cases where every application creates an impermissible risk of suppression of ideas, such as an ordinance that delegates overly broad discretion to the decisionmaker, and in cases where the ordinance sweeps too broadly, penalizing a substantial amount of speech that is constitutionally protected.");  *Kolender v. Lawson*, 461 U.S. 352, 358 n.8 (1982) ("We have traditionally viewed vagueness and overbreadth as logically related and similar doctrines.");  *Hunt v. City of L.A.*, 601 F. Supp. 2d 1158, 1167 n.6 (C.D. Cal. 2009) ("The doctrines of overbreadth, unbridled discretion, and vagueness overlap.") (citing SMOLLA & NIMMER ON FREEDOM OF SPEECH §§ 6:1–

---

[3] The vagueness doctrine, itself, encompasses the doctrine of standardless delegation of administrative discretion.  *See City of Chicago v. Morales,* 527 U.S. 41, 56 (1999). Sometimes, "standardless delegation" is treated as a separate, freestanding doctrine.  *See* SMOLLA & NIMMER ON FREEDOM OF SPEECH § 6:2 (2012) (stating that doctrines of overbreadth, vagueness, and standardless delegation of administrative discretion "are analytically distinct").  This Court will follow the lead of the Supreme Court and treat "standardless delegation" as a form of unconstitutional vagueness.

6 (2008)).  While noting the conceptual similarities, this Court heeds the warning not to "confuse vagueness and overbreadth doctrines," *Hoffman Estates v. Flipside*, *Hoffman Estates, Inc.*, 455 U.S. 489, 497 n. 9 (1982), and explain each doctrine separately.

### 1.   Vagueness and Standardless Delegation of Administrative Discretion

"Vagueness may invalidate a criminal law for either of two independent reasons.  First, it may fail to provide the kind of notice that will enable ordinary people to understand what conduct it prohibits; second, it may authorize and even encourage arbitrary and discriminatory enforcement."  *City of Chicago v. Morales*, 527 U.S. 41, 56 (1999).  Vague laws violate the Due Process clause of the Constitution, and this doctrine is not limited to laws regulating speech.  *See Papachristou v. Jacksonville*, 405 U.S. 156, 162 (1972) (vagrancy statutes void for vagueness under Due Process clause).  Requiring some precision in the law vindicates the "underlying principle that no man shall be held criminally responsible for conduct which he could not reasonably understand to be proscribed."  *United States v. Harriss*, 347 U.S. 612, 617 (1954). Perhaps more importantly, this doctrine reigns in the discretion of enforcement officers:

> [T]he more important aspect of the vagueness doctrine "is not actual notice, but the other principal element of the doctrine—the requirement that a legislature establish minimal guidelines to govern law enforcement."  Where the legislature fails to provide such minimal guidelines, a criminal statute may permit "a standardless sweep [that] allows policemen, prosecutors and juries to pursue their personal predilections."

*Kolender*, 461 U.S. at 358 (quoting *Smith v. Goguen*, 415 U.S. 566, 574–75 (1974)).

"[T]he Supreme Court has stated that the vagueness doctrine should be applied with special exactitude where a statute might impinge on basic First Amendment freedoms."  *Sharkey's. Inc. v. City of Waukesha*, 265 F. Supp. 2d 984, 990 (E.D. Wis. 2003) (citing *Grayned v. City of Rockford*, 408 U.S. 104, 109 (1972)); *see also F.C.C. v. Fox Television Stations, Inc.*, 132 S. Ct. 2307, 2317 (June 21, 2012) ("[T]he void for vagueness doctrine addresses at least two

connected but discrete due process concerns:  Regulated parties should know what is required of them so they can act accordingly; and precision and guidance are necessary so that those enforcing the law do not act in an arbitrary or discriminatory way.  When speech is involved, rigorous adherence to these requirements is necessary to ensure that ambiguity does not chill protected speech.").  Courts in this circuit have strictly enforced the vagueness doctrine.  *See Armstrong v. D.C. Public Library*, 154 F. Supp. 2d 67, 77, 81 (D.D.C. 2001) ("[W]hen a regulation lacks terms which can be defined objectively, a court will strike it down for vagueness."; "[T]his Circuit has ruled that officials must have explicit guidelines in order to avoid arbitrary and discriminatory enforcement.") (citations omitted).

The vagueness doctrine does not require "perfect clarity and precise guidance…even of regulations that restrict expressive activity." *Ward,* 491 U.S. at 794.  "Condemned to the use of words, we can never expect mathematical certainty from our language." *Grayned*, 408 U.S. at 110.  Regulations "cannot, in reason, define proscribed behavior exhaustively or with consummate precision." *United States v. Thomas*, 864 F.2d 188, 195 (D.C. Cir. 1988).  Courts "must be careful not to go beyond the statute's facial requirements and speculate about 'hypothetical' or 'imaginary' cases." *Washington State Grange v. Washington Republican Party*, 552 U.S. 442, 449–50 (2008) (citing *United States v. Raines*, 362 U.S. 17, 22 (1960)).

### 2.  Substantial Overbreadth

A Court may facially invalidate a law if there is "no set of circumstances under which the law would be valid." *United States v. Salerno*, 481 U.S. 739, 745 (1987).  "In the First Amendment context, however" the Supreme Court "recognizes 'a second type of facial challenge,' whereby a law may be invalidated as overbroad if 'a substantial number of its applications are unconstitutional, judged in relation to the statute's plainly legitimate sweep.'"

*United States v. Stevens*, 130 S. Ct. 1577, 1587 (2010) (quoting *Washington State Grange*, 552 U.S. at 449 n.6). Courts require that the overbreadth of the law be substantial "not only in an absolute sense, but also relative to the statute's plainly legitimate sweep." *United States v. Williams*, 553 U.S. 285, 292 (2008).

The Supreme Court has established a two-step test for analyzing substantial overbreadth. First, a court must "construe the challenged statute; it is impossible to determine whether a statute reaches too far without first knowing what the statute covers." *Id.* at 293. Second, a court must consider "whether the statute, as [the court has] construed it, criminalizes a substantial amount of protected expressive activity." *Id*. at 297. While this test is considerably less stringent than the *Salerno* test, the Supreme Court warns that "[i]nvalidation for overbreadth is strong medicine that is not to be casually employed." *Id*. at 293 (citations omitted).

## III.    DISCUSSION

The District's sign regulations are unconstitutional for two reasons. First, the law is an unconstitutional regulation of protected speech in a designated public forum. The District has not properly justified the distinction it draws between events and non-events. The District has not offered any admissible evidence explaining how its regulations further any content-neutral purposes. *See* Def.'s Statement of Material Facts, June 22, 2012, ECF No. 59-1 ("Def.'s SMF") (providing nothing how regulations achieve content-neutral purposes). The Court cannot accept the District's inadmissible *ipse dixit* that the law's event/non-event is narrowly tailored to promote esthetics and litter control, and the District has provided no admissible evidence about how the law accomplishes those interests. Thus, the law fails intermediate scrutiny—the lowest level applicable to a law regulating speech in a public forum.

Secondly, the regulations fail because they *explicitly* delegate administrative discretion to enforcement officers.  A sign could be related to an event if "reasonably determined from all circumstances by the inspector."  24 D.C. CODE MUN. REGS. § 108.13 (2012); Pl.'s Statement of Material Facts ¶8, June 22, 2012, ECF No. 60-1 ("Pl.'s SMF").  The Court recognizes that language is imprecise, and it cannot expect definitions to cover every imaginable scenario.  Yet, when a law touches on the sensitive area of free speech, more specificity is required.  A legislature cannot explicitly delegate ambiguous cases to the rudderless "reasonable" judgment of individual enforcement officers.

MASF has "show[n] that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law," Fed. R. Civ. P. 56(a), and MASF is entitled to summary judgment.  Since the District's cross-motion seeks summary judgment on identical issues, granting MASF summary judgment logically precludes granting the District's motion.

MASF also challenges the sign regulations on the grounds that they are unconstitutionally overbroad—although the law may be applied in some instances without offending the First Amendment, its overly-broad sweep penalizes a significant amount of constitutionally-protected speech.  Def.'s Mot. Summ. J. 38–40.  MASF relies heavily on cases that conflate overbreadth with vagueness; the Court strives to treat those doctrines separately.  The problem with the sign regulations isn't that they regulate *too much* speech, or regulate certain categories of speech that the District cannot touch.  A law that imposes an across-the-board durational limit on all signs, or properly explains the fit between the event/non-event distinction and content-neutral interests, could be constitutional.  The real problems are the lack of justification for the event/non-event distinction, and the explicit delegation of administrative discretion to individual decisionmakers.

### A.  MASF's Challenge that the Law is Unconstitutionally Content-Based

There are three steps in this kind of First Amendment challenge: determining whether the First Amendment protects the speech, determining the forum in which the speech occurs, and then assessing whether the regulations meet the requisite standard.  *See* Part III.B *supra*; *Mahoney*, 642 F.3d at 1116.  The District's latest amendments do not change how the Court would assess the first two steps; therefore, the Court will re-state and adopt, in the following two sections, its analysis in *ANSWER III*, 798 F. Supp. 2d at 144–45.

#### 1.  Do the Regulations Implicate Protected Speech?

The first step here is clear.  "[S]igns are a form of expression protected by the Free Speech Clause[.]"  *City of Ladue*, 512 U.S. 43, 48 (1994).  That is particularly true given the subject of the signs plaintiff seeks to post—political opinions on public issues such as war and racial profiling.  *Snyder*, 131 S. Ct. at 1211 ("[S]peech on public issues occupies the 'highest rung of the hierarchy of First Amendment values' and is entitled to special protection.") (quoting *Connick v. Myers*, 461 U.S. 138, 145 (1983)); *City of Ladue*, 512 U.S. at 54 (characterizing anti-war speech as "absolutely pivotal").  Plaintiff's desire to post signs bearing political messages easily qualifies as protected speech.

#### 2.  What is the Nature of the Forum?

The second step is to determine the nature of the forum where the protected speech occurs.  This is slightly more complicated than the first step, but still raises no serious doubt.  The "lamppost[s] and appurtenances" referenced by the regulations, 24 D.C. CODE MUN. REGS. § 108.1 (2012), are government property.  The District's lampposts are not a traditional public forum; their purpose is not to serve as a means of expression.  Unlike streets and parks, the quintessential public fora, they have not "immemorially been held in trust for the use of the

public and, time out of mind…been used for purposes of assembly, communicating thoughts between citizens, and discussing public questions." *Hague v. C.I.O.*, 307 U.S. 496, 515 (1939). On the other hand, the District's lampposts cannot be considered a nonpublic forum. While the Supreme Court found Los Angeles's utility poles to be a nonpublic forum in *Taxpayers for Vincent*, 466 U.S. at 815, there is an important distinction between that case and this one. The Los Angeles ordinance banned all signs on utility poles. *Id.* Here, the District explicitly permits a wide array of postings on public lampposts. The District's lampposts cannot constitute a nonpublic forum given that the regulations designate them as a lawful place for posting. 24 D.C. CODE MUN. REGS. § 108 (2012). Instead, the District's lampposts are a textbook example of a limited or designated public forum, in which public property has been "opened for use by the public as a place for expressive activity." *Perry*, 460 U.S. at 45.

### 3.  Are the Regulations Content-Neutral or Content-Based?

The next step is determining whether the regulations are content-neutral or content-based, and determining whether strict or intermediate scrutiny applies. The District has amended its regulations in response to the Court's July 2011 opinion. While these amendments do not solve all the regulations' constitutional problems—*see* Part III.A.5 *infra*—the Court will reexamine the content-neutrality of the regulations and not simply rely on its analysis in *ANSWER III*.

####     a.  *Content-neutral justifications for laws with incidental effects on content—legal standard and burden of proof*

The District argues that its regulations are content-neutral because they are "justified without reference to the content of the regulated speech." Def.'s Mot. Summ. J. 9 (quoting *Ward*, 491 U.S. at 789). But the "mere assertion of a content-neutral purpose will not be enough to save a law which, on its face, discriminates based on content." *Turner*, 512 U.S. at 642–43.

Simply by pointing to the words of the regulations and asking the Court to apply the controlling law, MASF has met its initial summary judgment burden.  It has shown that the sign regulations regulate protected speech in a designated public forum, and places differential burdens on different types of speech.  *See* Pl.'s SMF ¶8; Def.'s SMF ¶¶5–6; Def.'s Opp'n to Pl.'s SMF 3, July 17, 2012, ECF No. 62-1 ("The District does not dispute paragraph 8 of the [plaintiff's] SMF, as the quoted text is contained in the current regulations.").  The burden then shifts to the District to show how its law is narrowly tailored to achieve a significant, content-neutral interest.  *See ANSWER III*, 798 F. Supp. 2d at 148 ("In the absence of an explanation for how th[e] distinction between event and non-event signs advances the District's objective of litter prevention, the differential burdens imposed by [the sign regulations] present serious First Amendment concerns.").  The District asserts in its briefs, without reference to any legislative history or supporting affidavits, that the regulations promote esthetics and reduce litter.[4]  Def.'s Mot. Summ. J. 11–12.  At this stage, such conclusory statements are insufficient.

---

[4] One might argue that the District fails at a more basic level; not only does it fail to introduce any evidence explaining how its law achieves its interests in litter control and esthetics, it fails to introduce evidence showing that its interests are in fact litter control and esthetics.  In fact, the District does not introduce any legislative history or affidavit explaining why it passed the law; again, it simply relies on *ipse dixit* in its briefs.

Unlike with the issue of narrow tailoring, *see infra* Part.III.A.4, the Court can take judicial notice of public records evincing the intent behind Section 108.  In its Notice of Emergency Rulemaking, the District noted its amendment of the sign regulations "retain[s] the intent of the Council when it passed the Street Sign Regulation Amendment Act of 1979, D.C. Law 3-50, 26 DCR 2733 (December 21, 1979)."  D.C. MUN. REGS. tit. 56, §§ 8759–60 (Nov. 6, 2009).  The stated intent of that law was to control litter and promote esthetics and public safety.  26 DCR 2733 (1979).

Furthermore, the District's Notice of Proposed Rulemaking states that sign regulations serve to, *inter alia*, "[r]educe [ ] traffic hazards," "[p]rotect property values," and "[p]rovide an attractive visual environment[.]"  D.C. MUN. REGS. tit. 56, §§ 10022–99 (Aug, 17, 2012). (However, the Proposed Rulemaking's conclusory statement that its sign regulations "advance these governmental interests and objectives and are the minimum amount of regulation necessary to achieve them," *id.*, is evidence of nothing, especially considering it applies to dozens of different sections—including regulations of billboards and public art.)  While this Proposed Rulemaking has yet to become final, it provides more evidence that the District has litter control and esthetics interests in mind when regulating signs.

The Supreme Court held in *City of Cincinnati v. Discovery Network*, 507 U.S. 410 (1993), that the burden is on the government to explain how its law furthers its interests. Cincinnati prohibited the distribution of "commercial handbills" through newsracks installed on public property. The city did not completely ban newsracks and allowed the distribution of newspapers. *Id*. at 412–15. Cincinnati claimed that its interests in "ensuring safe streets and regulating visual blight" justified this distinction. *Id*. at 415. The Court held the law unconstitutional, as the city did not properly justify its law: "It was the city's burden to establish a reasonable fit between its legitimate interests in safety and esthetics and its choice of a limited and selective prohibition of newsracks as the means chosen to serve those interests." *Id*. at 416. Although Discovery Network challenged the law, the Court did not require Discovery to prove that Cincinnati had an impermissible or insufficient interest; instead the Supreme Court put the onus on the city to defend its law:

> In the absence of some basis for distinguishing between "newspapers" and "commercial handbills" that is relevant to an interest asserted by the city, we are unwilling to recognize Cincinnati's bare assertion that the "low value" of commercial speech is a sufficient justification for its selective and categorical ban on newsracks dispensing "commercial handbills." Our holding, however, is narrow. As should be clear from the above discussion, we do not reach the question whether, given certain facts and under certain circumstances, a community might be able to justify differential treatment of commercial and noncommercial newsracks. We simply hold that on this record Cincinnati has failed to make such a showing. Because the distinction Cincinnati has drawn has absolutely no bearing on the interests it has asserted, we have no difficulty concluding, as did the two courts below, that the city has not established the "fit" between its goals and its chosen means that is required[.]

*Id*. at 428. The Court also distinguished between content and viewpoint-discrimination. The Court rejected a need for "evidence that the city has acted with animus toward the ideas contained in respondents' publications," *id*. at 429, and the argument that "'discriminatory… treatment is suspect under the First Amendment only when the legislature intends to suppress

certain ideas'" *id.* (quoting *Simon & Schuster, Inc. v. Members of N.Y. State Crime Victims Board*, 502 U.S. 105, 117 (1991) (also rejecting argument)).

> b. *Content-neutral justifications for laws with incidental effects on content—the District's failure to explain with admissible evidence*

The District has failed to meet its burden and introduce any admissible evidence [5] explaining how District's regulations achieve content-neutral interests.  It does not introduce any relevant legislative history, municipal regulation, or affidavit.  The District's attorneys simply assert that the District's regulations promote esthetics and reduce litter.  *See* Def.'s Mot. Summ. J. 11–12.  Such unsworn *ipse dixit* is evidence of nothing.  *See*, *e.g.*, *Schoch v. First Fidelity Bancorporation*, 912 F.2d 654, 657 (3d Cir. 1990) ("unsupported allegations in [a non-movant's] memorandum and pleadings are insufficient to repel summary judgment"); *Int'l Distrb. Corp. v. Am Dist. Tel. Co.*, 569 F.2d 136, 139 (D.C. Cir. 1977) ("[A] party may not avoid summary judgment by mere allegations unsupported by affidavit."); *see also Akers v. Liberty Mut. Group*, 744 F. Supp. 2d 92, 96 (D.D.C. 2010) ("Because the objective of summary judgment is to prevent unnecessary trials, and because '[v]erdicts cannot rest on inadmissible evidence,' it follows that the evidence considered at summary judgment must be capable 'of being converted into admissible evidence.'") (quoting *Greer v. Paulson*, 505 F.3d 1306, 1315 (D.C. Cir. 2007)).

The District points to other cases where courts recognized that sign regulations were motivated by significant interests in reducing visual clutter.  Def.'s Mot. Summ. J. 13–16 (citing

---

[5] The party opposing summary judgment may rely on evidence "capable of being converted into admissible evidence at trial" to "survive summary judgment."  *Greer v. Paulson*, 505 F.3d 1306, 1315 (D.C. Cir. 2007).  Generally, this allows an opposing party to submit evidence such as sworn affidavits (which themselves would not be admissible at trial if the witness were available to testify) to establish that there is a genuine issue of disputed fact, and the case should go to trial.  *See Gleklen v. Dem. Congressional Campaign Comm., Inc.*, 199 F.3d 1365, 1369 (D.C. Cir. 2000).  But a party opposing summary judgment "may not rest upon mere allegations or denials."  *Anderson*, 477 U.S. at 256.  The unsupported statements of counsel are not capable of being transformed into admissible evidence, and therefore cannot be considered at this stage.

*Covenant Media of S.C. v. City of N. Charleston*, 493 F.3d 421 (4th Cir. 2007); *Wag More Dogs, Ltd. Liability Corp. v. Cozart*, 680 F.3d 359 (4th Cir. 2012); *Reed v. Town of Gilbert, Ariz.*, 587 F.3d 966 (9th Cir. 2009)).   These cases show that litter control and esthetics can act as significant content-neutral interests.   *Covenant Media*, 493 F.3d at 434 ("North Charleston's interests in regulating signs were completely unrelated to the messages displayed: They were to "eliminate confusing, distracting and unsafe signs, assure the efficient transfer of information; and enhance the visual environment[.]"); *Wag More Dogs*, 680 F.3d at 368 ("Arlington enacted the ordinance to, among other aims, promote traffic safety and the County's aesthetics, interests unrelated to messages displayed."); *Reed*, 587 F.3d at 981 (city has "significant interests in aesthetics and traffic safety").   These cases also show that sign regulations are not content-based simply because they distinguish between different types of signs.   *Covenant Media*, 493 F.3d at 434 (although "the Sign Regulation required looking generally at what type of message a sign carries to determine where it can be located, this 'kind of cursory examination' did not make the regulation content-based.") (quoting *Hill*, 530 U.S. at 721); *Wag More Dogs*, 680 F.3d at 365 (rejecting "wooden logic" that all laws imposing different requirements are content-based; embracing "a practical analysis of content neutrality, requiring that a regulation do more than merely differentiate based on content to qualify as content based"); *Reed*, 587 F.3d at 978 ("[T]his regulation is a good example that the 'officer must read it' test is not always determinative of whether a regulation is content based or content neutral.").   They show how municipalities may treat different kinds of signs differently without violating the Constitution.

The holdings in *Covenant Media*, *Wag More Dogs*, and *Reed* would support arguments the District could make to defend its sign regulations.   The cases cannot, however, replace the need for the District to make its own arguments.   As *Cincinnati* holds, the District has "the

burden to establish a reasonable fit between its legitimate interests…[and] the means chosen to serve those interests."  507 U.S. at 416; *see also Bd. of Trustees of State Univ. of New York v. Fox*, 492 U.S. 469, 480 (1989) ("[T]he State bears the burden of justifying its restrictions…and must affirmatively establish the reasonable fit we require.").  The Court must determine whether the District's event/non-event distinction is narrowly tailored to achieve its interests.  This is a case-specific inquiry.  *Covenant Media*, *Wag More Dogs*, and *Reed* may show that, in other instances, cities have justified differential treatment of signs to further esthetics.  But the laws in those cases deal with different kinds of sign regulations; none are sufficiently similar to prove that the kinds of differential burdens the District places on event and non-event signs would be similarly justified.  *Covenant Media*, 493 F.3d at 424–25 (regulation exempted signs "identifying or advertising a business…located on the premises where the sign is installed" from size and zoning requirements applicable to other "billboards"); *Wag More Dogs*, 680 F.3d at 363–64 (petitioner objects to differential permit requirements placed on business signs); *Reed*, 587 F.3d at 971–78, 981–83 (considering requirements placed on "Temporary Directional Signs Relating to a Qualifying Event"—signs placed outside of event site for less than a day—and distinctions between commercial and non-commercial speech).

*Reed* presents the most analogous case, but there are still important differences.  The law in *Reed* regulates the placement of signs on private property, not in a designated public forum. 587 F.3d at 976–77 (law specifically prohibits placing signs "[o]n fences, boulders, planters, other signs, vehicles, utility facilities, or any structure").  The signs in *Reed* direct someone to the place of a particular event, and are not used to broadly advertise future events.  *Id*. at 979–80. The sign regulation in *Reed* is very limited; it only allows signs to be displayed "up to 12 hours before, during, and 1 hour after the Qualifying Event ends."  *Id*. at 977.  This kind of ordinance

does not address the kinds of signs at issue in the present case—campaign signs posted months before the election; signs advertising political marches and rallies weeks in advance. The present case is not like *Nixon v. Shrink Missouri Gov't PAC*, 528 U.S. 377 (2000), where the Supreme Court found that Missouri's law was so similar to the campaign finance regulations approved in *Buckley v. Valeo*, 424 U.S. 1 (1976), and its progeny that Missouri need not introduce extensive empirical evidence in support of its law. *Nixon*, 528 U.S. at 391 ("The quantum of empirical evidence needed to satisfy heightened judicial scrutiny of legislative judgments will vary up or down with the novelty and plausibility of the justification raised."). There is no evidence that the District relied on the experiences of the municipalities referenced in *Covenant Media*, *Wag More Dogs*, and *Reed* when passing its regulations.

The District's reliance on the Supreme Court's decisions in *Turner*, *Nixon* and *Renton* is misplaced. The District argues:

> [T]he government need not produce affirmative evidence that the challenged regulations are having the intended effect. *See Turner*, 512 U.S. at 666 ("[W]hen trenching on first amendment interests, even incidentally, the government must be able to adduce either empirical support *or at least sound reasoning* on behalf of its measures") (emphasis added) (quoting *Century Communications Corp. v. FCC*, 835 F.2d 292, 391(D.C. Cir. 1987)). The reasoning contained herein is more than sufficient to demonstrate the constitutionality of the District's postering regulations….
>
> In *Nixon*, the Supreme Court upheld a Missouri campaign-finance law against a First Amendment challenge, despite the fact that the state does not preserve legislative history. *Nixon*, 528 U.S. at 393. The "evidence" introduced by the government there included a single affidavit from a state legislator and numerous newspaper articles. *Id.* (citing, *inter alia*, *City of Renton v. Playtime Theatres*, 457 U.S. 41, 51–52 (1986) ("The First Amendment does not require a city, before enacting…an ordinance, to conduct new studies or produce evidence independent of that already generated by other cities, so long as whatever evidence the city rests upon is reasonably believed to be relevant to the problem that the city addresses")).

Def.'s Mot. Summ. J. 11, n.7. The Court agrees that the District need not introduce extensive evidence that its regulations promote esthetics or reduce litter. *See Turner*, 512 U.S. at 666. But

the Court cannot accept "mere conjecture as adequate to carry a First Amendment burden." *Nixon*, 528 U.S. at 392.  In all three cases cited, the government provided *some* evidence— outside of the unsworn statements of counsel—to show how the law would further content- neutral interests.  In *Turner*, "Congress enacted the 1992 Cable Act after conducting three years of hearings on the structure and operation of the cable television industry. The conclusions Congress drew from its factfinding process are recited in the text of the Act itself."  512 U.S. at 632 (citations omitted).  In *Renton*, the "resolution contained a clause explaining that" businesses which have as their "primary purpose the selling, renting or showing of sexually explicit materials…would have a severe impact upon surrounding businesses and residences." 475 U.S. at 44 (internal quotation marks omitted).  Renton's City Council, prior to enacting the law, "referred the matter to the city's Planning and Development Committee" who "held public hearings, reviewed the experiences…of other cities, and received a report from the City's Attorney's Office advising as to developments in other cities." *Id*.  And while the District points out that an affidavit and some newspaper articles were sufficient to meet the government's burden in *Nixon*, 528 U.S. at 393, at least Missouri provided *something*.[6]

The District emphasizes *Turner*'s statement that "'when trenching on first amendment interests…the government must be able to adduce either empirical support *or at least sound reasoning* on behalf of its measures.'"  512 U.S. at 666 (quoting *Century*, 835 F.2d at 304) (emphasis added).  The District may argue that its filings—and the arguments contained

---

[6] The District points to two news articles from the Washington Post discussing the visual blight caused by campaign signs. Def.'s Mot. Summ. J. 19.  However, neither of these articles explains *why* the Council enacted these regulations.  In fact both of them relate to efforts in Virginia, not Washington, D.C., to curb election signs. *See* Holly Hobbs, *Signs of election time*, WASH. POST, Oct. 20, 2011, at T17 (describing political signs in Fairfax County, Virginia); Shya Somashekhar, *Looking for Sign-Free Roadsides: County Considers Pact with VDOT*, WASH. POST, Sept. 18, 2008, at T1 (describing efforts in Loudoun County, Virginia to regulate political signs).  Unlike in *Renton*, there is no evidence that the District's Department of Transportation or City Council considered the efforts in other jurisdictions when amending its sign regulations.

therein—constitute the 'sound reasoning' needed to defend the sign regulations. Def.'s Mot. Summ. J. 10–12. However, even if 'sound reasoning' could suffice, that reasoning cannot rest solely on lawyers' arguments. Directly before quoting *Century*, the *Turner* Court stated: "Th[e] obligation [of the Court] to exercise independent judgment when First Amendment rights are implicated…assure[s] that, in formulating its judgments, Congress has drawn reasonable inferences based on substantial evidence." 512 U.S. at 666. Therefore, while the Court may defer to the "sound reasoning" of the government—and not require extensive empirical evidence—it must have some way to independently test the government's reasoning. Relying on the unsupported, unsworn *ipse dixit* of counsel is the opposite of "exercis[ing] independent judgment when First Amendment rights are implicated." *Id.* It would be ironic if *Turner* held that the government need not introduce any evidence to defend its law under the First Amendment, and may simply rest on unsworn conclusory statements. The *Turner* Court did not find the government's 'sound reasoning'—supported by properly submitted statistics, studies, and legislative history—sufficient to defend the law, and remanded the case to develop an even "more thorough factual record." *Id.* at 668.

The District also cites, in its Reply, *City of L.A. v. Alameda Books, Inc.*, 535 U.S. 425, 439 (2002), which states: "In effect [the dissenting Justices ask[]] the city to demonstrate, *not merely by appeal to common sense*, but also with empirical data, that its ordinance will successfully lower crime. Our cases have never required that municipalities make such a showing, certainly not without *actual and convincing evidence from plaintiffs to the contrary*." (presented as quoted in Def.'s Reply 8). As with *Turner*, *Nixon* and *Renton*, the District presents language out of context to try to show that the government may rely solely on lawyers' arguments to demonstrate the proper "fit" between the law and the government's interests.

*Alameda Books* concerned an ordinance, similar to the one in *Renton*, regulating the siting of adult entertainment establishments. *Id*. at 433–34. Los Angeles submitted relevant legislative history and a 1977 report from the Department of City Planning to explain the interests behind the law, and how the law is narrowly tailored to accomplish those interests. *Id*. at 430. The key dispute between Justice O'Connor and the dissenting Justices was not whether the government had any evidentiary burden to explain its regulation of speech; the dispute concerned *how much* evidence the government had to provide to meet this burden. *Id*. at 438–42. The sides disagreed over whether Los Angeles could rely on the 1977 Study to demonstrate the reasonable "fit" required by the First Amendment. *Id*. Although the majority was willing to grant the city considerable deference to address the secondary effects of pornographic speech, "[t]his is not to say that a municipality can get away with shoddy data or reasoning. The municipality's *evidence* must fairly support the municipality's rationale for its ordinance." *Id*. at 438 (emphasis added). Los Angeles had an "evidentiary requirement" to justify its law, despite the fact that it did not facially discriminate against particular viewpoints. *Id*. at 439. Justice O'Connor recognized that the "City Council is in a better position than the Judiciary to gather and evaluate data on local problems," *id*. at 440, but weighed this against the Court's "'obligation to exercise independent judgment when First Amendment rights are implicated.'" *Id*. (quoting *Turner*, 512 U.S. at 666). *Alameda Books* suggests that once a city introduces evidence on how its law is narrowly tailored to mitigate the secondary effects of speech, the conclusions the city draws from that evidence deserves judicial deference. It does not hold, as the District suggests, that a government has no evidentiary burden whatsoever when treading on First Amendment rights.

At one point, the District claims there is "ample evidence in the legislative and public records to uphold the District's scheme." Def.'s Mot. Summ. J. 11. But the District never

directed the Court to this evidence. A conclusory claim that supporting evidence may exist is not enough to defeat plaintiff's summary judgment motion. *See, e.g.*, *Celotex Corp v. Catrett*, 477 U.S. 317, 325 (1986) (disapproving "a line of cases allowing a party opposing summary judgment to resist a properly made motion by reference only to its pleadings"); *Engl v. Aetna Life Ins. Co.*, 139 F.2d 469, 473 (2d Cir. 1943) (allowing an opposing party to "reserve one's evidence when faced with a motion for summary judgment" would render "useless the very valuable remedy of summary judgment"). At summary judgment the Court cannot rely on "mere allegations or denials." *Anderson*, 477 U.S. at 256; *see also* 10A WRIGHT, MILLER & KANE, FEDERAL PRACTICE & PROCEDURE § 2727 (3d ed. 2012) ("A judge may not resolve a summary-judgment motion by 'assumptions' about matters that have not been properly presented in the manner prescribed by the rule or that are not the subject of the judicial notice doctrine.").

### 4.  Would the regulations survive the applicable standard?

The District does not seem to treat this case as one arising under the First Amendment. It does not act as if it needs to do anything to justify its law, except to suggest that the plaintiff has not met *its* burden. *Cf. Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 885 (1990) ("Rule 56 does not require the moving party to negate the elements of the nonmoving party's case."). The law undeniably touches First Amendment rights, and therefore the Court cannot analyze it under the rational basis standard. The Court must subject the law to at least intermediate scrutiny, which applies to content-neutral regulations. Because of the District's total failure to explain the "fit" between the event/non-event distinction and any content-neutral justification, the law fails intermediate scrutiny and is unconstitutional.

Under intermediate scrutiny, the Court allows content-neutral time, place, and manner regulations of speech that "are narrowly tailored to serve a significant governmental interest" and

"leave open ample alternative channels for communication of the information."  *Ward*, 491 U.S at 791.  In analyzing laws for narrow tailoring:

> [O]ur decisions require [ ] a fit between the legislature's ends and the means chosen to accomplish those ends—a fit that is not necessarily perfect, but reasonable; that represents not necessarily the single best disposition but one whose scope is in proportion to the interest served; that employs not necessarily the least restrictive means but…a means narrowly tailored to achieve the desired objective.  Within those bounds we leave it to governmental decisionmakers to judge what manner of regulation may best be employed.

*S.U.N.Y. v. Fox*, 492 U.S. at 480 (internal quotation marks and citations omitted) (applied to public forum context in *Cincinnati*, 507 U.S. at 417).  Although the District has discretion in tailoring a solution to the litter problems posed by event signs, it still has the burden to "establish a 'reasonable fit' between its legitimate interests in safety and esthetics" and the event/non-event distinction drawn by the law.  *Cincinnati*, 507 U.S. at 417; *see also S.U.N.Y. v. Fox*, 492 U.S. at 480 ("[T]he State bears the burden of justifying its restrictions…and must *affirmatively establish the reasonable fit we require*.") (emphasis added).

In *Alameda Books*, the Supreme Court explained how a court should approach whether a law purporting to regulate the secondary effects of speech is content-neutral, and whether such a law is narrowly tailored:

> In *Renton*, the Court distinguished the inquiry into whether a municipal ordinance is content neutral from the inquiry into whether it is "designed to serve a substantial government interest and do[es] not unreasonably limit alternative avenues of communication." 475 U.S., at 47–54. The former requires courts to verify that the "predominate concerns" motivating the ordinance "were with the secondary effects of adult [speech], and not with the content of adult [speech]." *Id.*, at 47….The latter inquiry goes one step further and asks whether the municipality can demonstrate a connection between the speech regulated by the ordinance and the secondary effects that motivated the adoption of the ordinance. Only at this stage did *Renton* contemplate that courts would examine evidence concerning regulated speech and secondary effects. *Id.*, at 50-52.

535 U.S. at 440-41.   This case makes clear that content-neutral laws are subject to intermediate scrutiny, *id*. at 440 ("municipal ordinances receive only intermediate scrutiny if they are content neutral"), and under intermediate scrutiny the government has an *evidentiary* burden to demonstrate the connection between the regulation of speech and a substantial, independent government interest, *id*. at 439 (characterizing *Renton*'s burden on government to justify its regulation of speech as an "evidentiary requirement").

After a half-year discovery period, and sufficient time to prepare complete summary judgment motions, there is still no "explanation for how th[e] distinction between event and non-event signs advances the District's objective." *ANSWER III*, 798 F. Supp. 2d at 148.   The District has not properly explained how the regulations' distinction "advance[s] the content-neutral purpose the city asserts." *Id*. at 147.   Even if the Court is willing to defer to the District's "greater experience with and understanding of the secondary effects that follow certain protected speech," *Alameda Books*, 535 U.S. at 442, the District has given the Court nothing to which it can defer.   Taking the unsworn, conclusory statements of counsel at face value would completely obliterate the Court's "obligation to exercise independent judgment when First Amendment rights are implicated." *Turner*, 512 U.S. at 666.

Since this law touches on protected speech in a public forum, the Court cannot provide its own justification for the law based on what the District *might have* thought, or put the burden on the plaintiff to prove that the District could not have any non-discriminatory motives.   *Cf. Am. Bus Ass'n v. Rogoff*, 649 F.3d 734, 742 (D.C. Cir. 2011) (law did not implicate First Amendment and was "subject only to rational basis-review," under which "a legislature…need not actually articulate at any time the purpose or rationale supporting its classification.").   The First Amendment's public forum doctrine does not permit such deference.   *Perry*, 460 U.S. at 46.

### 5.   The District's 2011 amendments do not solve all the constitutional problems

The District amended the sign regulations in 2011 after this Court's opinion in *ANSWER III*.  Addressing the previous iteration of the law, *ANSWER III* suggested that "limit[ing] posters 'not related to a specific event' to a hanging time of sixty days[ ] is unproblematic." 798 F. Supp. 2d at 148.  It also suggested that "requiring posters related to events to be 'removed no later than thirty (30) days following the event' is straightforward.  A poster for an event that has already occurred is more likely to constitute litter and blight than a poster for a future event or a general political message." *Id*.  The Court was most worried by the fact that the regulations allowed posters relating an event to hang for an indefinite time before the event. *Id*.  This provision seriously undercut any possible argument that the event/non-event distinction could advance content-neutral interests in reducing litter, and since "the District has announced that elections qualify as 'events' under the new regulations this distinction could be seen as a way of resurrecting the old rules that prioritized election-related speech[.]" *Id*.

The District's latest amendments address some of these issues.  Rather than allowing an event poster to hang indefinitely before the event, all posters are subject to a one hundred eighty day durational limit.  Pl's SMF ¶ 8.  The only difference is that event posters must be removed within thirty days after the occurrence of the event, but these thirty days do not extend the 180-day limit.  *Id*.  This change may alleviate worries that the District is pushing the same unconstitutional preference for campaign signs in a less obviously discriminatory package.  The District's amended law combines two features the Court found less offensive—the time limit for non-event posters, and the 30-day post-event limit for event posters—and removes the feature the Court found most odious—allowing event posters to hang indefinitely pre-event.  *See ANSWER III*, 798 F. Supp. 2d at 148.

34

The District took commendable measures to address pressing constitutional concerns. Nevertheless, the regulations still distinguish between event and non-event signs without any admissible justification for this difference. They still regulate protected speech in a designated public forum. When the Court suggested that "[a] poster for an event that has already occurred is more likely to constitute litter and blight than a poster for a future event or a general political message," *id*. at 148, the Court was considering the District's Motion to Dismiss. In such a posture, the Court generally does not look at facts outside the pleadings. *See Nat'l Postal Professional Nurses v. U.S. Postal Service*, 461 F. Supp. 2d 24, 28 (D.D.C. 2006) ("When addressing a motion to dismiss under Rule 12(b)(6), the Court generally may not look outside the facts contained within the four corners of the complaint, unless it treats the motion to dismiss as a motion for summary judgment.") (internal citations and quotation marks omitted). The relevant inquiry there is whether the "complaint states a plausible claim for relief," *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009), not whether the moving party has shown "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law," Fed. R. Civ. P. 56(a). At summary judgment, however, the District has the burden of introducing evidence explaining how the regulations are narrowly tailored, and the court must look beyond the pleadings and briefs.

*ANSWER III* suggested that the most straightforward way to avoid constitutional problems would be to subject all posters to the same durational limits. *Id*. at 155 ("There is, of course, another alternative available to the District's officials. They can revise the regulations to include a single, across-the-board durational restriction that applies equally to all viewpoints and subject matters."). Granted, this is not the only option available to the District—with a proper content-neutral justification, it might constitutionally distinguish between event and non-event

signs.  Yet, when courts have approved of content-neutral sign regulations, they still subjected those laws to intermediate scrutiny.  If the District wants to treat different types of signs differently, it must provide evidence justifying this distinction.  *See id.* at 148 ("In the absence of an explanation for how this distinction between event and non-event signs advances the District's objective of litter prevention, the differential burdens imposed by §§ 108.5–108.6 present serious First Amendment concerns.")  The 2011 amendments, while a step in the right direction, did not obviate this requirement.

### 6.  MASF is entitled to summary judgment

MASF has met is summary judgment burden.  It has put forward undisputed facts showing that the District's regulations regulate protected speech in a designated public forum.  It has shown that the law facially makes distinctions between certain types of speech.  These questions are primarily legal—essentially, the Court need only apply the controlling law to the plain text of the regulations.  Pl.'s SMF ¶ 8; Def.'s SMF ¶¶ 5–6; Def.'s Opp'n to Pl.'s SMF 3. After the plaintiff makes this showing, the burden then shifts to the District to provide evidence justifying its law and demonstrating that it is narrowly-tailored to accomplish a significant content-neutral interest.  The District's complete failure to introduce evidence for which it would have the burden at trial means that the plaintiff is entitled to summary judgment now, and the Court should not further delay this matter.

*Cincinnati* held that the government has the burden of explaining the purposes of its law and how it achieves those purposes.  507 U.S. at 417.  With the burden now on the government, the District may not simply rest on its pleadings to oppose MASF's motion for summary

judgment.  One of the most-cited Supreme Court cases in history,[7] *Celotex Corp v. Catrett*, 477 U.S. 317 (1986), makes this clear.  The Supreme Court held:

> [T]he plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.  In such a situation, there can be "no genuine issue as to any material fact," since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial.  The moving party is "entitled to a judgment as a matter of law" because the nonmoving party has failed to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof.

477 U.S. at 322–23 (quoting Fed. R. Civ. P. 56(c)).  The Supreme Court elaborated:

> In cases…where the nonmoving party will bear the burden of proof at trial on a dispositive issue, a summary judgment motion may properly be made in reliance solely on the "pleadings, depositions, answers to interrogatories, and admissions on file."  Such a motion, whether or not accompanied by affidavits, will be "made and supported as provided in this rule," and Rule 56(e) therefore requires the nonmoving party to go beyond the pleadings and by her own affidavits, or by the "depositions, answers to interrogatories, and admissions on file," designate "specific facts showing that there is a genuine issue for trial."

*Id*. at 324 (quoting Fed. R. Civ. P. 56).  *Celotex* meant "to disapprove a line of cases allowing a party opposing summary judgment to resist a properly made motion by reference only to its pleadings," *id*. at 325—which the District tries to do by submitting no evidence whatsoever.

This case is over five years old.  This Court, after narrowing the remaining issues, opened a 120-day discovery period and set a schedule for dispositive motions.  Sched. Order, ECF No. 48.  The Court and the plaintiff put the District on notice that the purposes and operation of its regulations would be at issue.  *ANSWER III*, 798 F. Supp. 2d at 155 ("[T]he District will have an

---

[7] An empirical study found, as of June 2005, that *Celotex* is the second most frequently cited case of all time by federal courts and tribunals.  The first and third most cited cases—*Anderson v. Liberty Lobby, Inc*., 477 U.S. 242 (1986); and *Matsushita Elec. Indus. Co. v. Zenith Radio Corp*., 474 U.S. 574 (1986)—are related summary judgment opinions issued the same year.  Adam M. Steinman, *The Irrepressible Myth of* Celotex: *Reconsidering Summary Judgment Burdens Twenty Years After the Trilogy*, 63 WASH. & LEE L. REV. 81, 143 (2006).  These cases are often called the "*Celotex* Trilogy." *See id*. at 94.  As of November 2012, a WestLaw search returns over 154,000 federal cases citing *Celotex*.

opportunity [during discovery] to clarify…the relation of event/non-event distinction in §§ 108.5–108.6 to the anti-littering interest it asserts."); Pl.'s Notice of Dep. 2, May 3, 2012, ECF No 54-1 (requesting information on "[t]he purpose of the postering regulations; the asserted interests in promulgating the postering regulations" and "[h]ow, and to what extent, the event/non-event distinction advances and/or accomplishes the purpose(s) of the postering regulation.").[8] The District's complete failure to justify its law should not further delay this case. As the Second Circuit stated in a seminal case:

> If one may thus reserve one's evidence when faced with a motion for summary judgment there would be little opportunity "to pierce the allegations of fact in the pleadings" or to determine that the issues formally raised were in fact sham or otherwise unsubstantial. It is hard to see why a litigant could then not generally avail himself of this means of delaying presentation of his case until the trial. So easy a method of rendering useless the very valuable remedy of summary judgment is not suggested in any part of its history or in any one of the applicable decisions.

*Engl*, 139 F.2d at 473 (detailed in 10A WRIGHT, MILLER & KANE, FEDERAL PRACTICE & PROCEDURE § 2727 (3d ed. 2012)). The District may claim that it was mistaken, that it did not know that it had to produce evidence of anything. This is not a reason to deny MASF summary judgment. Following the Supreme Court's lead in *Cincinnati*, and the summary judgment precedent of *Celotex*, the Court holds that while the District "might be able to justify differential treatment" of signs relating to event and signs bearing a general message, "on this record [the District of Columbia] has failed to make such a showing." *Cincinnati*, 507 U.S. at 428. Therefore, MASF has shown there is "no genuine dispute as to any material fact and is…entitled to judgment as a matter of law," Fed. R. Civ. P. 56(a), and is entitled to summary judgment.

---

[8] The District refused to answer MASF's questions, instead moving for a protective order. Def.'s Mot. Protective Order, May 14, 2012, ECF No. 54. The Court's action today moots this motion, as addressed in a separate Memorandum and Order issued later this date.

**B.  MASF's Challenge that the Law is Unconstitutionally Vague**

MASF claims the District's sign regulations are unconstitutionally vague because they fail "to define what constitutes a sign to be 'related to a specific event,'" Pl.'s Mot. Summ. J. 1, and do not provide "sufficient guidance to the state's agents as to how to enforce the law," *id*. at 2.  MASF believes the regulations' definition of "event" provides neither potential speakers nor enforcement officers any real guidance, and this uncertainty chills a substantial amount of protected speech.  *Id*. at 33–34.  The Court agrees that the sign regulations are unconstitutionally vague, but rests its decision on narrower grounds than urged by MASF.  The most obvious problem with the regulations' definition of "event" is its explicit authorization of administrative discretion.  The sign regulations provide the following definition of "event":

> 108.13:  For purposes of this section, the term 'event' refers to an occurrence, happening, activity or series of activities, specific to an identifiable time and place, if referenced on the poster itself *or reasonably determined from all circumstances by the inspector.*

24 D.C. CODE MUN. REGS. § 108.13 (2012) (emphasis added).  By delegating some cases to the "reasonable determination" of individual inspectors, the District fails to assure potential speakers that it will enforce the sign regulations in an objective, predictable manner.  On this basis, the Court holds that the sign regulations facially lack the "precision and guidance…necessary so that those enforcing the law do not act in an arbitrary or discriminatory way," *F.C.C. v. Fox*, 132 S. Ct. at 2317, and MASF is entitled to summary judgment.

**1.  MASF's broader argument that the sign regulations are vague**

"Vagueness may invalidate a criminal law[9] for either of two independent reasons.  First, it may fail to provide the kind of notice that will enable ordinary people to understand what

---

[9] The District's sign regulations, 24 D.C. CODE MUN. REGS. § 108 (2012), constitute a penal statute.  *See Washington v. D.C. Dep't of Public Works*, 954 A.2d 945, 948 (D.C. 2008) (Litter Control Act, under which the sign regulations are authorized and issued, is a penal statute).

conduct it prohibits; second, it may authorize and even encourage arbitrary and discriminatory enforcement." *Morales*, 527 U.S. at 56.  MASF argues that the District's regulations are void for both kinds of vagueness, and seek to "demonstrate that the regulations are discretionary, subjective, and not outcome-determinative, fail to adequately constrain enforcement officials' discretion, authorize or encourage arbitrary and/or biased enforcement, and fail to provide notice to enable ordinary people seeking to engage in constitutionally protected free speech postering as to what signs will or will not be subject to financial penalties."  Pl.'s Mot. Summ. J. 2–3.

In support of their motion, MASF deposed four of the District's Solid Waste Inspectors, the government officials responsible for enforcing the sign regulations and issuing notices of violation.  *See* Pl.'s SMF ¶¶ 15–18; Def.'s Opp'n to Pl.'s SMF ¶¶ 15–18; *see also* Exs. 5–6 to Pl.'s Mot. Summ. J (documents on Solid Waste Inspector duties and background of individual deponents); Broome Dep., May 15, 2012, Ex. 7 to Pl.'s Mot. Summ. J.; Hood Dep., May 15, 2012, Ex. 8 to Pl.'s Mot. Summ. J.; Lee Dep., May 17, 2012, Ex. 9 to Pl.'s Mot. Summ. J.; Barber Dep., May 15, 2012, Ex. 10 to Pl.'s Mot. Summ. J.   Each deposition followed a similar pattern.  At the beginning of the examination, plaintiffs' counsel provided the deponent with a complete and current copy of the District's sign regulations, and allowed the deponent to refer to this exhibit at all times.  *See* Pl.'s Mot. Summ. J. 10; Pl.'s SMF ¶ 20; Def.'s Opp'n to Pl.'s SMF ¶ 20.  Plaintiff's counsel then presented each Inspector with a series of hypothetical signs and asked whether each sign was related to an event, which event, and when the regulations require the sign to be taken down.  *See* Pl.'s Mot. Summ. J. 10–33; Exs. 7–10 to Pl.'s Mot. Summ. J. (excerpts of deposition transcripts); Exs. 11–18 (hypothetical signs used in depositions).  MASF's counsel asked each Inspector about several types of potentially-troublesome signs, including signs referring to a candidate's name, signs which may be related to more than one

event, signs pertaining to future political events or a series of activities, and signs with hybrid content.  Pl.'s SMF ¶¶ 21–22; Def.'s Opp'n to Pl.'s SMF ¶¶ 21–22.  As MASF characterizes the examinations, the Solid Waste Inspectors provided conflicting statements on whether a sign relates to an event (and when it needs to come down), admitted that the regulations provide no guidance for particular signs in front of them, and frequently relied on their individual discretion to make close calls.  Pl.'s Mot. Summ. J. 10–33.

The plaintiff places significant weight on these depositions, dedicating most of its Motion for Summary Judgment to discussing them.  *Id.*  In summary, MASF claims that the Solid Waste Inspector depositions show:

> [N]ot even trained law enforcement officers responsible for issuing penalties through notices of violation can provide consistent applications of the regulations. Activists and organizations who wish to affix signs to lampposts have no notice as to how long a sign may remain posted under the regulations before the pain of financial sanction may be imposed.  They are at the mercy and punishment of these agents who, lacking any guidance, have no choice but to be arbitrary in their enforcement; and whose biases and discriminations, whether conscious or unconscious, are unchecked by clear regulations that properly constrain discretion.

*Id.* at 34–35.  MASF's vagueness challenge is broad.  There is no easy fix for the problem— according to MASF, the regulations are "hopelessly vague."  *Id.* at 2.  MASF does not say what would be an acceptable definition of "event," although it might be one providing clear guidance to the Solid Waste Inspectors regarding the hypothetical signs used during the depositions.

## 2.  The narrower grounds for finding the sign regulations vague

MASF's depositions yield interesting results and leave the reader with the impression that the sign regulations might be hopelessly vague.  Solid Waste Inspectors contradict each other— and sometimes themselves—when presented with the hypothetical signs.  *See id.* at 10–33. While MASF used "fake" posters, it based some of its hypotheticals on real world examples.  *See*

Pl.'s Reply 8–12 (submitting real examples of campaign signs that simply state name of candidate and office, without specifying date of related "event").

The Court must be careful when determining how much weight to give these depositions. While the Court does not think MASF's counsel tried to mislead or confound the Solid Waste Inspectors, the Inspectors might be more easily confused in the unfamiliar context of a formal deposition. It is hard to determine how much of the Inspectors' confusion comes from the form of the depositions, rather than the regulations themselves. It is also hard to determine how much of the Inspectors' confusion comes from the regulations' definition of event, rather than the regulations' delegation of administrative discretion. Would the Inspectors have turned to their individual "reasonable determination" so quickly if the statute did not tell them they could do so? On several occasions, the Inspectors state that the sign regulations specifically allow them to use their personal judgment, and use this to justify moving away from any objective, codified standards.[10] While not direct evidence that the sign regulations are vague, this testimony suggests problems with the guidance the law provides to enforcement officers.

When considering whether a statute is unconstitutionally vague, the Court should start with the text of the statute. *Cf. Forsyth*, 505 U.S. at 133 ("[T]he success of a facial challenge on the grounds that an ordinance delegates overly broad discretion to the decision maker rests not on whether the administrator has exercised his discretion in a content-based manner, but whether

---

[10] *See, e.g.*, Broome Dep. 31:18–22 ("Q: You would—as an enforcement officer, sir, you have the reasonable discretion, though, when you come across this exact same poster, 1-E, to treat it as a sign of general support for Graham, don't you?…A: Yes."); *Id.* at 38:7–38:19 ("Q. Where in the regulations does it suggest that you are constrained in any way? A. It doesn't constrain me in the regulations. It says I can use my judgment…. Q. Someone else's exercise of discretion and judgment might lead them to another reasonable conclusion, that is, it's related to the general election; correct? A. Correct."); Hood Dep. 15:19–17:19 ("Q. And as you apply the regulations as an enforcement officer, what's the removal date appropriate for this sign? A. It would actually be—it would be my discretion between 108.5 and 108.6…. Q. And the rules leave it up to you because of the nature of the sign, as to which one you might reasonably apply; correct? A. Yes.").

there is anything in the ordinance preventing him from doing so.").  If the text of the statute—as interpreted—indicates that the law is vague, there may be no need for extrinsic evidence.  In fact, several courts have disapproved of looking at anything other than the words of the law when facing a facial challenge.  *See* Def.'s Reply 5–6 (collecting cases from outside D.C. Circuit).  Furthermore, when considering a facial constitutional challenge, the Court should exercise "judicial restraint" to avoid "'unnecessary pronouncement on constitutional issues'" and "'premature interpretations of statutes.'"  *Washington State Grange*, 522 U.S. at 450 (quoting *Raines*, 362 U.S. at 22).  When faced with a broad constitutional challenge, a court should try to resolve the issue on narrower grounds if possible.  *See*, *e.g.*, *Plaut v. Spendthrift Farm, Inc.*, 514 U.S. 211, 217–18 (1995) (Court first considers narrowest of alternate grounds submitted for claim that congressional statute is unconstitutional); *Shelby Co., Ala. v. Holder*, 679 F.3d 848, 868–69 (D.C. Cir. 2012) ("courts will avoid deciding constitutional questions…if the litigation can be resolved on narrower grounds").

Therefore, the Court turns to the text of the sign regulations, which provide:

108.13:  For purposes of this section, the term 'event' refers to an occurrence, happening, activity or series of activities, specific to an identifiable time and place, if referenced on the poster itself or reasonably determined from all circumstances by the inspector.

24 D.C. CODE MUN. REGS. § 108.13 (2012).  At first glance, this definition of event may seem acceptable.  After all, the Constitution does not require "perfect clarity and precise guidance… even of regulations that restrict expressive activity."  *Ward,* 491 U.S. at 794.  The District argues that ordinary people know what an "event" is and understand what it means for a poster to be "related to an event."  *See* Def.'s Opp'n to Pl.'s Mot. Summ. J. 9 (citing *Hill*, 530 U.S. at 732 ("The likelihood that anyone would not understand any of those common words seems quite remote.")).  The District defines an "event" as "an occurrence, happening, activity or series of

activities, specific to an identifiable time and place[.]"  24 D.C. CODE MUN. REGS. § 108.13 (2012).  While this definition is not absolutely comprehensive, it does not need to be.  *See Thomas*, 864 F.2d at 195 (laws "cannot, in reason, define proscribed behavior exhaustively or with consummate precision").  MASF argues the Inspector depositions show that this definition is inadequate, Pl.'s Mot. Summ. J 33–35.  But the District could counter that "speculation about possible vagueness in hypothetical situations not before the Court will not support a facial attack on a statute when it is surely valid 'in the vast majority of its intended applications.'"  *Hill*, 530 U.S. at 733 (quoting *Raines*, 362 U.S. at 23).

The Court need not determine whether defining "event" as "an occurrence, happening, activity or series of activities, specific to an identifiable time and place," 24 D.C. CODE MUN. REGS. § 108.13 (2012), could be sufficient.  If the District had stopped there, this would be a closer case.  The regulations' definition of event continues, stating that an "'event' refers to an occurrence, happening," et cetera, "if referenced on the poster itself or reasonably determined from all circumstances by the inspector."  *Id.*  Since this explicitly delegates discretion, it provides the Court a narrower ground for finding the law unconstitutionally vague.[11]

The regulations allow a poster to be related to an event, even if the poster itself does not reference an event, if "reasonably determined from all circumstances by the inspector."  24 D.C. CODE MUN. REGS. § 108.13 (2012).  This is a clear example of the kind of administrative discretion that the Due Process Clause and First Amendment abhor.  *See, e.g.*, *Kolender*, 461 U.S. at 358.  Using the modifier "reasonable" does not provide enough guidance.  Telling an officer to act "reasonably" does not provide objective criteria cabining his discretion.

---

[11] Again, if the regulations ended with "if referenced on the poster itself," this would be a closer case.  MASF might argue that the law does not make it clear when an event is "referenced on the poster itself."  But the District could counter that imagining remote scenarios where the law is not perfectly clear does not mean the law is facially vague. *See Williams*, 554 U.S. at 305 ("Close cases can be imagined under virtually any statute.").

Reasonable people frequently come to different conclusions.  While MASF would not want the enforcement officers to act *unreasonably*, MASF might still worry about uneven and inconsistent implementation of the sign regulations; this fear could substantially chill protected speech.  *See Reno*, 521 U.S. at 871–72.  Moreover, the inspector is allowed to draw on "all circumstances" when making this "reasonabl[e] determin[ation]." 24 D.C. CODE MUN. REGS. § 108.13 (2012). The inspectors are not limited to considering clear, objective criteria when deciding whether a sign relates to an event.  Since the inspectors may look at "*all* circumstances," this suggests they may consider whatever they find relevant as long as they come to a "reasonable" determination.

If a law presents a constitutional issue, a court should construe the statute—if possible— to avoid the constitutional problem.  Courts assume that legislatures do not intend to pass unconstitutional laws, and this assumption acts as an interpretive tool.  *See, e.g., Edward J. DeBartolo Corp. v. Florida Gulf Coast Bldg. & Constr. Trades Council*, 485 U.S. 568, 575 (1988).  This canon does not work when its application would, in effect, rewrite the law.  *See Clark v. Martinez*, 543 U.S. 371, 385 (2005) ("The canon of constitutional avoidance comes into play only when, after the application of ordinary textual analysis, the statute is found to be susceptible of more than one construction; and the canon functions as *a means* of *choosing between them.*") (emphasis in original).  Here, the Court cannot avoid the constitutional problems without doing considerable violence to the text, and must find the regulations' delegation of discretion unconstitutional.  The District admits that "there exist no additional policies, rules, staff instructions, guidance or any documents or communications which further constrain the term 'event' or define what characteristics render a sign to be 'related to a specific event.'  There are no limiting or interpretive materials beyond what appears…on the face of the regulation

itself."  Pl.'s Reply 5; *see also* Def.'s Resps. to Pl.'s First Set of Reqs. 10–11, Mar. 13, 2012, ECF No. 60-3 (Ex. 4 to Pl.'s Mot. Summ. J.) (Requests for Admission Nos. 2 & 3).

If the Court construed the sign regulations to avoid constitutional problems about unfettered discretion, it would have to add or delete text.  When engaging in statutory construction, courts are limited to interpreting the language before them; they may not drastically re-write the statute to save it from its drafters.  *Stevens*, 130 S. Ct. at 1591–92 ("We will not rewrite a law to conform it to constitutional requirements, for doing so would constitute a serious invasion of the legislative domain, and sharply diminish Congress's incentive to draft a narrowly tailored law in the first place.") (alterations, citations and quotation marks omitted).

One might avoid the constitutional problem by limiting the Inspectors' "reasonabl[e] determin[ation]" to the definition listed elsewhere in the regulations.  That is, an Inspector may reasonably determine that a poster is related to an event only if the poster itself references "an occurrence, happening, activity or series of activities, specific to an identifiable time and place[.]"  24 D.C. CODE MUN. REGS. § 108.13 (2012).  This construction replaces subjective judgment with objective criteria.  Since it relies on language from the regulations to limit the Inspectors' discretion, it stays closer to the intent of the District.  This construction, however, basically makes a significant portion of the text inoperative.  If the Inspectors are restricted to deciding whether posters reference an "event" as described by § 108.13, why tell them they can draw on "all circumstances" to "reasonably determine[]" what an event is?  24 D.C. CODE MUN. REGS. § 108.13 (2012).  If "all circumstances" simply means what is explicitly listed in the regulations, then "all circumstances" is basically surplus, inoperative language.  This construction would "violate[] the established principle that a court should give effect, if possible, to every clause or word of a statute."  *Moskal v. United States*, 498 U.S. 103, 109 (1990)

(internal quotation marks omitted).  The Court could read the impermissible discretion out of the regulations, but doing so would read a significant part of the text out of the regulations.  *Cf. Clark*, 543 U.S. at 384 ("If we were…free to 'interpret' statutes as becoming inoperative when they 'approach constitutional limits,' we would be able to spare ourselves the necessity of ever finding a statute unconstitutional as applied.  And the doctrine that statutes should be construed to contain substantive dispositions that do not raise constitutional difficulty would be a thing of the past; no need for such caution, since—whatever the substantive dispositions are—they become inoperative when constitutional limits are 'approached.'")

Furthermore, the sign regulations' use of "or" weighs against minimizing the grant of discretion.  An "'event' refers to an occurrence, happening," et cetera, "if referenced on the poster itself *or* reasonably determined from all circumstances by the inspector."  24 D.C. CODE MUN. REGS. § 108.13 (2012) (emphasis added).  A basic canon of statutory construction provides that, typically, "and" joins a conjunctive list, and "or" joins a disjunctive list.  *See* ANTONIN SCALIA & BRYAN A. GARNER, READING LAW: THE INTERPRETATION OF LEGAL TEXTS 116 (2012).  Since an event is something "referenced on the poster itself" *or* "reasonably determined…by the inspector," 24 D.C. CODE MUN. REGS. § 108.13, this suggests that the administrative discretion is somehow distinct from the rest of the subsection.  It suggests that an Inspector, if making a reasonable determination from all circumstances, can decide that a poster relates to an event even if that poster does not clearly list the time and place of the event.  But if the Court construed the regulations to limit the Inspectors' discretion to strictly applying what has already been listed, it would effectively turn that "or" into an "and"—in violation of the general understanding of what "or" means in statutes.

There might be another way to avoid the constitutional problem.  Instead of effectively nullifying part of the regulations, the Court could interpret "reasonable" and "circumstances" to provide clear, objective criteria to enforcement officers.  This would preserve the text—the grant of discretion would still have some independent effect—and offer clear guidance to enforcement officers and potential speakers.  However, if the Court did this it would essentially rewrite the statute.  The terms "reasonably determined" and "all circumstances" do not give the Court enough to develop sufficiently clear standards.  In order to achieve the required level of precision, the Court would need to provide its own criteria.  In doing so, the Court would go beyond merely construing the statute, and would engage in lawmaking.  This is not permissible, even to save a statute from unconstitutionality.  *See*, *e.g.*, *United States v. Locke*, 471 U.S. 84, 96 (1985) ("We cannot press statutory construction 'to the point of disingenuous evasion' even to avoid a constitutional question."); *Stevens*, 130 S. Ct. at 1591 ("We will not rewrite a law to conform it to constitutional requirements[.]")

> In response to MASF's discovery requests, the District admitted:
>
> For the purposes of determining the date by which a poster must be removed, the postering regulations allow an enforcement agent to use reasoning and discretion and to consider any and all circumstances believed or known to the inspector in order to "reasonably determine[] from all circumstances" whether a sign is "related to a specific event" and what the date of the referenced specific event is.

Def.'s Resps. to Pl.'s First Set of Reqs. 12 (Request for Admission 10).  Combined with the District's admission that there are no other materials construing the definition of "event," *id*. at 10–11 (Reqs. 2 & 3), this suggests that the District may interpret its statute as granting Inspectors administrative discretion above and beyond merely applying the plain text of the regulations.  It at least suggests that the District does not place a narrow limiting construction on § 108.13.

The District argues that "[t]he fact that the inspectors here…may have some discretion in enforcing the regulations is immaterial." Def.'s Opp'n to Pl.'s Mot. Summ. J. 9. It is "common sense that all police officers must use some discretion in deciding when and where to enforce city ordinances," *Morales*, 527 U.S. at 62 n.32, and "[a]s always, enforcement requires the exercise of some degree of police enforcement," *Grayned*, 408 U.S. at 114. No statutory definition of "event" can cover every possible scenario, and an overly-verbose definition might serve to confuse more than clarify. Courts recognize that legislatures can never obviate the need for police officers to make reasonable, on-the-beat judgments about whether certain conduct violates the law. However, there is a difference between recognizing that administrative discretion is inevitable and writing that discretion into the law.

The District cites cases outside the First Amendment to argue that the inspectors' discretion is immaterial. Def.'s Opp'n to Pl.'s Mot. Summ. J. 9–10 (citing *Town of Castle Rock v. Gonzales*, 545 U.S. 748, 761 (2005) (interest at stake asserted under procedural component of Due Process Clause); *Morales*, 527 U.S. at 62 n.32 (vagrancy law does not implicate First Amendment rights, but a liberty interest protected by the Due Process Clause of the Fourteenth Amendment)). [12] Courts apply the vagueness doctrine with special exactitude when First Amendment interests are at stake. *See, e.g., F.C.C. v. Fox*, 132 S. Ct. at 2317 ("When speech is involved, rigorous adherence to th[e] requirements [of the vagueness doctrine] is necessary to

---

[12] The District also cites *Grayned v. City of Rockford*—a First Amendment case—for the proposition that "enforcement requires the exercise of some degree of police judgment." 408 U.S. at 114. This recognition that some discretion is inevitable is *not* an endorsement of the District's position. Elsewhere in *Grayned*, the Supreme Court emphasized the need to hold laws affecting First Amendment interests to a higher standard: "[W]here a vague statute abuts upon sensitive areas of basic First Amendment freedoms, it operates to inhibit the exercise of those freedoms;" *id.* at 109 (internal quotation marks omitted) and "Where First Amendment interests are affected, a precise statute evincing a legislative judgment that certain specific conduct be proscribed assures us that the legislature has focused on the First Amendment interests and determined that other governmental policies compel regulation." *Id.* at 109 n.5 (internal quotation marks and citations omitted).

ensure that ambiguity does not chill protected speech."); *Sharkey's*, 265 F. Supp. 2d at 990 ("[T]he Supreme Court has stated that the vagueness doctrine should be applied with special exactitude where a statute might impinge on basic First Amendment freedoms.").

When First Amendment rights are at issue, the government must strive to be clear and precise.  It should cabin discretion to ensure that its law is enforced fairly and predictably.  It cannot simply allow each officer to independently decide whether certain speech runs afoul of the law.  Even if the officers apply the law in good faith—without discriminatory motive or bias—the possibility of inconsistent enforcement can chill speech.  The District's broad grant of administrative discretion to its Inspectors raises serious Due Process concerns.  The Court cannot find a way to construe the law to avoid this constitutional problem, and must hold that § 108.13 is unconstitutional.

### 3.   MASF is entitled to summary judgment

While MASF puts significant weight on the depositions of Solid Waste Inspectors, and the testimony raised some interesting points, the vagueness issue can be resolved by looking only at the words of the sign regulations.  The District states that there is nothing outside of the regulations that interprets or constrains the regulations.  Def.'s Resps. to Pl.'s First Set of Reqs. 10–11 (Requests for Admission Nos. 2 & 3).  The District has submitted no relevant limiting construction that any court has placed on the sign regulations, nor has this Court found any.

By applying the principles of statutory construction and the vagueness doctrine to the plain text, the Court determines that the sign regulations delegate administrative discretion to individual enforcement officers in violation of the Due Process Clause.  This Court, and the Court of Appeals, have previously found that MASF has standing to bring this facial challenge. *ANSWER II*, 589 F.3d at 435–36; *ANSWER III*, 798 F. Supp. 2d at 143.  The Court decided the

issue on narrower grounds not requiring the consideration of any extrinsic evidence. The question being essentially legal, not factual, MASF has sufficiently shown it is entitled to summary judgment on this issue. *See United States v. Phillip Morris USA, Inc.*, 327 F. Supp. 2d 13, 17 (D.D.C. 2004) ("[S]ummary judgment is appropriate for purely legal questions."); *325–343 56th Street Corp. v. Mobil Oil Corp.*, 906 F. Supp 669, 679 (D.D.C. 1995) ("When the unresolved issues are primarily legal rather than factual, summary judgment is particularly appropriate. Such issues include matters turning on statutory interpretation.") (citations omitted).

### C. MASF's Challenge that the Law is Unconstitutionally Overbroad

MASF also argues that the District's sign regulations are unconstitutionally overbroad. Under traditional overbreadth doctrine, a law touching First Amendment concerns would be invalid if a "substantial number of its applications are unconstitutional, judged in relation to the statute's plainly legitimate sweep." *Washington State Grange*, 552 U.S. at 449 n.6. The doctrine of substantial overbreadth creates an exception to the traditional facial challenge, where the party challenging the law must show that there is "no set of circumstances under which the law would be valid." *Salerno*, 481 U.S. at 745. Because of concerns about chilling protected speech, such a strong showing is not required in free speech cases. *See Stevens*, 130 S. Ct. at 1587. When determining whether a law is substantially overbroad, a court must "construe the challenged statute," *Williams*, 553 U.S. at 293, and consider "whether the statute, as [the court has] construed it, criminalizes a substantial amount of protected expressive activity," *id*. at 297.

MASF relies primarily on cases that intertwine overbreadth with vagueness, quoting the following language:

> [A] party [may] challenge an ordinance under the overbreadth doctrine in cases where every application creates an impermissible risk of suppression of ideas, such as an ordinance that delegates overly broad discretion to the decisionmaker,

and in cases where the ordinance sweeps too broadly, penalizing a substantial
amount of speech that is constitutionally protected.

*Boardley*, 615 F.3d at 513 (quoting *Forsyth*, 505 U.S. at 129) (quoted in Pl.'s Mot. Summ. J. 38).

While Courts sometimes conflate overbreadth and vagueness, it is important to remember that

the doctrines are distinct.  A vague law may be overbroad—through its imprecision, it may have

a large number of unconstitutional applications.   One often accompanies the other, but not

always.  In this case, the problem is not that the law is overbroad; in order for the District to

make the regulations constitutional, it does not necessarily have to narrow their sweep.  A law

applying the thirty-day restriction to all "event" signs could be constitutional if enforcement

officers and the public had clear guidance on what constituted an "event" sign, and the District

properly justified the distinction.  A law placing an across-the-board restriction on all signs could

be constitutional, even though this change does not necessarily "narrow" the law's sweep.

Therefore, it would be analytically incorrect to say that the sign regulations are

"substantially overbroad."  Clarifying this does not significantly alter the plaintiff's position—

often, MASF called the sign regulations "overbroad" when making an argument about vagueness

and administrative discretion.  Clarifying this does not change the ultimate result—the sign

regulations' event/non-event distinction and definition of event are still unconstitutional.

### D.  Severability of the District's Sign Regulations

The Court has found that the District's differential treatment of signs relating to an event

and signs bearing a general message is an unconstitutional regulation of speech in a designated

public forum, and explicitly delegates overly broad discretion to individual decisionmakers.

Now the Court must consider whether it can sever the unconstitutional aspects of the law from

the remainder of the statute, and if the law is severable, the Court must make clear which

provisions it finds unconstitutional.

"Generally speaking, when confronting a constitutional flaw in a statute," courts "try to limit the solution to the problem," severing any "problematic portions while leaving the remainder intact." *Ayotte v. Planned Parenthood of Northern New Eng.*, 546 U.S. 320, 328–329 (2006). "Whether an unconstitutional provision is severable from the remainder of the statute in which it appears is largely a question of legislative intent, but the presumption is in favor of severability." *Regan v. Time, Inc.*, 468 U.S. 641, 653 (1984). The "invalid portions of a statute are to be severed '[u]nless it is evident that the [l]egislature would not have enacted those provisions which are within its power, independently of that which is not.'" *I.N.S. v. Chadha*, 462 U.S. 919, 931–32 (1983) (quoting *Buckley*, 424 U.S. at 108). A legislature "could not have intended a constitutionally flawed provision to be severed from the remainder of the statute if the balance of the legislation is incapable of functioning independently." *Alaska Airlines, Inc. v. Brock*, 480 U.S. 678, 684 (1987). "The more relevant inquiry in evaluating severability is whether the statute will function in a manner consistent with the intent" of the legislature after the court severs the unconstitutional provisions. *Id.* at 685. When the legislature "has explicitly provided for severance by including a severability clause in the statute" this heightens the presumption in favor of severability. *Id.* at 686. The "absence of a severability clause, however…does not raise a presumption against severability." *Id.* If "[t]he unconstitutionality of a part of an Act does not necessarily defeat or affect the validity of its remaining provisions, the normal rule is that partial, rather than facial, invalidation is the required course." *Free Enter. Fund v. Pub. Co. Accounting Oversight Bd.*, 130 S. Ct. 3138, 3161 (2010) (internal citations and quotation marks omitted).

The first step is to clearly identify the unconstitutional provisions, so the Court can consider what the law would look like without those provisions. The law in question is Section

108 of the D.C. Code of Municipal Regulations, titled "Signs, Posters, and Placards;" it currently has thirteen subsections authorizing and regulating the posting of signs on public lampposts. *See* Ex. 3 to Pl.'s Mot. Summ. J.; 24 D.C. CODE MUN. REGS. §§ 108.1–13 (2012). At this stage, MASF only challenges the regulations' distinction between event and non-event posters, and the regulations' definition of event. Pl.'s Mot. Summ. J. 1–3. Sections 108.5 and 108.6 draw the key distinction:

> 108.5: A sign, advertisement, or poster shall be affixed for no more than one hundred eighty (180) days.

> 108.6: A sign, advertisement, or poster related to a specific event shall be removed no later than thirty (30) days following the event to which it is related. This subsection is not intended to extend the durational restriction in subsection 108.5.

24 D.C. CODE MUN. REGS. §§ 108.5–6 (2012). Furthermore, the regulations define event as:

> 108.13: For purposes of this section, the term 'event' refers to an occurrence, happening, activity or series of activities, specific to an identifiable time and place, if referenced on the poster itself or reasonably determined from all circumstances by the inspector.

*Id.* at 108.13. These provisions are at issue.

The Court finds that subsections 108.6 and 108.13 are severable from the rest of the sign regulations. Since the District's lampposts are a designated—not traditional—public forum, declaring the entire law void might forbid the posting of *any* sign on the District's lampposts.[13] In the alternative, voiding the entire law may open the lampposts to all comers, without any of the reasonable protections and limitations afforded by Section 108. The Court does not believe

---

[13] One could argue that the sign regulations are what designate the lampposts as a public forum in the first place, and in the absence of a law authorizing limited political speech, no one would have a free-standing "right" to post there. 24 D.C. CODE MUN. REGS. §§ 108.4 (2012) ("Any sign, advertisement, or poster that does not relate to the sale of goods or service may be affixed on public lampposts or appurtenances of a lamppost, subject to the restrictions set forth in this section."); *cf. Taxpayers for Vincent*, 466 U.S. at 815 (utility poles are not a traditional public forum and government may completely forbid the posting of signs thereupon).

that the District intended—in the absence of the event-based restrictions—to either completely open or completely close the District's lampposts as a forum for speech.  The sign regulations might still "function in a manner consistent with the intent" of the District without subsections 108.6 and 108.13.  *Brock*, 480 U.S. at 685.  Certainly, the District might prefer to subject event signs to the shorter periods provided by § 108.6, but the District could still be protected by the generally-applicable limit imposed by § 108.5.[14]  The law is not made nonsensical or inoperative by severing subsections 108.6 and 108.13, and does not result in a law that the Court feels the District could not have intended.

The vast majority of the regulations' remaining 11 subsections make complete sense after excising subsections 108.6 and 108.13.  The regulations' prohibition of posting on trees (§ 108.2), ban on indecent signs (§ 108.3), regulation of adhesives (§ 108.9), et cetera, do not depend on the regulations' event/non-event distinction.  Only one subsection need be modified after the Court severs subsections 108.6 and 108.13 from the law:

> 108.11:  Within twenty-four hours of posting each sign, advertisement, or poster, two (2) copies of the material shall be filed with an agent of the District of Columbia so designated by the Mayor.  The filing shall include the name, address, and telephone number of the originator of the sign, advertisement, or poster, *and if the sign is for an event, the date of the event*.

24 D.C. CODE MUN. REGS. §§ 108.11 (2012) (emphasis added).[15]  The District added the italicized text to subsection 108.11 after the Court's July 2011 motion to dismiss ruling.  D.C. MUN. REGS. tit. 58, § 8410 (Sept. 30, 2011).  This language depends on the unconstitutional distinction between event and non-event posters, and the Court believes that the District would

---

[14] MASF does not challenge the across-the-board durational limit imposed by § 108.5, but challenges the differential treatment between signs that fall under § 108.5 and event signs under § 108.6.

[15] Neither the District or MASF paid much attention to this provision.  The District did not argue that it relies on the "event dates" designated in the filings to determine when a poster must come down.

not have intended to add it if subsections 108.6 and 108.13 were not part of the law; this language should be severed from the rest of the law.

It is possible to sever the sign regulations' unconstitutional provisions without making the rest of the law inoperable or unreasonable.  Having found the sign regulations' event/non-event distinction and definition of event unconstitutional, the Court holds subsections 108.6 and 108.13 unconstitutional but severable from the rest of Section 108.   Furthermore, the portion of subsection 108.11 reading "and if the sign is for an event, the date of the event," is solely related to the unconstitutional distinction drawn by subsection 108.6, but severable from the rest of Section 108.  Therefore subsections 108.1–5, 108.7–10, and 108.12 (inclusive) shall remain in effect.   Subsection 108.11 shall remain in effect after the language referencing "events" is excised from the provision.

## IV.    CONCLUSION

When the District first passed its sign regulations in 1980, it expressed a clear preference for candidates seeking political office.   24 D.C. CODE MUN. REGS. § 108 (1980).   After ANSWER—and later MASF—challenged the sign regulations, the District took steps to fix the problems in its law.  Unfortunately, after five years of litigation and four amendments to the sign regulations, the law still fails First Amendment and Due Process scrutiny.

The Court lauds the District for opening its lampposts to political messages, when it might have never designated them a public forum in the first place.  The Court commends the District's Department of Transportation for repeatedly amending the sign regulations to bring the law closer to constitutionality.

But once the District opens up public property to political speech, it has a responsibility to be fair, even, and precise in its regulations.   If it chooses to make distinctions between

different types of speech—even if its distinctions might appear benign—it must justify why it treats different kinds of speech differently, and explain how this distinction furthers its significant interests.   When treading on First Amendment interests, it should strive to limit administrative discretion, not codify and endorse it.  In order to avoid chilling protected speech, the regulations must be clear, and provide objective standards for enforcement.

The District has a considerable interest in regulating how signs are posted on its lampposts.  Speakers do not have a right to post signs wherever and however they want, but can be restrained by reasonable time, place and manner restrictions.   Not every law that treats different types of speech differently is an impermissible content-based limitation.  When a law is narrowly tailored to serve significant content-neutral interests, and leaves open ample alternative channels of communication, it can pass intermediate scrutiny.

MASF has a strong interest in knowing that the District will implement the sign regulations in a predictable, consistent, and objective manner.  The fear of inconsistent, uneven enforcement can have a serious chilling effect on speech.  The nature of speech at issue increases the chance of inconsistent applications.  If MASF posts signs throughout the District, several different Solid Waste Inspectors will see the signs.   As the depositions indicate, different Inspectors may come to different conclusions about the same signs.  Furthermore, MASF has an interest in knowing that, when the District decides to place restrictions on protected speech, it has seriously considered those restrictions.   Requiring the District to show that its law is narrowly tailored forces the government to consider whether it can achieve its goals by a less restrictive means.  It forces the District to consider the effect of its speech regulations, and look more closely at whether those regulations are necessary.

The Court rests its decision on narrower grounds than urged by MASF.  The Court must exercise restraint and not unnecessarily decide extraneous matters.  At this point, the Court does not decide whether the District could justify its event/non-event distinction if it properly explained how its law is narrowly tailored to promote litter control and esthetics.  The Court does not decide whether the regulations' definition of "event"—if it did not explicitly delegate administrative discretion to inspectors—would be sufficient.

The Court hopes that it has provided the District some guidance going forward.  The District may keep the law as is, with one across-the-board durational limit applying to all signs.  It may reenact the event/non-event distinction—and an amended definition of event—and be prepared to explain the fit between the distinction and the law's purposes.  But the District may not regulate protected speech in a designated public forum without being able to show that the law is narrowly tailored, and it may not allow officers to exercise broad individual judgment when enforcing the law.

For the reasons explained in this Memorandum Opinion, the Court will grant in part the plaintiff's Motion for Summary Judgment, ECF No. 60, and deny in toto defendant's cross-Motion for Summary Judgment, ECF No. 59.

A separate Order consistent with this Memorandum Opinion shall issue this date.

Signed, Royce C. Lamberth, Chief Judge, November 29, 2012.